1
2
3
4

POMERANTZ LLP
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

5
6

*Counsel for Lead Plaintiff Altimeo Asset*
*Management and Lead Counsel for the Class*

7

(*additional counsel on signature page*)

8
9

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

10

11
12
13
14
15
16
17
18
19

| | |
|---|---|
| EMAL HAIDERI, Individually and on behalf of all others similarly situated,<br><br>                                        Plaintiff,<br><br>                v.<br><br>JUMEI INTERNATIONAL HOLDING LIMITED, LEO OU CHEN, SHENQUAN REN, SEAN SHAO, MANG SU, and ADAM J. ZHAO,<br><br>                            Defendants. | Case No.: 3:20-cv-02751-EMC<br><br>SECOND AMENDED CLASS ACTION COMPLAINT<br><br><u>CLASS ACTION</u><br><br>Judge:  Hon. Edward M. Chen<br>Courtroom:  5 – 17th Floor |

20
21
22
23
24
25
26
27
28

**TABLE OF CONTENTS**

I.      INTRODUCTION ......................................................................................... 1

II.     JURISDICTION AND VENUE ................................................................... 7

III.    PARTIES ...................................................................................................... 7

IV.     OTHER RELEVANT ENTITIES ................................................................ 8

V.      SUBSTANTIVE ALLEGATIONS .............................................................. 9

        A.      Jumei's Background ......................................................................... 9

                1.      Chen's Long-Term Effort to Take Jumei Private ................... 10

                2.      The Jiedian Acquisition ........................................................ 12

                3.      Jumei's Other Recent Investments ........................................ 14

                4.      Jumei's Business Prior to the Buyout ................................... 15

                        a.      *Jumei's Successful Jiedian Power Bank Business* ...... 15

                        b.      *Jumei's Large Cash Reserve* ................................... 17

                        c.      *Jumei's Valuable E-Commerce Business* ................. 17

        B.      The Buyout ...................................................................................... 19

        C.      Insider Interests in the Buyout ....................................................... 22

        D.      The Recommendation Statement Falsely Described Chen's Offer Price as "Fair"
                to Jumei's Shareholders .................................................................. 23

                1.      The Buyout Fulfills Chen's Plan to Underpay Shareholders for the
                        Company ............................................................................... 25

                2.      Houlihan Lokey's and the Special Committee's False and Misleading
                        Analysis ................................................................................ 26

                3.      Defendants Provided False Projections for Jiedian ............... 30

                        a.      *Jumei's Management Falsely Assumed that Jiedian Did Not Have
                                Adequate Financing Available* ................................ 34

                                i.      Jumei Was Engaged in Negotiations to Sell Jiedian to One
                                        of the Company's Main Competitors ............................ 34

                                ii.     Jiedian Also Had Other Financing Opportunities
                                        Available .................................................................. 35

                        b.      *The Jiedian Financial Projections Were False Regardless of the
                                Availability of Additional Financing* ......................... 40

                        c.      *Houlihan's Analysis of Jiedian Was Tainted Even Further by the
                                Irrelevant Companies it Chose for Its Selected Companies
                                Analysis* .................................................................. 42

          *d.*     *The Recommendation Statement Incongruously Claims That Chen Was Not Aware of the Jiedian Financial Projections* .................. 46

      4.     Defendants Provided False Information for Jumei's Other Businesses ... 47

VI.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS ....... 54

      1.     Statements Related to the Fairness of the Buyout and Valuation of Jumei's Businesses ................................................................................... 54

          *a.*     *Fairness Statements* ..................................................... 54

          *b.*     *Inputs For the Fairness Analysis* ................................. 56

              i.     Materially False and Misleading Information Related to Jiedian .................................................. 56

              ii.    Materially False and Misleading Information Related to Jumei's "Other Businesses" ................................ 57

          *c.*     *Reasons Why Defendants' Statements Related to the Fairness of the Buyout and Valuation of Jumei's Businesses Were Materially False and Misleading* ...................................................... 58

      2.     Statements Concerning the Absence of Plans or Negotiations Related to Jiedian ......................................................................................... 59

      3.     Disclosures Concerning the Existence of Appraisal Rights ................... 60

          *a.*     *The Individual Appraisal Rights Disclosures* ............................. 61

          *b.*     *Reasons Why The Foregoing Appraisal Rights Statements Are False And   Misleading* ................................................ 65

VII.   DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS CAUSED PLAINTFF'S LOSSES ................................................................... 70

VIII.  SCIENTER ALLEGATIONS RELEVANT TO SECTION 10(b) CLAIM .................. 72

      A.    Motive and Opportunity ........................................................................ 72

      B.    The Individual Defendants' Knowledge, Recklessness, and Involvement in the Fraudulent Buyout ............................................................................ 73

IX.    APPLICABILITY OF THE PRESUMPTION OF RELIANCE ..................................... 76

X.     NO SAFE HARBOR ............................................................................................... 79

XI.    CLASS ACTION ALLEGATIONS ........................................................................ 80

XII.   COUNT I ................................................................................................................ 81

XIII.  COUNT II ............................................................................................................... 84

XIV.  COUNT III .............................................................................................................. 84

XV.   PRAYER FOR RELIEF ......................................................................................... 85

XVI.  DEMAND FOR TRIAL BY JURY ........................................................................ 86

Lead Plaintiff Altimeo Asset Management ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, announcements made by Defendants, filings with Securities and Exchange Commission ("SEC"), wire and press releases published by Jumei International Holding Limited ("Jumei" or the "Company"), analysts' reports and advisories about the Company, interviews of confidential witnesses, consultation with an expert in Chinese M&A and capital markets transactions, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.[1]

# I.   <u>INTRODUCTION</u>

1.     This is a class action brought on behalf of former Jumei stockholders against Jumei, the members of its Board of Directors, and its CEO for violating Sections 14(e), 10(b), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and the rules promulgated thereunder, in connection with Defendant Leo Ou Chen's recent Buyout of Jumei through his affiliates Super ROI and Jumei Investment Holding Limited.

2.     Defendants' statements that Chen's Buyout offer was fair to, and in the best interests of, Jumei's minority shareholders, were based on two key false and misleading assumptions: that (i) Jiedian—Jumei's leading shared power bank business—would experience flat-to-negative growth from 2021 through 2024 because it could not raise adequate financing and (ii) Jumei's other businesses—including its flagship e-commerce business and its popular video-sharing app—needed to be wound down and valued at mere "liquidation value." These material misrepresentations led to Defendants grossly undervaluing the Company when they recommended that shareholders should accept Chen's tender offer and that the Company should

---

[1] Emphases in this Consolidated Amended Class Action Complaint are added unless otherwise noted. Foreign language sources are described based on English translations.

1  agree to the Buyout.

2      3.      The Buyout was the culmination of Chen's years'-long effort to underpay

3  shareholders for their minority stake in the Company. Chen has been Jumei's CEO and

4  Chairman since he founded the Company in 2009. He took it public in 2014 at a price of $22

5  per share. In 2016, when Chen owned approximately 35% of Jumei's stock and controlled 75%

6  of its voting power, he led a group that sought to buy all of the Company's outstanding shares

7  for a price of $7 per share. After that effort failed, Chen further consolidated his control of the

8  Company by having Jumei repurchase a substantial amount of stock from Jumei's shareholders

9  for the much lower price of $2.30 per share. By the time that Chen made his tender offer in

10  early 2020, these buybacks enabled Chen to increase his personal stake to 44.6% of the

11  Company's stock, representing 88.9% of the total voting power, at no cost to himself.

12      4.      On February 25, 2020, Jumei and Chen entered into a merger agreement that was

13  premised on Chen's tender offer seeking to purchase all outstanding Jumei shares for $2 per

14  share (or $20 per ADS). After extending the deadline for shareholders to tender their shares

15  several times, on April 9, 2020, Jumei announced that Chen obtained approximately 79.9% of

16  Jumei's ordinary shares and 96% of the total voting power in the Company, thereby allowing

17  him to complete his buyout of the Company through a "short form" merger (the "Buyout" or

18  "Merger").  Chen proceeded to pay the rest of Jumei's shareholders the Buyout price of $2 per

19  share to complete the transaction and take ownership of 100% of the Company.  The Buyout

20  valued Jumei at approximately $229 million and involved Chen's payment of $128 million for

21  all of Jumei's outstanding shares that he did not own at the start of his tender offer. On April

22  14,2020, Jumei and Chen announced the completion of the Buyout.

23      5.      Jumei, under Chen's control, did not release any financial information to

24  shareholders after the Company's 2018 Annual Report (released on April 30, 2019). That report

25  portrayed Jumei as succeeding in its two main businesses—its recently acquired controlling

26  stake in Jiedian (the leading company in the fast-growing shared power bank industry in China)

27  and its flagship e-commerce beauty products business.

28

6.      Jiedian's revenue from its business other than its e-commerce business rose five-fold in 2018, achieving 930 million RMB (or $135 million) in revenue. This extraordinary growth was fueled by Jiedian's 697 RMB in revenue, with 289.8 RMB in gross profits and a very strong profit margin of 41.6%. Jumei also described its e-commerce business in very positive terms in its 2018 Annual Report, touting its "large base of highly engaged and loyal customers" and the advantages created by its "superior online shopping experience."

7.      But then, the next time that Jumei released financial information, in connection with Chen's tender offer in February 2020, Defendants promoted Chen's meager offer price of $2 per share as "fair" and in the best interests of Jumei's unaffiliated shareholders based on very different information about the Company's performance and prospects. This lowball offer was based on (i) financial projections that baselessly assumed that Jiedian's growth rate between 2021 and 2024 would languish between 0.2% and *negative* 2.1%, and (ii) the assumption that the Company's other businesses, including its e-commerce business, should be assessed at "liquidation value" because Jumei's management planned to wind these businesses down.

8.      These two key inputs into Jumei's valuation analysis had no basis in fact. Jiedian was the market leader in the fast-growing shared power bank industry in China. An industry report estimated in March 2020 that the power bank industry in China would grow between 50% and 80% for the next several years. This same report described Jiedian as having the largest market share of the top four companies in the industry and as having substantial room for further growth. Jumei's projection that Jiedian's revenues would be flat or *contract* from 2021 through 2024  had no basis in reality.

9.      Houlihan Lokey ("Houlihan"), which advised the Special Committee in the Buyout, based its financial analysis entirely on the information that Jumei's management provided. Houlihan did not do any independent investigation to verify the accuracy of that information. The only way that Houlihan was able to arrive at its substantial undervaluation of Jiedian was by blindly accepting the assumption provided by Jumei's management that "the Company is unable to adequately finance the operations of its businesses resulting in limited

1  expected growth at Jiedian."

2          10.     This assumption was completely unfounded. One of Jiedian's main competitors

3  was able to raise 500 million RMB (or yuan) in financing in December 2019 and another one of

4  the top four companies in the industry announced an IPO in June 2020.

5          11.     In addition, a senior procurement engineer at Jiedian from June 2017 to July

6  2020 (CW 1) reported that Jiedian has been in negotiations since early 2020 with another one of

7  its main competitors regarding a planned acquisition of Jiedian. In addition to rendering

8  Defendants' assumptions about financing for Jiedian false, this fact also contradicts Defendants'

9  denial of any plans or negotiations to conduct any extraordinary transactions involving Jiedian

10  following the Buyout.

11          12.     After the Buyout closed, even Jiedian's CEO acknowledged the promising

12  prospects for the shared power bank industry in China, and for Jiedian in particular as the

13  industry leader, including the availability of financing. He stated that the IPO filing of one of

14  Jiedian's competitors in June 2020 "is not an isolated incident, I believe that we can see more

15  capital moves in this market soon."

16          13.     The availability of financing for Jiedian is also supported by other factors,

17  including the fact that Jumei had $110 million in cash on hand at the time of the Buyout, but

18  Chen chose to use those funds to take the Company private rather than to support Jiedian.

19  Furthermore, Chen was unwilling to even consider alternatives to his Buyout and the Special

20  Committee decided not to take the standard step of conducting a "market check" to assess the

21  fairness of Chen's offer.

22          14.     Moreover, Defendants' projections for Jiedian were unfounded based solely on

23  the amount of organic growth that the company could achieve, irrespective of the availability of

24  additional financing. A May 12, 2020 article quoted an internal message that Jiedian's CEO sent

25  to employees, stating that "I trust you all, and ***our reserves have enough of a margin of safety***

26  ***to face future challenges***." This article also discussed Jiedian's status as the industry leader that

27  performed better than its competitors, and its multiple avenues for growth. While additional

28

financing might have helped Jiedian achieve *even more* growth, its status as the industry leader and the internal statements that its CEO made after the Buyout show that Jiedian was well positioned to experience at least some growth in the coming years. That is a far cry from the *contraction* that Defendants projected for Jiedian from 2021 through 2024.

15.     Houlihan's "selected companies analysis," which compared Jiedian to other companies, highlights the basic flaws in its valuation. The purpose of this type of analysis is to select companies that actually provide a basis for comparison to the company at issue. But Houlihan compared Jiedian to car and appliance rental companies in the U.S. Plaintiff's expert in Chinese M&A and capital market transactions has explained that this comparison was completely inappropriate because these other companies had much lower projected growth rates than what one would expect from Jiedian, which was the leader in the fast-growing power bank market in China. Houlihan's analysis was particularly flawed because there are four companies (including Jiedian) that dominate the power bank market in China.  Instead of comparing Jiedian to these peers, Houlihan chose to compare it to companies from a different part of the world that are in completely different industries associated with much slower growth.

16.     In addition to grossly undervaluing Jiedian, Jumei's and Houlihan's "liquidation analysis" for its flagship e-commerce business, its video sharing app (Shuabao), and its other businesses was also indefensible because it valued those substantial assets at an average price of just $71 million. That was substantially below Jumei's $110 million in cash or equivalents that was included in the liquidation analysis. In other words, Jumei and Houlihan attributed *negative* value to these other business.

17.     This determination was based entirely on the assumption that Jumei would be winding down these other businesses. Because of that supposition, Defendants did not disclose the key financial results or any financial projections for these businesses. But evidence shows that Jumei's e-commerce business and its Shuabao app were not actually being wound down. Former employees have stated that the businesses were operating normally at the time of the Buyout, and that the e-commerce business even posted a net profit in 2019. Furthermore, Jumei

has continued to operate these businesses as usual since the Buyout. Jumei's e-commerce business continues to advertise and sell its many products and Shuabao continues to be a heavily downloaded app in China. Jumei even continues to advertise new jobs across all areas of the Company. Moreover, former employees have stated that they did not see any indication that these businesses were winding down. Chen even admitted that he does not plan to liquidate these businesses.

18.     The assumption that Jumei's other businesses were worthless because they would be winding down was therefore completely unfounded. Moreover, as Plaintiff's expert has explained, even within the context of a liquidation analysis, an advisor should still value the business at issue based on a traditional discounted cash flow analysis or by comparing it to comparable companies to form a baselines of the business's value in the liquidation process. Defendants did no such analysis here, and instead improperly wrote-down to zero key portions of these businesses that Jumei had on its balance sheet. In addition, their analysis was even more flawed because Defendants chose not to conduct a market check to determine what third parties would be willing to pay for these businesses.

19.     Chen tried to have it both ways by purchasing Jumei's remaining shares while serving as the Company's CEO, Chairman, acting CFO, and dominant shareholder. For example, Chen is the embodiment of Jumei's management, yet he tried to distance himself from management's untenable assumptions by claiming that "[n]o members of the Buyer Group were provided with, and [2 -] none of such persons were entitled [to] rely[,] or relied on, any of these financial projections" that formed the basis for Houlihan's analysis. This futile disclaimer does not make any sense because Chen, by definition, knew of management's assessments of Jumei's business.

20.     The only plausible explanation for the paltry assumptions that Jumei's management—led by Chen—provided to support the Buyout is that these inputs substantially understated Jumei's performance and business prospects so that Chen could purchase the remaining shares of the Company at far below their fair value.

## II.     JURISDICTION AND VENUE

21.     This Court has jurisdiction over the claims asserted herein for the violations of Sections 14(e), 10(b), and 20(a) of the Exchange Act pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331. The Defendants engaged in a scheme that violated United States securities law. In doing so, the Defendants engaged in conduct that was directed toward the United States. Jumei registered its ADS with the SEC pursuant to Section 12(b) of the Exchange Act and these securities traded on the NYSE. In addition, the Bank of New York Mellon, whose corporate headquarters is located in New York, New York, served as the ADS Depositary for Jumei's ADS.

22.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) as the alleged misleading public filings and press releases entered this district.

23.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the NYSE.

## III.     PARTIES

24.     Plaintiff Altimeo Asset Management was at all relevant times a Jumei ADS holder and was damaged as a result of Defendants' wrongdoing, as alleged in this Complaint. (*See* ECF No. 18-2, 18-4.) Plaintiff is an institutional asset manager that manages investment assets through separate funds and is authorized to bring legal action on their behalves. Prior to seeking appointment as Lead Plaintiff, Altimeo obtained a valid assignment of the claims of the funds Altimeo Investissement and Altimeo Optimum.

25.     Jumei is incorporated in the Cayman Islands. The Company's corporate headquarters is located at 20th Floor, Tower B, Zhonghui Plaza, 11 Dongzhimen South Road, Dongcheng District, Beijing 100007, People's Republic of China. Its American Depositary Shares ("ADS") are traded on the New York Stock Exchange ("NYSE") under the ticker symbol "JMEI." Since January 10, 2020, one Jumei ADS represented ten Class A ordinary shares of Company stock. (Before that time, each ADS represented one Class A ordinary share.)

26.     Jumei listed its  ADS on the NYSE in order to avail itself of the U.S. securities

market. Jumei disclosed in its 2018 Annual Report that "[t]o our knowledge, as of March 31, 2019, 100,628,746 of our Class A ordinary shares are held by three record holders in the United States, almost totally held by the depositary of our ADS program, the Bank of New York Mellon." Jumei also disclosed in that report that it had 100,628,746 Class A ordinary shares issued and 73,187,255 outstanding as of December 31, 2018.[2]

27.     Defendant Chen is Jumei's founder and has served as its Chairman of the Board and Chief Executive Officer since the Company's inception. Chen has also served as Jumei's acting CFO since April 11, 2018

28.     Defendant Zhenquan Ren has served as an independent director of the Company since 2015.

29.     Defendant Sean Shao has served as independent director and chairman of the Company's audit committee of Jumei since 2014.

30.     Defendant Mang Su has served as an independent director of the Company since 2015.

31.     Defendant Adam J. Zhao has served as an independent director of the Company since 2016.

32.     Defendants Chen, Ren, Shao, Zhao, and Su are collectively referred to herein as the "Board" or the "Individual Defendants."

## IV.     OTHER RELEVANT ENTITIES

33.     Super ROI Global Holding Limited ("Super ROI") is a privately owned company

---

[2] Jumei did not update this information after its 2018 Annual Report, but SEC filings by investors show that the top holders of Jumei ADS as of the time of the Buyout were also U.S. investors. For example, Blackrock Inc., based in New York City, was the largest holder of Jumei ADS, with 164,241 ADS as of the end of the first quarter of 2020 (representing 1,642,1000 Class A ordinary shares). Similarly, an investment fund called Alpine Global Management LLC, based in New York City, held 100,000 ADS as of that time (representing 1 million Class A ordinary shares) and an investment fund called Dimensional Fund Advisors, based in Austin, Texas, held 78,170 ADS (representing 781,700 Class A ordinary shares). These were three of the four largest holders of Jumei ADS that filed reports on their holdings with the SEC as of the end of the first quarter of 2020. Jumei had approximately 63 million Class A ordinary shares issued and outstanding as of that time. (*See infra* ¶ 51).

organized and existing under the laws of the British Virgin Islands, and is beneficially owned by Chen.

34.     Jumei Investment Holding Limited is a wholly owned subsidiary of Super ROI with limited liability under the laws of the Cayman Islands and was formed for the sole purpose of engaging in the Buyout.

35.     Jumei formed a special committee to act on behalf of the Company to consider Chen's offer (the "Special Committee"). The Special Committee consisted of Defendants Shao and Zhao, with Shao serving as Chairman. The Board unanimously adopted written resolutions providing that each member of the Special Committee would receive a monthly compensation of $20,000 in exchange for his service on the Special Committee. The Special Committee was given wide latitude to take any actions that the Committee deemed "necessary or appropriate" to investigate the fairness of the Buyout.

## V.     SUBSTANTIVE ALLEGATIONS

### A.     Jumei's Background

36.     Jumei was incorporated in 2010 in the Cayman Islands and was publicly listed on the NYSE in May 2014. Jumei is an offshore holding company that, since its founding, engaged in selling beauty products online in China in the retail market. The Company has adopted multiple sales formats to encourage product purchases on its platform. Their sales formats consist of curated sales, online shopping malls, and flash sales.

37.     Jumei has also invested in adjacent fashion and lifestyle businesses such as Jiedian, a mobile device power bank operating company; Shuabao, a short-video-sharing mobile phone app; and TV drama series production, to expand its service offerings. These investments were entered into to further expand and strengthen Jumei's ecosystem as it seeks to benefit from China's transition into the new retail era.

38.     Defendant Chen founded Jumei and has always owned a substantial stake in the Company.  He has been the Company's CEO and Chairman since founding the Company, and

its acting CFO since the prior CFO resigned on April 11, 2018.[3]

39.     When the Company went public, Chen owned 35.6% of the Company's stock, with 75.7% aggregate voting power.

### 1.     Chen's Long-Term Effort to Take Jumei Private

40.     On February 17, 2016, when Chen owned 34.7% of the Company's stock, he attempted to lead a group that offered to buy the Company's outstanding shares for a price of $7 per share. (At that time, each Jumei ADS represented 1 share). He offered to buy the remaining 45% of the Company that was not owned by his group for approximately $467 million, valuing the Company at $1 billion.

41.     This $7 per share offer price reflected a 68% decrease from the Company's price of $22 per share at its IPO on May 16, 2014, less than two years earlier.

42.     Investors and analysts viewed that offer as significantly undervaluing Jumei's business.  For example, HSBC issued a report on February 18, 2016, titled "privatization offer undervalues the company." HSBC described this offer as "as opportunistic and materially undervaluing the business" based on the Company's $2.7 per share of net cash as of its most recent disclosure, which HSBC expected to continue to increase. HSBC viewed Chen as taking advantage of the "unusual volatility" in the price of Jumei stock that was not attributably to any "fundamental changes to the business."

43.     Similarly, Credit Suisse explained in a February 22, 2016 note that it was "deeply disappointed by the low offer price, at such timing." Even after accounting for Jumei's "weaker fundamentals" as compared to its e-commerce rivals in China and the fact that "[g]iven the current transaction progress, the likelihood that the company would deliver strong results in the short run would be low," Credit Suisse still maintained its price target price of $9 per share—significantly above Chen's offer of $7 per share—and "urge[d] management to seriously consider raising the privatisation offer price, to better reflect the intrinsic value of JMEI."

---

[3] On April 13, 2018, Chen announced that the Company's Chief Financial Officer, Mr. Yunsheng Zheng, abruptly resigned on April 11, 2018, "for personal reasons."

44.     After making this ill-received offer, Chen did not give shareholders any update on the status of his offer until November 27, 2017, when Jumei announced that Chen and his group was withdrawing its offer.

45.     During that time, Jumei's share price continued to fall further in the face of uncertainty surrounding Chen's offer. After Chen's offer, Jumei stopped holding quarterly earnings calls with investors. Jumei also rarely released interim financial results for the Company beyond its annual reports that it filed with the SEC on Form 20-F.

46.     By the time that Chen withdrew his offer on November 27, 2017, Jumei's shares traded for just $3.30 per share. Chen therefore decided to use the company's funds to repurchase shares at an even lower price, thereby consolidating his control of the company.

47.     On April 30, 2018, Jumei announced that its Board of Directors authorized a share repurchase plan under which the Company may repurchase up to US$100 million of its shares over the next 12 months.

48.     Over the course of 2018, Jumei repurchased over 26 million shares (26,031,329 shares) at an average price $2.30 per share, for a total of approximately $59.8 million.

49.     This stands in stark contrast to prior years. Jumei did not repurchase any shares from 2016 through 2017 and repurchased only $145,000 worth of shares in 2015.

50.     Jumei then announced another $100 million share repurchase plan on May 28, 2019.

51.     When Chen and Jumei agreed to his tender offer to buy the Company's remaining shares for $2 per share on February 25, 2020, the Company had 63,255,412 Class A Ordinary Shares issued and outstanding. In contrast, the Company had 92,992,483 Class A Ordinary Shares issued and outstanding as of December 31, 2017 (and 87,829,756 Class A Ordinary Shares issued and outstanding as of December 31, 2015, just before Chen made his prior offer to buy the Company).

52.     By the time that Chen made his tender offer, his 50,892,198 Class B Ordinary Shares was now equal to 44.6% of the Company's total ordinary shares (representing 88.9% of

the total outstanding voting power), based on 114,147,610 Ordinary Shares (including Class A and Class B shares) outstanding as of February 25, 2020.[4]

53.      In contrast, as of March 31, 2016, Chen owned the same 50,892,198 Class B ordinary shares, but because the Company had so many more shares outstanding as of that time, Chen's holdings amounted to just 34.7% of the Company's total ordinary shares and just 75.3% of its aggregate voting power. Jumei's repurchasing spree thus enabled Chen to substantially increase his stake in the Company at no personal cost to himself.

54.      This increase in Chen's ownership made a significant difference because, according to the Recommendation Statement that Jumei issued to recommend the Buyout to shareholders, Part XVI (and in particular Section 233(7), Cap. 22 (Law 3 of 1961, as consolidated and revised)) of the Companies Law of the Cayman Islands provides that a shareholder with at least 90% of the total voting power in the Company may conduct a "short-form" merger, which does not require the vote of the shareholders of the parties to the Merger if a copy of the Plan of Merger is given to every registered shareholder of the Company.

55.      But Chen still needed Jumei's ordinary shareholders to tender their shares in order for him to be able to complete his proposed Buyout, because he controlled only 88.9% of the total outstanding voting power when he made his tender offer.

56.      Under Cayman Islands law, when a corporation makes a recommendation about a merger, there is an affirmative duty to disclose "sufficient information" for shareholders to be able to fairly understand the action that is being recommended to them.

## 2.      The Jiedian Acquisition

57.      In May 2017, Jumei acquired a 60% equity stake in Shenzhen Jiedian Technology Co., Ltd ("Jiedian") for RMB300 million (or $46.1 million). Upon Jumei's acquisition of its majority stake in Jiedian in May 2017, Chen became Chairman of Jiedian.[5]

58.      Jumei announced that "Jiedian is one of the leading players in the portable power

---

[4] This total included the sum of 63,255,412 Class A Ordinary Shares and 50,892,198 Class B Ordinary Shares.

[5] *See* https://www.bloomberg.com/profile/person/18708501 (Chen's Bloomberg profile).

bank sharing business. It facilitates master power charging boxes in highly frequented points of interest, such as restaurants, bars, gyms, airports, train stations, shopping malls, hair/beauty salons, hospitals and parks." In addition, "[e]ach power box contains multiple portable power banks, and users can charge their mobile phones on-site or take away a power bank and return it at any other Jiedian site. Users can use Jiedian's app to locate nearby power boxes where they can rent a portable power bank by scanning a QR code and making mobile payments. Jiedian has deployed its power boxes in over twenty major cities and plans on expanding nationwide."

59.     Chen commented on the Jiedian acquisition that "[t]he sharing economy is rapidly developing as hundreds of millions of Chinese consumers have embraced internet mobility as a way of life, both professionally and socially. Intensive smartphone usage creates a vast market for Jiedian's innovative services and network. This strategic investment in Jiedian will allow us to further expand our eco system to the forefront of mobile internet business and is an important portion of Jumei's all-in strategy to ride the new wave of technology innovation."

60.     Jumei continued to acquire additional stakes in Jiedian through June 2019. Jumei told Houlihan that the Company owned 83.7% of Jiedian as of the time of Houlihan's analysis for the Buyout in February 2020.

61.     Jumei explained in its 2018 Annual Report that "[w]e derive our power bank sharing service revenue from fees paid by customers for each use of the power bank or for subscription for access to our network of power bank during certain period of time, usually less than a month. Subscription fees are recognized on a straight-line basis over the subscription period."

62.     As of December 31, 2018, Jumei had over 400,000 power bank cabinets deployed in over 300 cities across China, including at restaurant and coffee shop owners, public transportation stations, hotels, beauty salons, hospitals, shopping malls and markets, where those establishments would place Jiedian power bank cabinets that consists of multiple separate portable power banks on their countertop. Each power bank "is powered by [Jiedian's] intelligent adaptive and fast charging technologies, and insured by the China Pacific Insurance

Company for product safety." In addition, the Jiedian mobile app and third-party apps allow users to search for power bank cabinets close to their location, including directions, information about the average price range and opening hours of the establishment hosting the power bank cabinets, and whether there is any portable power bank in the selected cabinet with their designated power connector.

### 3.     Jumei's Other Recent Investments

63.     Jumei has also made significant investments in other businesses in recent years. As stated on its website and repeatedly in SEC filings, Jumei has "invested in adjacent fashion and lifestyle businesses such as Jiedian, a mobile device power bank operating company, and TV drama series production, to expand its service offerings. These investments will further expand and strengthen Jumei's ecosystem as it seeks to benefit from China's transition into the new retail era."

64.     For example, on July 28, 2017, Jumei invested RMB 84 million in the production of a television drama series titled "Here to Heart." The series is based on a book of the same title. In April 2018, this television drama was broadcast on the Hu'nan TV station and other online video platforms. Jumei described this as part of its marketing efforts because the show starred "popular actors and actresses in China, depicting city life of white collars targeting to turning viewers into our customers."

65.     In addition, in November 2018, Jumei "entered into definitive agreements for investing approximately RMB80 million in a venture capital fund set up, managed and operated with a focus on investments in the e-commerce related industries in China. The venture capital fund is set up, managed and operated in China."

66.     Then, in April 2019, Jumei launched Shuabao, a short-video-sharing application that, similar to Tik Tok, allows users to like, comment, forward or subscribe to their favorite accounts. Shuabao was reported to have had over 300 million downloads as of the time of Chen's offer to purchase the Company in January 2020.

### 4.     Jumei's Business Prior to the Buyout

67.     Jumei stopped releasing financial information in advance of Chen's offer. The last financial report that Jumei issued was its release of its 2018 Annual Report on Form 20-F, which it issued on April 30, 2019.  The Company then announced, on January 1, 2020—ten days before Chen made his offer to the Company—that it was "delay[ing] the release of its financial results for the six months ended June 30, 2019. The Form 6-K containing semi-annual financial information could not be filed within the time period specified by the New York Stock Exchange because certain operational results associated with Jumei's new businesses cannot be provided on a U.S. GAAP basis without significant effort or expense."

68.     Jumei's reported stellar results in its 2018 Annual Report. The Company's net revenue in 2018 was 4.289 billion RMB (or $623.8 million), including 3.359 billion RMB (or $489 million) from merchandise sales in its e-commerce business and 930 million RMB (or $135 million) from "services and other" areas. The Company posted gross profit of 1.09 billion RMB (or $158.6 million) and net income of 117 million RMB (or $17 million).

69.     In addition, Jumei's profit margin increased substantially in 2018. Its gross profit as a percentage of net revenues increased from 22.2% in 2017 to 25.4% in 2018. This higher gross profit margin was attributed to Jumei's increase in revenue from its "other services," which mainly comprised Jiedian's power bank sharing services.

#### a.     *Jumei's Successful Jiedian Power Bank Business*

70.     By the end of 2018, Jiedian was a substantial part of Jumei's business. Jumei explained, in response to the SEC's follow-up request for more information following the Company 2018 Annual Report, that revenue generated from the Company's e-commerce business accounted for 78% of its total consolidated revenues in 2018. Revenue from "services and others represent revenue from the power bank sharing services, film production [including its TV drama series production business] and other services, which accounted for 16%, 3%, and 1% of the total consolidated revenues for the year ended December 31, 2018, respectively." In contrast, in 2016 and 2017, e-commerce revenue represented 98% and 97% of Jumei's total consolidated revenues.

71.     Jumei's revenue from its services and other businesses increased dramatically in 2018, from RMB182.7 million in 2017 to RMB929.6 million (US$135.2 million) in 2018, which the Company "mainly attributed to the increase of revenue generated from power bank sharing service." In other words, Jumei's revenue from these other segments, which were primarily attributable to Jiedian, *quintupled* from 2017 to 2018.

72.     The financial information that Jumei disclosed for Jiedian in connection with Chen's offer showed that Jiedian performed extremely well in 2018 and 2019.[6] In 2018, Jiedian achieved 697 RMB in revenue with 289.8 RMB in gross profit, showing a very strong profit margin of 41.6%. Even after accounting for expenses, its adjusted EBITDA was 196 RMB, with a profit margin of 28.1%.

73.     But, as will be described further below, Jumei artificially suppressed Jiedian's valuation in connection with the Buyout by applying completely unfounded assumptions to Jiedian's growth prospects. Indeed, many industry commentators have noted that the nascent power bank industry in China in general did very well in 2018, and that Jiedian was the industry leader. That was the first year that companies in the industry, including Jiedian, started to become profitable. (*See infra* Sections IV.D.3).

74.     Jiedian then did even better in 2019. It had 1.364 billion RMB in revenue—an extraordinary 95.7% growth rate from 2018—and doubled its users from 100 million in 2018 to 200 million in 2019. Jiedian also had 416.4 million RMB in gross profit in 2019 for a profit margin of 30.5%. It also continued to be profitable after accounting for expenses, with adjusted EBITDA of 170.4 million RMB. The publication *21st Century Business Review* reported on July 10, 2019 that Jiedian's COO, He Shun, stated that the market leaders (including Jiedian) in the power bank industry turned to profitability and that the industry would continue to grow along with the market for mobile phones.[7]

---

[6] Jumei did not break-out Jiedian's results when reporting the Company's results for 2018, or any results for 2019, before Chen made his tender offer in 2020.

[7] *21st Century Business Review*, "Is the Shared Power Bank Profitable?" (July 10, 2019), available at https://xw.qq.com/cmsid/20190710A0N5S000.

*b.*   *Jumei's Large Cash Reserve*

75.    Jumei also reported that it had approximately 920 million RMB (or $134 million) in cash and cash equivalents as of the end of 2018. This was an increase of approximately 129% as compared to the 401 million RMB that the Company had at the end of 2017. Jumei told investors in its 2018 Annual Report that "[w]e believe our current cash and cash equivalents, short-term investments and anticipated cash flow from operations will be sufficient to meet our anticipated cash needs for the next 12 months."

*c.*   *Jumei's Valuable E-Commerce Business*

76.    Jumei also touted its e-commerce business in its 2018 Annual Report. The Company stated that "[w]e have built a large base of highly engaged and loyal customers, as well as a wide variety of well-selected products." Jumei told investors that "[u]nder our visionary management's leadership, we have attracted a large and loyal user base through our creative and cost-efficient marketing campaigns and live broadcasting function as well as word-of-mouth referrals resulting from our well-selected products and superior customer experience."

77.    The e-commerce business had 10.7 million active customers in 2018 and it worked with approximately 1,341 suppliers and third-party merchants.

78.    Jumei also assured investors of the continued strength of the Company's e-commerce business. For example, Jumei highlighted that "[t]he loyalty of our customer base is demonstrated by the repeat purchase rates and growing willingness of our customers to try new products on our internet platform." In particular, orders placed by repeat customers accounted for approximately 91.2%, 90.8% and 87.9% of total orders in 2016, 2017 and 2018, respectively.

79.    Jumei stated that "[w]e believe that our internet platform is a trusted destination for consumers to discover and purchase branded beauty products, baby, children's and maternity products, pre-packaged food, as well as fashionable apparel and other lifestyle products. Leveraging our deep understanding of customer needs and preferences, as well as our strong merchandizing capabilities, we have adopted multiple effective sales formats to

1    encourage product purchases on our platform."

2         80.    Jumei also described its multiple sales formats, exclusive arrangements with

3    suppliers, its marketing efforts, payment options, "logistics and delivery network with

4    nationwide coverage," its 24/7 customer service, its return policy, and its "rigorous security

5    policies" as positive features of its business.

6         81.    In addition, Jumei highlighted its "technology systems [that] are designed to

7    enhance efficiency and scalability, and play an important role in the success of our business,"

8    which "improve our website and management systems in order to optimize every aspect of our

9    operations for the benefit of our customers, suppliers and third-party merchants." Jumei

10   particularly highlighted its website and mobile platform as business strengths. The Company

11   noted that  "[w]e have invested substantial resources to build a mobile platform that is dedicated

12   to providing a superior mobile shopping experience. As a result, sales through our mobile

13   platform have grown significantly since its launch in May 2012. In the fourth quarter of 2018,

14   approximately 98.4% of our GMV was generated through our mobile platform."  Jumei also

15   touted its website by stating that "[o]ur website interface is fully integrated with our warehouse

16   management system, enabling us to track order and delivery status on a real-time basis. Our

17   website design offers several user-friendly features that enhance customer experience and

18   convenience."

19        82.    While Jumei noted that "[t]he retail market of beauty products in China is

20   fragmented and highly competitive," the Company assured investors that it was able to compete

21   effectively in its E-commerce business because "[w]e believe we compete primarily on the basis

22   of our ability to identify beauty products in demand among consumers and source these

23   products on favorable terms from suppliers and third-party merchants; our ability to ensure the

24   authenticity and quality of our products; our ability to acquire new customers at relatively low

25   cost and provide superior customer service; our internet platform features; our customer service

26   and fulfillment capabilities; and our reputation among consumers, suppliers and third-party

27   merchants."

28

83.     Jumei did not give any indication in its 2018 Annual Report that it was considering winding down its flagship e-commerce business, which sold 3.359 billion RMB ($488.6 million) worth of goods in 2018.

## B.      The Buyout

84.     After giving this favorable description of Jumei's business in its 2018 Annual Report on April 30, 2019, Jumei stopped providing investors with updates about its business.

85.     On December 31, 2019, Jumei announced that, effective January 10, 2020, it was changing the ratio of its ADS to Class A ordinary shares from one ADS to one Class A ordinary share, to a new ratio of one ADS to ten Class A ordinary shares. This stock split made Chen's tender offer—which he made the day after this split—of $2 per share equivalent to $20 per ADS.

86.     Then, on January 12, 2020, Jumei announced Chen's tender offer. This offer was made exclusively by Chen and entities that he controls, including Super ROI and Jumei Investment Holding Limited ("JIHL"). Jumei also announced the creation of the Special Committee, composed of Defendants Shao and Zhao, to evaluate the offer.

87.     Leading up to this offer, between January 2, 2020, and January 10, 2020, a total of eight days, Chen and representatives of the Company's corporate counsel, Skadden, Arps, Slate, Meagher, & Flom LLP ("Skadden"), participated in a number of discussion regarding Chen's proposal to acquire all outstanding Class A Ordinary Shares that were not already owned by Chen and his affiliated entities.

88.     On January 13, 2020, the next day, Jumei filed a Form 6-K with the SEC attaching the previous day's press release as an exhibit. The same day, Chen and Super ROI jointly filed a Schedule 13D/A reflecting Chen's intent with the Buyout. The SEC, however, determined that Chen and his affiliated entities should have filed an amended Schedule 13D disclosing their plans on January 2, 2020, when Chen participated in discussions with his advisors regarding acquiring all outstanding Class A Ordinary Shares, instead of waiting until January 13 to do so.

89.     On January 14, 2020, Jumei issued a press release announcing that the Special Committee engaged Houlihan Lokey as its financial advisor.

90.     On February 25, 2020, following further discussions between Jumei's and the Special Committee's legal representatives, and Houlihan Lokey's valuation analysis and fairness opinion, Jumei entered into the Merger Agreement with Super ROI (which is wholly-owned by Chen) and JIHL (which is a wholly-owned subsidiary of Super ROI). They announced the agreement in a press release filed with the SEC on that day as an attachment to a Form 6-K, along with the Merger Agreement. Defendant Chen signed the Form 6-K on behalf of Jumei. In addition, Chen signed the Merger Agreement on behalf of Super ROI and JIHL. Defendant Shao, Chairman of the Special Committee, signed the Merger Agreement on behalf of Jumei.

91.     On February 26, 2020, Chen and Jumei commenced Chen's tender offer. That day, Jumei filed a Schedule 14D-9 (Rule 14d-101) Solicitation/Recommendation Statement Under Section 14(d)(4) of the Exchange Act (the "Recommendation Statement," including subsequent amendments thereto). Defendant Shao signed this form on behalf of Jumei, as Chairman of the Special Committee. The Recommendation Statement annexed Houlihan's fairness opinion and included several exhibits, including Chen's Offer to Purchase For Cash All Outstanding Class A Ordinary Shares Including Class A Ordinary Shares Represented by ADS of Jumei at $2.00 per Class A Ordinary Share and $20.00 per ADS (the "Offer to Purchase," dated February 26,2020) and Houlihan's presentations that it made to the Special Committee on February 15 and 25, 2020.

92.     Also on February 26, 2020, Chen, Super ROI, and JIHL filed a Tender Offer Statement and Rule 13e-3 Transaction Statement filed under cover of Schedule TO, under Section 14(d)(1) or 13(e)(1) of the Exchange Act (the "Tender Offer Statement"), with the SEC. This filing included Chen's Offer to Purchase as an exhibit and incorporated the information in the Offer to Purchase by reference.

93.     Jumei also filed a Schedule 13E-3 (Rule 13e-100) Transaction Statement under

Section 13(e) of the Exchange Act and Rule 13e-3 thereunder (the "Schedule 13e-3 Transaction Statement) on February 26, 2020. This Schedule 13e-3 Transaction Statement was also signed by Defendant Shao on behalf of the Special Committee and included key transaction documents as exhibits and incorporated them by reference.

94.     The purpose of Chen's Offer was to increase his and Super ROI's ownership of Jumei's outstanding shares from their then-existing 44.6% to 100%. The Recommendation Statement stated that if enough shares were to be tendered pursuant to the Offer to provide Chen and Super ROI with 90% of the total voting power in the Company, then the parties would conduct a "short-form" merger, which does not require the vote of the Jumei's shareholders under Section 233(7) of the Companies Law of the Cayman Islands.

95.     Defendants also stated in the Recommendation Statement that "[a]ppraisal rights are not available in connection with the Offer. . . . As the Merger will be a 'short-form' merger pursuant to Section 233(7) of the Companies Law and no shareholder vote on the Merger will be held, holders of Class A Ordinary Shares (including holders of Class A Ordinary Shares represented by ADSs) will not be able to exercise dissenters' rights under Section 238 of the Companies Law, which applies to mergers under the Companies Law in which a shareholder vote is held." This representations was essentially repeated elsewhere in the Recommendation Statement and multiple times in the Offer to Purchase, the relevant portions of which were incorporated into the Schedule 13e-3 Transaction Statement and the Tender Offer Statement. These disclosures contained false and misleading statements of Cayman Island law and failed to satisfy reporting obligations imposed by Rule 13e-3(f), 17 C.F.R. §  240.13e–3(f).

96.     Chen's original tender offer set a deadline of midnight at the end of the day on March 25, 2020, for shareholders to tender their shares.  As of March 19, 2020, only 822,550 Class A Ordinary Shares (including Class A Ordinary Shares represented by ADSs), totaling 0.7% of outstanding shares, were validly tendered. Chen therefore extended the offer deadline several times, first until April 1, 2020, then until midnight at the end of the day on April 8, 2020.

1

2

3

97.     Defendants updated their Recommendation Statement, Tender Offer Statement, and Rule 13e-3 Transaction Statements on March 20, 2020 and April 1, 2020, in part to account for information that the SEC deemed incorrect or missing from the original set of documents.

4

5

6

7

8

9

10

11

12

98.     On April 9, 2020, Chen, his affiliated entities, and Jumei filed updated transaction documents with the SEC announcing that as of the extended April 8, 2020 deadline for Chen's offer, a total of 40,344,690 Class A Ordinary Shares (including Class A Ordinary Shares represented by ADSs) were validly tendered, representing approximately 63.7% of Jumei's 63,304,836 outstanding Class A Ordinary Shares.  This gave Chen, after acquisition of those shares, approximately 79.9% of Jumei's ordinary shares and 96% of the total voting power in Jumei. This satisfied the condition that Chen obtain 90% voting rights to be able to complete the Buyout.[8] After accounting for the exercise of outstanding options, the acquisition of Jumei's outstanding shares was valued at $127,605,917.27.

13

14

15

16

17

18

99.     On April 14, 2020, Jumei and Chen announced the completion of the Buyout. On April 14, 2020, the "Effective Time" of the Buyout, JIHL merged into Jumei and Jumei became a wholly owned subsidiary of Super ROI. Each Class A ordinary share that was issued and outstanding as of the Effective Time was cancelled and ceased to exist in exchange for the right to receive $2.00 and each ADS was cancelled and ceased to exist in exchange for the right to receive $20.00.[9]

19

20

100.     After the Buyout, Jumei's ADS were removed from being listed on the NYSE. Chen, through JIHL and Super ROI, owned 100% of Jumei in its post-Buyout form.

21

**C.     Insider Interests in the Buyout**

22

101.     Chen, Jumei's founder, Chairman, CEO, and acting CFO, is the primary

23

24

25

26

[8] After acquiring these tendered shares, Chen had 91,236,888 ordinary shares, representing (i) 40,344,690 Class A Ordinary Shares and (ii) 50,892,198 Class B Ordinary Shares held by JHIL. This was 79.9% of the Company's total ordinary shares Based on 114,197,034 Ordinary Shares as a single class outstanding as of April 9, 2020, being the sum of 63,304,836 Class A Ordinary Shares and 50,892,198 Class B Ordinary Shares.

27

28

[9] The ADS holders were directed to pay any applicable fees, charges and expenses of The Bank of New York Mellon, the ADS Depositary, and government charges (including withholding taxes if any) due to or incurred by the ADS Depositary, including applicable ADS cancellation fees of $0.05 per ADS.

beneficiary of the Buyout. Chen, through his affiliated entities, became the sole beneficial owner and controller of Jumei after the Buyout.

102.    Not only did Chen become the sole owner of the Company, but he, as well as other executive officers, maintained their current positions with Jumei following the Buyout.

103.    Chen explained in his Offer to Purchase on February 26, 2020, that he needed approximately $129 million to fund his tender offer. He stated that the $110 million that Jumei had in cash and cash equivalents could be used to fund his offer, with only $16 million in third-party debt financing. In other words, Chen planned to use shareholders' own funds to finance 85% of his buyout that gives him ownership over the entire Company.

104.    Chen later disclosed, on April 1, 2020, that he obtained  $100 million in additional debt financing for the Buyout from an entity called WB Online Investment Limited, and would therefore need only $30 million of Jumei's cash to fund the Buyout. Chen agreed to use just $5 million of his own funds toward the $129 million needed to complete the Buyout.

###    D.    The Recommendation Statement Falsely Described Chen's Offer Price as "Fair" to Jumei's Shareholders

105.    Defendants determined in the Recommendation Statement that Chen's offer was fair and in the best interests of Jumei's shareholders. The Recommendation Statement provided that "[t]he Special Committee reviewed the terms and conditions of the Offer and the Merger with the assistance of its legal and financial advisors and unanimously (a) determined that the Merger Agreement and the transactions contemplated thereby, including the Offer and the Merger, are fair to, and in the best interests of, the Company and" its shareholders; "(b) recommended that the Unaffiliated Security Holders accept the Offer and tender their Class A Ordinary Shares and/or ADSs to Purchaser pursuant to the Offer; and (c) recommended that the Board" recommend the Merger to shareholders.

106.    Jumei's Board, acting upon the unanimous recommendation of the Special Committee and on behalf of the Company, then "(a) determined that the Merger Agreement and the transactions contemplated thereby, including the Offer and the Merger, are fair to, and in the best interests of, the Company and the Unaffiliated Security Holders; (b) approved and adopted

the Merger Agreement . . . ; and (d) recommended that the Unaffiliated Security Holders accept the Offer and tender their Class A Ordinary Shares and/or ADSs to Purchaser pursuant to the Offer."

107. Chen was Chairman of the five-member Board making this determination. He did not recuse himself even though he was highly conflicted because the Board was evaluating his offer to purchase the entire amount of outstanding shares of the Company that he did not already own. Moreover, Chen dominated the Company and its Board based on his role as the Company's founder, CEO, and Chairman since its founding, his role as acting CFO since April 11, 2018, and his ownership of approximately 44.6% of the Company's shares and control of approximately 88.9% voting power.

108. In addition, Chen and his affiliated entities stated in the Offer to Purchase that their offer was fair to Jumei's shareholders because of the recommendations and fairness assessments of the Special Committee and Jumei's Board (which Chen was the Chairman of), as well as Houlihan's fairness opinion.

109. The $2.00 per share Buyout price for Jumei's public stockholders was insufficient, as it failed to adequately account for the Company's strong financial performance and prospects. This price reflected a premium of just 14.7% of the closing price of Jumei's stock and ADS on January 10, 2020, the day before Chen made his offer. This is a much smaller premium than is typically provided in tender offers or other shareholder buyouts. For example, a study published on April 16, 2020, shows that the average premium for merger and acquisition transactions in the technology industry was 36.3% in 2018 and 26.6% in 2017.[10]

110. The Buyout also reflects Chen's opportunistically waiting for the Company's share price to hit a level that allowed him to immediately make an offer at a price that was

---

[10] "Average merger and acquisition (M&A) premiums to four week stock price in the United States (US) in 2017 and 2018, by industry," *Statista*, available at https://www.statista.com/statistics/978494/average-premiums-in-the-united-states-by-industry/. This study compared the transaction price to the company's stock price for the four weeks prior to the announcement of the transaction. It showed similar premiums for the consumer products and services industry (30.7% in 2018 and 39% in 2017) and the retail industry (29.5% in 2018 and 23% in 2017).

substantially lower than the Company's true value. Jumei's stock traded above the Buyout price as recently as January 6, 2020, when Chen was already discussing his offer with Jumei's counsel just five days before he officially made his offer to the Company. The Company's stock price was also consistently higher than the Buyout price for most of 2019 and closed at a price of $2.75 per share—approximately 38% above Chen's offer price—as recently as May 6, 2019.

111.   On February 26, 2020, Defendants caused the materially false, incomplete, and misleading Recommendation Statement, Tender Offer Statement, and Rule 13e-3 Transaction Statements to be filed with the SEC.

112.   While the Recommendation Statement provides a summary of the review process the Special Committee undertook prior to voting to enter into the Merger Agreement with Super ROI and the financial analyses that Houlihan performed in support of its fairness opinion, it misstates and omits certain pieces of critical information that render the Recommendation Statement (including its exhibits and documents incorporated by reference) materially false, misleading, and incomplete. Chen's Tender Offer Statement and Defendants' Rule 13e-3 Transaction Statements also relied on these materially false, misleading, and incomplete statements about the Buyout in the Recommendation Statement.

113.   Specifically, the Recommendation Statement falsely represented, and omitted material information necessary to make not misleading, the data and inputs underlying Houlihan Lokey's financial valuation that purportedly support its so-called "fairness opinion" related to (i) Jumei's financial projections for Jiedian; and (ii) the value of Jumei's businesses and assets other than Jiedian. These misstatements also render false, misleading, and incomplete, Defendants' attestations that the Buyout was "fair" to Jumei's shareholders.

### 1.   The Buyout Fulfills Chen's Plan to Underpay Shareholders for the Company

114.   Chen's offer to purchase Jumei's outstanding shares was the culmination of his years' long effort to take the Company private. After his prior offer to purchase the Company for $7 per share in 2016 failed, Jumei (under Chen's control) proceeded to buy back shares to consolidate his control of the Company and pave the way for his current offer that he made on

1    January 11, 2020. (*See supra* ¶¶ 47-53).

2        115.    On January 17, 2020, a Jumei shareholder from China wrote to the SEC

3    beseeching the SEC to "investigate and stop [Chen's] ultra-low-price tender offer" and "to

4    protect the legitimate interests of the minority shareholders." This investor explained that

5    individual shareholders "will be severely harmed in [Chen's] long-planned robbery." This letter

6    noted that as of Jumei's 2018 Annual Report—the last time that Jumei released any financial

7    information to shareholders before the Buyout—the value of its net assets exceeded $40 per

8    ADS. In addition, Jumei's Shuabao video-sharing app had over 300 million downloads in 2019,

9    giving it substantial value.

10       116.    This investor also noted that on December 25, 2019, Chen promised at the

11   Company's annual shareholder meeting "not to privatize the Company, but instead to work hard

12   to increase the Company's actual stock price." All of these factors led this investor to conclude

13   that Chen "is intentionally manipulating the stock price, to get it lower" for his Buyout.

14           **2.    Houlihan Lokey's and the Special Committee's False and Misleading
                     Analysis**
15

16       117.    In reaching its determination that the Buyout was fair to, and in the best interests

17   of, Jumei's shareholders, the Special Committee relied on Houlihan Lokey's valuation analysis.

18   Defendants initially stated that Houlihan's fairness opinion was one of the factors that the

19   Special Committee considered as supporting its fairness determination. In response to the SEC's

20   criticism of this disclosure as failing to explain the role of Houlihan's analysis in the Company's

21   fairness determination, Defendants clarified that "[t]he Special Committee ***expressly adopted***

22   [Houlihan's] analyses and the opinion of Houlihan Lokey, among other factors considered, in

23   reaching its determination as to the fairness of the transactions contemplated by the Merger

24   Agreement, including the Offer and the Merger."

25       118.    During the Buyout process, the Special Committee focused on Houlihan's

26   fairness analysis based on their discussions during the transaction process, from their

27   introductory "organizational" meeting on January 21, 2020 with Houlihan and Hogan Lovells

28   (the Special Committee's legal advisor), to the Special Committee's recommendation in support

of the Buyout on February 25, 2020. For example, on January 28, 2020, the Special Committee held a telephonic meeting with Houlihan Lokey and Hogan Lovells at which Houlihan updated the Special Committee on the Houlihan's valuation analysis. Then, on February 15, 2020,  the Special Committee held a telephonic meeting with Houlihan Lokey and Hogan Lovells at which Houlihan "presented its financial analysis to the Special Committee based on the preliminary financial due diligence and the Special Committee discussed various aspects of the financial analysis with Houlihan Lokey."

119.    Finally, "[o]n February 25, 2020, the Special Committee held a telephonic meeting with Hogan Lovells and Houlihan Lokey. Hogan Lovells reviewed the fiduciary duties applicable to the Special Committee in connection with the Proposed Transaction and the key terms in the merger agreement. Houlihan Lokey then presented its financial analyses to the Special Committee and verbally rendered its opinion to the Special Committee (which was subsequently confirmed in writing by delivery of Houlihan Lokey's written opinion addressed to the Special Committee on the same date), as to the fairness, from a financial point of view, of the [Buyout] consideration of $2.00 per Share or $20.00 per ADS." The Special Committee made its fairness determination and recommendations in support of the Buyout that same day.

120.    The Special Committee decided not to conduct a market check to assess potential alternative offers for the Company from third parties—a standard step in the buyout process— because (i) Chen "holds approximately 88.8% voting power in the Company"; (ii) he "made it clear that [he] is committed to the current proposal only"; (iii) Jumei represented it made "efforts to seek third party financing in the past with no fruitful outcome"; and (iv) "the Special Committee may change its recommendation of the current proposal."

121.    These reasons are patently insufficient to justify omitting such a basic step that is necessary to assess the adequacy of a tender offer. Chen's holding 88.8% of the voting power, and his refusal to consider alternative transactions, speak only to his undue influence over other the Company, not to the fairness of his offer. Moreover, the Special Committee merely accepted Chen's representation that past efforts to obtain third party financing were unsuccessful. Neither

the Special Committee nor Houlihan actually investigated themselves whether such financing was available.

122.    The Special Committee agreed to pay Houlihan Lokey up to $750,000 for its fairness opinion, including $300,000 upon the execution of the engagement letter; $400,000 upon the earlier of the execution by the Company of definitive legally binding documentation with respect to a transaction or Houlihan Lokey's delivery of the opinion; and up to an additional $50,000, "payable at the Committee's sole discretion," if the Committee "is satisfied with Houlihan Lokey's performance." While Jumei stated that no portion of Houlihan's fee was contingent upon any conclusions set forth in the Opinion, this $50,000 discretionary fee, based on the Special Committee's undefined "satisfaction" with Houlihan's performance, improperly incentivized Houlihan to provide an opinion in line with Defendants' expectations.

123.    Houlihan determined that Jumei is worth between $13.68 and $24.66 per ADS (or $1.368 and $2.466 per share) based on its analyses of the combined value of (1) Jiedian and (2) Jumei's "Other Businesses."

124.    According to Houlihan's analysis, Jiedian was worth between $119.5 million and $177.6 million based on the Company management's financial projections and business assumptions for Jiedian.

125.    Houlihan then conducted a "liquidation analysis" on Jumei's other businesses (including its flagship e-commerce business, its Shuabao video-sharing app, its $110 million in cash holdings, and its other investments). This liquidation analysis was based entirely on the representation of Jumei's management that they planned to wind down Jumei's businesses other than Jiedian. Based on this liquidation analysis, Houlihan determined that Jumei's Other Businesses were worth between $37.2 million and $105.3 million.

126.    Houlihan's range for the value of the entire Company was therefore between $156.7 million (adding the low-end of its $119.5 million valuation for Jiedian and its $37.2 million valuation for Jumei's Other Businesses) and $282.8 million (adding the high-end of its $177.6 million valuation for Jiedian and its $105.3 million valuation for Jumei's Other

Businesses).    The midpoint of this range in value for the entire Company is $219.75 million.

127.    When evaluating Jumei's value, Houlihan relied entirely upon the assumptions provided by Jumei's management. In particular, Houlihan "relied upon  and assumed, without independent verification, the accuracy and completeness of all data, material and other information," including the information provided by Company management. This included the financial projections that Jumei's management provided. "Houlihan Lokey expressed no opinion with respect to such projections or the assumptions on which they were based."

128.    Houlihan also based its analysis on conversations with "certain members of the management of the Company and certain of its and the Committee's representatives and advisors regarding the businesses, operations, financial condition and prospects of the Company, the Transaction and related matters" and on "a certificate addressed to us from senior management of the Company which contains, among other things, representations regarding the accuracy of the information, data and other materials (financial or otherwise) provided to, or discussed with, us by or on behalf of the Company."

129.    Houlihan reviewed financial projections only for Jumei's Jiedian business, and not for any of its other businesses, including its flagship e-commerce business and its popular Shuabao video-sharing app. Jumei's management advised Houlihan, and Houlihan assumed, "that (i) due to the capital intensiveness of certain businesses of the Company, the inability of the Company to secure third party financing and the recent difficulties faced by the E-Commerce segment of the Company's businesses, among other factors, the Company expected to wind down its Other Businesses by 2021 and 2022, respectively, and (ii) the Company was unable to adequately finance the operations of its businesses resulting in limited expected growth at Jiedian business."

130.    Houlihan's analysis was even more dependent on Jumei's management because "the Company advised Houlihan Lokey, and Houlihan Lokey assumed, that the liquidation analysis of the Other Businesses of the Company reviewed by Houlihan Lokey were reasonably prepared by the management of the Company in good faith on bases reflecting the best currently

available estimates and judgments of such management as to the matters covered thereby, and Houlihan Lokey expressed no opinion with respect to such analysis, or the estimates, assumptions or judgements on which they were based."

131.    Houlihan also added another suspicious qualification in its fairness opinion, stating that it "relied upon and assumed, without independent verification, that there has been no change in" Jumei's business "since the respective dates of the most recent financial statements and other information, financial or otherwise, provided to us that would be material to our analyses or this Opinion, and that there is no information or any facts that would make any of the information reviewed by us incomplete or misleading, ***except the fact that*** the Company has delayed in reporting its financial results for the six months ended June 30, 2019 and the likelihood that the Company may restate its financial results for the fiscal years of 2017 and 2018, which, however, as advised by the management of the Company and relied upon and assumed by us, will not have any material impact on our analyses or this Opinion."

132.    Houlihan's valuation analysis was therefore based entirely on the unusual set of assumptions that Jumei's management provided. While the Recommendation Statement did not say who from Jumei's "management" provided these assumptions to the Special Committee, this information had to have come from or been approved by Chen because, as Jumei's CEO, acting CFO, Chairman, and dominant shareholder, he exerted total control over the Company. Indeed, the Recommendation Statement listed only two "Executive Officers of the Company": Chen, as Jumei's "Founder, Chairman of the Board of Directors, Chief Executive Officer and Acting Chief Financial Officer," and Huipu Liu, as "Senior Vice President." Jumei's "management" could not have made financial projections or assumptions about Jumei's business without Chen's involvement and approval.

### 3.    Defendants Provided False Projections for Jiedian

133.    Jumei provided Houlihan with false financial projections for Jiedian. The Recommendation Statement stated that the "Management Projections on Jiedian were prepared by the Company's management in February 2020, based on certain assumptions that

management then believed to be potentially achievable." While Management projected that Jiedian's revenue would grow 14.3% in 2020, for 2021 through 2024, Jiedian's revenue was projected to be either flat (0.2% growth in 2021) or *negative* (between minus 1% and minus 2.1% from 2022 through 2024):

The following table summarizes the Management Projections on Jiedian:

| | 2020E | 2021E | 2022E | 2023E | 2024E |
|---|---|---|---|---|---|
| | | (RMB in millions, except for percentages) | | | |
| **Revenues, Net** | **1,559.7** | **1,563.2** | **1,548.0** | **1,516.3** | **1,484.9** |
| Growth % | 14.3 | 0.2 | (1.0) | (2.0) | (2.1) |
| Cost of Goods Sold | (986.2) | (1,051.5) | (1,097.2) | (1,005.0) | (955.4) |
| **Gross Profit** | **573.5** | **511.7** | **450.8** | **511.4** | **529.5** |
| Margin % | 36.8 | 32.7 | 29.1 | 33.7 | 35.7 |
| **Adjusted EBITDA** | **115.3** | **51.4** | **(12.5)** | **(8.3)** | **(4.2)** |
| Margin % | 7.4 | 3.3 | (0.8) | (0.5) | (0.3) |
| Growth % | (32.3) | (55.4) | * | * | * |
| **Adjusted EBIT** | **(63.2)** | **(120.2)** | **(169.2)** | **(93.1)** | **(60.0)** |
| Margin % | (4.1) | (7.7) | (10.9) | (6.1) | (4.0) |

*Note: * not meaningful figure*

134.    This resulted in a paltry estimated compound annual growth rate ("CAGR") of just 1.7% for 2019 through 2024. Based on these projections, Houlihan valued Jiedian as being worth between $119.5 million and $177.6 million. Houlihan explained in its February 25, 2020 presentation to the Special Committee, which was an exhibit to the Recommendation Statement, that the financial projections for Jiedian "do not assume the Company can raise sufficient financing to support Jiedian's required capital expenditures, increased revenue sharing costs and sales & marketing expenses, that are necessary to compete with other major players in the industry." Houlihan stated that the source for this information was "Company management":

## Jiedian Financial Analysis
Selected Historical and Projected Financial Information

Projections do not assume the Company can raise sufficient financing to support Jiedian's required capital expenditures, increased revenue sharing costs and sales & marketing expenses, that are necessary to compete with other major players in the industry.

*(RMB in millions)*

| | Fiscal Year Ended December 31, | | Fiscal Year Ending December 31, | | | | | CAGR 2019 to 2021E | CAGR 2019 to 2024E |
|---|---|---|---|---|---|---|---|---|---|
| | 2018 | 2019 | 2020E | 2021E | 2022E | 2023E | 2024E | | |
| Self-Operated Leasing [1] | ¥228.0 | ¥619.0 | ¥674.8 | ¥747.7 | ¥878.9 | ¥860.6 | ¥842.3 | | |
| Outsourced Leasing [2] | 346.7 | 605.9 | 742.2 | 671.4 | 524.9 | 512.7 | 500.5 | | |
| Power Bank Sales [3] | 117.2 | 139.0 | 141.7 | 141.9 | 140.4 | 137.3 | 134.3 | | |
| Other [4] | 5.2 | 7.6 | 8.8 | 10.1 | 11.6 | 13.3 | 15.4 | | |
| Business Tax and Surcharges | 0.0 | (7.3) | (7.8) | (7.9) | (7.8) | (7.6) | (7.5) | | |
| **Revenues, Net** | **¥697.0** | **¥1,364.2** | **¥1,559.7** | **¥1,563.2** | **¥1,548.0** | **¥1,516.3** | **¥1,484.9** | **7.0%** | **1.7%** |
| *Growth %* | | 95.7% | 14.3% | 0.2% | -1.0% | -2.0% | -2.1% | | |
| Cost of Goods Sold | (407.2) | (947.8) | (986.2) | (1,051.5) | (1,097.2) | (1,005.0) | (955.4) | | |
| Gross Profit | ¥289.8 | ¥416.4 | ¥573.5 | ¥511.7 | ¥450.8 | ¥511.4 | ¥529.5 | | |
| *Margin %* | 41.6% | 30.5% | 36.8% | 32.7% | 29.1% | 33.7% | 35.7% | | |
| General & Administrative Expense | (16.7) | (19.8) | (23.5) | (23.6) | (23.3) | (22.9) | (22.4) | | |
| Stock Based Compensation Expense | 0.0 | (61.9) | (17.5) | (11.4) | (5.5) | (2.5) | 0.0 | | |
| Sales & Marketing Expense | (185.3) | (357.0) | (548.6) | (549.9) | (544.5) | (533.4) | (522.3) | | |
| Product Development Expense | (41.2) | (44.2) | (47.0) | (47.1) | (46.7) | (45.7) | (44.8) | | |
| Depreciation & Amortization | 149.5 | 236.9 | 178.5 | 171.6 | 156.7 | 84.9 | 55.8 | | |
| **Adjusted EBITDA** | **¥196.0** | **¥170.4** | **¥115.3** | **¥51.4** | **(¥12.5)** | **(¥8.3)** | **(¥4.2)** | **-45.1%** | **NMF** |
| *Margin %* | 28.1% | 12.5% | 7.4% | 3.3% | -0.8% | -0.5% | -0.3% | | |
| *Growth %* | | -13.1% | -32.3% | -55.4% | NMF | NMF | NMF | | |
| Depreciation & Amortization | (149.5) | (236.9) | (178.5) | (171.6) | (156.7) | (84.9) | (55.8) | | |
| **Adjusted EBIT** | **¥46.5** | **(¥66.5)** | **(¥63.2)** | **(¥120.2)** | **(¥169.2)** | **(¥93.1)** | **(¥60.0)** | **NMF** | **NMF** |
| *Margin %* | 6.7% | -4.9% | -4.1% | -7.7% | -10.9% | -6.1% | -4.0% | | |
| **Additional Financial Information** | | | | | | | | | |
| Capital Expenditures | (¥305.7) | (¥330.9) | (¥145.2) | (¥130.4) | (¥113.2) | (¥111.0) | (¥107.8) | | |

Source: Company management
1. Represents revenue generated by internal business managers who negotiate with merchants and deploy power banks.
2. Represents revenue generated by the Company contracting third parties to negotiate with merchants and deploy power banks.
3. Represents revenue generated by selling power banks directly to users if they do not return those to the power bank cabinets.
4. Represents advertising revenue generated by displaying advertisements on the Company's power bank cabinets.

Preliminary and Confidential | Subject to Further Review and Revision

HOULIHAN LOKEY   13

135.    Houlihan also noted that its approach to its financial analysis for each of Jiedian's distinct businesses was based on "a review of the company and industry considerations impacting each business, including, but not limited to, capital intensiveness, lack of available third party financing and competitive pressure." The source for this information was, again, "Company management."

136.    Similarly, the Special Committee based its fairness assessment on the assumption that Jumei faced "ongoing business challenges," including "increasing competition faced by the Jiedian power bank sharing business and the live video broadcasting business which require consistent cash support for expansion of the businesses."

137.    In other words, if Jumei could raise sufficient financing, Jiedian's growth prospects and financial projections would be much better than the projections that formed the basis for Houlihan's analysis.

138.    Houlihan did not conduct any "independent verification" of these assumptions, but instead relied entirely on information about "[r]ecent financing efforts as provided by Company management" and the "[f]orecast provided by Company management." Chen's longstanding efforts to purchase Jumei and his lack of transparency with its public shareholders cast substantial doubt on these assumptions.

139.    Moreover, the Special Committee noted that Chen's "ownership of a significant percentage of the voting power of the Shares of the Company and [his] public expression of unwillingness to consider alternative sale transactions" was a "countervailing factor" that counseled against the fairness of the Buyout. This also casts doubt on the assumption that Jumei provided to Houlihan about its inability—as opposed to Chen's unwillingness—to obtain financing for Jiedian.

140.    In addition, Jumei would have had more cash to fund Jiedian's operations if not for Chen's burdening the Company with $116 million of debt, and using $30 million of Jumei's $110 million of cash on hand, to complete the Buyout. (*See supra* ¶¶ 103-04). It is implausible that Chen would have done this financial maneuvering if doing so would depress the value of

his Company by preventing Jiedian from being able to expand further and maintain its place atop the fast-growing power bank industry.

> a. _Jumei's Management Falsely Assumed that Jiedian Did Not Have Adequate Financing Available_

141.    The low-growth projections that Jiedian's management gave to Houlihan were based on the assumption that Jiedian would not have adequate financing available to fund its business. This was false for several reasons.

> i.    **Jumei Was Engaged in Negotiations to Sell Jiedian to One of the Company's Main Competitors**

142.    A senior procurement engineer at Jiedian from June 2017 to July 2020 (Confidential Witness, or "CW," 1) reported that former colleagues at Jiedian who now work for Laidian (one of the other four main power bank companies in China) has been in negotiations with Jiedian regarding a planned acquisition of Jiedian since early 2020.

143.    This fact alone makes the Company's assumption that there was not adequate financing available for Jiedian, false.  At the very least, it was highly misleading for Defendants to make that assumption without disclosing these ongoing negotiations.

144.    Moreover, Defendants falsely stated in the Recommendation Statement that "the Company is not currently undertaking or engaged in any negotiations in response to the Offer that relate to, or would result in, (a) a tender offer for or other acquisition of the Company's securities by the Company, any subsidiary of the Company or any other person, (b) any extraordinary transaction, such as a merger, reorganization or liquidation, involving the Company or any subsidiary of the Company, (c) any purchase, sale or transfer of a material amount of assets of the Company or any subsidiary of the Company, or (d) any material change in any present dividend rate or policy, indebtedness or capitalization of the Company."

145.    Similarly, Chen stated in his Offer to Purchase (which was incorporated by reference into the Recommendation Statement) that "[e]xcept as otherwise described in this Offer to Purchase, Parent and Purchaser have no current plans or proposals or negotiations that relate to or would result in (i) an extraordinary corporate transaction, such as a merger (other

than the Merger), reorganization or liquidation involving Jumei or any of its subsidiaries; (ii) any purchase, sale or transfer of a material amount of assets of Jumei or any of its subsidiaries; (iii) any material change in Jumei's present dividend rate or policy or the indebtedness or capitalization of Jumei; or (iv) any other material change in Jumei's corporate structure or business."

146.    These statements that the Company was "not currently undertaking or engaged in any *negotiations*," and that Chen had "no current plans or proposals or *negotiations*," that would result in the change in ownership or structure of any of the Company's assets or subsidiaries was blatantly false in light of Jumei's ongoing negotiations to sell Jiedian to Laidian.

### ii.    Jiedian Also Had Other Financing Opportunities Available

147.    Many sources show that abundant financing was available for Jiedian's competitors, both immediately before and after the Buyout. Jiedian, as the industry leader, had these same types of financing opportunities.

148.    In March 2020, iResearch, a leading market research firm in China that focuses on the technology industry, released a report on the power bank sharing industry in China (the "iResearch Report"). This Report confirmed that the industry was growing rapidly leading up to Chen's offer and that Jiedian was the leading company in the industry. It explained that "[i]n 2019, the charger sharing industry underwent a rapid emergence." The report specifically listed "the four dominant players in the market [as] Jiedian, Laidian, Xiaodian, and Energy Monster."

149.    The iResearch Report also explained that after a lull in the industry in 2017 that led to second-tier companies closing, the top four players—including Jiedian—remained. Several factors then led to the industry gaining momentum from the second half of 2018 through 2019. First, "during the second half of 2018, the top companies announced one after another that they would achieve profitability." The report specially noted that "Jiedian announced a large-scale profit for three consecutive months" around August 2018. Second, in September 2019, the going rate for power bank services doubled, from 1 yuan per hour to 2

yuan per hour. Third, in December 2019, Energy Monster (one of Jiedian's three peer company's) raised 500 million yuan in financing. These factors combined "caused the industry once again to attract the attention of the investment and financing industries."

150.    Consistent with Energy Monster having raised 500 million yuan in financing in December 2019, the investor that complained to the SEC on January 17, 2020, noted that one of Jiedian's peer companies of a similar size was able to raise $70 million in financing in December 2019, giving it a valuation of more than $500 million.

151.    Similarly, on June 17, 2020, the *Hurun Report*, one of the most influential consulting companies in China, noted that Energy Monster "completed 500 million yuan in Series C financing at the end of last year in 2019. This round of financing was led by SoftBank Asia Ventures, and BOC International, Goldman Sachs, Shangyu Capital, Yunjiu Capital, Hillhouse Capital, Shunwei Capital and other outstanding capital companies."[11]

152.    In addition, the iResearch Report explained that in 2019, China's power bank sharing market grew by 143%. The report stated that "[t]he outlook for the first and second tier markets is progressively improving every day, and the market has begun to reach third and fourth-tier cities." The ***industry was projected as of March 2020 "to have a high growth rate, with a trend of 50-80% in the next few years***." The report also explained that "[t]he industry has progressively become more mature, and the business model has been tested and verified by the market, with first and second-tier cities covering high high-yield areas, showing successful cultivation of user habits and profits have basically been realized." But the industry was just beginning to enter smaller markets and was therefore "at its early period . . . . As [a] whole the industry is in an early stage of maturity, and ***there is much room for growth***."

153.    The iResearch Report also described Jiedian as having "many successful cases of marketing and cobranding," including in connection with the FIFA World Cup, and having plans for further growth. The report stated that Jiedian was focused on optimizing the user

---

[11] "Monster Charging is on the List of '2020 Hurun China Gazelle Enterprise," *Jiangxi Internet Radio and Television Station* (June 24, 2020), available at https://cn.chinadaily.com.cn/a/202006/24/WS5ef318a8a310a859d09d41f9.html.

experience, providing vendors with customized solutions, expanding into new markets, and offering its services in collaboration with new partners.

154.    These observations are consistent with the results that Jumei reported for Jiedian in its 2018 Annual Report, and in connection with the Buyout, where the Company described its revenue from Other Services increasing five-fold in 2018, stated that Jiedian's revenue increased 95.7% in 2019 as compared to 2018, and highlighted Jiedian's attractive profit margins. (*See supra* ¶¶ 70-74).

155.    Jumei also explained to the SEC on August 26, 2019, that the Company promised the holders of the remaining noncontrolling interest in Jiedian that Jumei did not purchase, that if Jiedian did not complete an initial public offering within five years of Jumei's initial investment in May 2017 (*i.e.*, by May 2022) and other undefined conditions were not met, then those noncontrolling interests would be redeemable at an annual interest rate of 10% from the investment date until the date on which the redemption amount is paid in full. Jumei also concluded at that time that "it is not probable that the non-controlling interests will become redeemable because the likelihood of a Jiedian Qualified IPO not occurring, and the occurrence of a material breach as defined in the Acquisition Agreement, are both remote."

156.    Jumei did not change that assumption or otherwise account for the redemption of the noncontrolling interests in Jiedian when valuing Jiedian for the Buyout. This shows that even during the Buyout process, Jumei expected to be able to conduct an IPO for Jiedian by May 2022, or conduct a comparable transaction that would satisfy the rights of the noncontrolling interests in Jiedian.

157.    Furthermore, on January 7, 2020, the news organization *36Kr* released an article from *Blue Whale TMT* describing an interview with Jiedian's CEO, Wan Li. This article noted that Energy Monster's 500 million yuan financing (described above) "undoubtedly boosted industry confidence." The article described Jiedian as "the leading company" of the top four in the industry, "currently occupying the largest market share in the shared power bank industry." Jiedian had over 200 million users in 2019, which was double the 100 million users that it had

in 2018. Li stated that Jiedian was the only company in the industry that increased its revenue since August 2019, with its highest revenue for the year coming in December 2019. Li also stated that Jiedian planned further expansion in smaller cities. He also described several positive factors for the industry as a whole, including that power banks are more profitable than other types of shared goods (such as bicycles) and that the introduction of 5G technology would be a big benefit for the industry because it will make mobile phones consume much more power while battery capacity is not expected to increase at the same rate.[12]

158.    Then, in June 2020, just three months after the Buyout, Xiaodian, one of the four leading power bank sharing companies, filed documents with the Chinese Securities Regulatory Commission to prepare for an upcoming IPO.[13] Li, Jiedian's CEO, explained in an interview with *Caijing Tuya* that this IPO "fully proved the commercial value and investment potential of the shared power bank industry." According to Li, "Xiaodian's IPO filing is not an isolated incident, I believe that we can see more capital moves in this market soon. For the top players in the market, opportunities and challenges are the same."[14]

159.    This article also described Li as touting Jiedian's advantages over its competitors such as Xiaodian, because Jiedian "is one of the pioneering companies in the industry, it is also a brand that leads with comprehensive strength. . . . We use data-based methods to make scientific judgments and considerations for all points. . . . [Jiedian] can make accurate judgments on market merchants" and make accurate local "strategic direction and guidance." Li saw vast potential for growth based on the transition to 5G technology and the opportunity for user and vendor growth.

160.    In addition, this article described Jiedian's compound growth rate for the prior three years as being 40%. It commented on Jiedian, and the industry in general, achieving

---

[12] "Interview With Jiedian CEO Wan Li," *Blue Whale TMT* (January 7, 2020), available at https://36kr.com/p/1724956147713.
**[13]** "Xiaodian Technology Accepts Listing Guidance," *36Kr* (July 6, 2020), available at https://36kr.com/p/782125053698694.
[14] "Dialogue With Jiedian CEO Wan Li," *Caijing Tuya* (July 13, 2020), available at https://xueqiu.com/6741233383/153826024.

SECOND AMENDED CLASS ACTION COMPLAINT

1   greater profits in 2019 than in the past. The article also noted iResearch's prediction that the
2   industry would experience enormous growth for the next three years would, in part because of
3   the room for growth in smaller cities.

4   161.   An August 24, 2020 article in the *South China Morning Post* confirms these
5   observations, repeating the earlier statement by Jiedian's CEO (which this article attributed to a
6   Jiedian representative) as stating that "Xiaodian's planned IPO is not an isolated event, and we
7   will soon witness more moves by the capital markets in the industry." This article also noted
8   iResearch's estimate from March 2020 that after growing 140% in 2019, the industry would
9   grow 17% in 2020 and then accelerate to grow between 50% and 80% annually in the upcoming
10  years. This article also cited a Trustdata report as describing Jiedian as the "front-runner" of the
11  industry with a market-share of 28.6% in 2019 (followed by Xiaodian at 27%, Energy Monster
12  at 25.1%, and Laidian at 15.6%).[15]

13  162.   In addition, an August 27, 2020 article from *Lei Technology* described how
14  abundant financing has been available for the industry since the consolidation and profitability
15  that Jiedian and its main competitors experienced in 2018. This article noted that "[t]he reason
16  why capital is willing to continue blood transfusions for shared power banks is that it has not
17  followed up the blind expansion of shared bicycles [which did not perform well], but has
18  focused its main energy on reducing costs and increasing revenue." This article also described
19  Jiedian as continuing to be the industry leader.[16]

20  163.   All of these sources show that, contrary to Jumei's representation to Houlihan
21  that the Company was unable to raise adequate financing for Jiedian, Jiedian was the leading
22  business in the fast-growing and profitable power bank sharing industry in China. Substantial
23  financing was available for Jiedian's main competitors both immediately before and after the

24  _____

25  [15] "China's power bank sharing industry took a hit from Covid-19, but it's not out of juice yet,"
    South China Morning Post (August 24, 2020), available at
26  https://www.scmp.com/print/tech/gear/article/3098327/chinas-power-bank-sharing-industry-
    took-hit-covid-19-its-not-out-juice.
27  [16] "After the epidemic has passed, shared power banks should worry about Meituan," *Lei
    Technology* (August 27, 2020), available at https://www.leikeji.com/article/31590.

28

Buyout. This includes Energy Monster raising 500 million yuan in December 2019 at a $500 million valuation and Xiaodian's IPO that it filed for in June 2020. Jiedian's CEO and industry analysts viewed these developments as promising for Jiedian's further growth. It strains credulity, and basic economic principles, to suggest that Jiedian's main competitors had abundant financing but that type of financing was not available to Jiedian even though Jiedian was in a stronger position than those peer companies. Moreover, Jumei has also been negotiating to be acquired by Laidian, and Jumei continues to assume that it will be able to conduct an IPO or equivalent transaction for Jiedian by May 2022. The low financial projections for Jiedian that formed the basis of Houlihan's analysis therefore had no basis because they were premised on the false assumption that Jiedian would not be able to raise adequate financing. These projections were also materially misleading because they omitted Jumei's true projections for Jiedian based on the alternative where Jiedian did have adequate financing available.

b.    *The Jiedian Financial Projections Were False Regardless of the Availability of Additional Financing*

164.    The financial projections for Jiedian that formed the basis for Houlihan's analysis were also false because Jiedian did not actually need additional financing to grow beyond the flat-to-negative growth that management predicted for 2021 through 2024. Even if additional financing would have been helpful for Jiedian to grow even further, its current position set it up to perform far better than Jumei's management disclosed.

165.    A May 12, 2020 article on *Sohu* that discussed Jiedian's strong performance amid the coronavirus pandemic revealed Jiedian's true financial position. This article described Jiedian's orders during the recent May Day holiday as "strong and eye-catching." Jiedian's performance even surpassed its pre-pandemic levels from December 2019 (which itself had been Jiedian's strongest performance in 2019, as described above and in this article). This article described Jiedian's strong performance as "inseparable" from its years'-long strategy of actively promoting its products across many different types of venues. It also described how, in 2019, Jiedian "completed the full-scene comprehensive layout of catering, supermarkets,

entertainment and other consumption scenarios, high-speed rail, passenger transportation, airports and other transportation scenarios, libraries, hospitals, museums and other public places" in major cities, while it was still actively promoting expansion in smaller cities. As of November 2019, Jiedian "achieved 95% of the country's urban coverage." Its placement in many different types of venues and its extensive urban coverage "weakened the impact of a single consumption field to a certain extent, enabling [Jiedian] to achieve a more balanced and stable growth overall."[17]

166.    This *Sohu* article quoted an internal letter that Wan Li, Jiedian's CEO, sent to company employees, assuring them that "the immediate difficulties are temporary, and opportunities belong to those who are prepared. . . . I trust you all, and ***our reserves have enough of a margin of safety to face future challenges***."

167.    In addition, this article cited analysts that attributed Jiedian's ability to outperform its rivals based on its business strategy that focused on data analysis. This not only helped Jiedian "achieve counter-trend growth," but also "brought stable cash flow to it." The article also described Jiedian's room for revenue growth through more partnerships that increase customers for the businesses that host its power banks, and cited several examples of how Jiedian has already done that. Jiedian was also continuing "to optimize the user experience and improve user stickiness through various methods such as sign-in and points mall benefits."

168.    While this *Sohu* article discussed Jiedian's performance amid the pandemic, it shows how Jiedian did not need additional financing to continue to grow. Jiedian's industry-leading performance gave it "stable cash flow" that allowed it to surpass its competitors. Jiedian's CEO was therefore able to assure employees in an internal letter that Jiedian's "reserves have enough margins to face future challenges" and that it was prepared to capitalize on business opportunities. This description of Jiedian's strong internal finances, regardless of external market conditions, directly contradicts Defendants' assessment in the Recommendation Statement that Jiedian would contract if it could not raise adequate financing.

---

[17] "Jiedian's May Day Ushered in a Small Peak in Use," *Sohu* (May 12, 2020), available at https://www.sohu.com/a/394707478_536272.

To the contrary, while additional financing might have helped Jiedian expand even further, its current position easily provided Jiedian with a path to grow in the coming years. That is far more than what management's financial projections in the Recommendation Statement disclosed.

        c.     *Houlihan's Analysis of Jiedian Was Tainted Even Further by the Irrelevant Companies it Chose for Its Selected Companies Analysis*

169.    The inadequacy of Houlihan's analysis is further demonstrated by its selected companies analysis. Houlihan calculated Jiedian's enterprise value by apply a multiple range of 0.90x to 1.20x to Jiedian's estimated 2019 revenue and a range of 0.80x to 1.10x to Jiedian's estimated 2020 revenue. But Houlihan selected only rent-to-own appliance companies in the United States and rental car companies (only one of which is located in China) for its set of comparable companies. None of these remotely resemble Jiedian's fast-growing power bank sharing business in China.

170.    A basic tenet of valuation analysis is that a financial advisor must select comparable companies that actually provide a basis for comparison to the company at issue. Otherwise the comparable companies analysis is, by definition, irrelevant. A prominent finance professor known as the "Dean of Valuation" explains that "[w]hen multiples are used, they tend to be used in conjunction with comparable firms to determine the value of a firm or its equity. But what is a comparable firm? A comparable firm is one with cash flows, growth potential, and risk similar to the firm being valued."[18]

171.    Plaintiff's counsel has consulted an expert in in Chinese M&A and capital market transactions, who explains that it is inappropriate to compare Jiedian, a high-growth Chinese company with high profit margins in the power bank sharing industry, to U.S. car and appliance rental companies. For example, Houlihan's analysis shows that both Avis (a rental car company) and Rent-a-Center (an appliance rental company) were projected to have just 2.8% revenue growth in 2020, as compared to Jiedian's 14.3% revenue growth:

---

[18] Aswath Damodaran, "Valuation Approaches and Metrics: A Survey of the Theory and Evidence," at 65 (November 2006).

## Jiedian Financial Analysis
### Selected Benchmarking Information

**Size** (LTM Revenue, millions)

| Rent-to-Own Companies | |
|---|---|
| Aaron's, Inc. | $3,947.7 |
| Rent-A-Center, Inc. | $2,663.7 |
| Jiedian | $194.3 |
| FlashShopper, Inc. | $107.6 |
| **Car Rental Companies** | |
| Hertz Global Holdings, Inc. | $9,749.0 |
| Avis Budget Group, Inc. | $9,172.0 |
| AMERCO | $3,862.9 |
| Europcar Mobility Group S.A. | $3,192.6 |
| Localiza Rent a Car S.A. | $2,220.2 |
| CAR Inc. | $1,041.3 |
| Jiedian | $194.3 |

**Size [1]** (Enterprise Value as of 2/21/20, millions)

| Rent-to-Own Companies | |
|---|---|
| Aaron's, Inc. | $3,241.2 |
| Rent-A-Center, Inc. | $1,601.2 |
| FlexShopper, Inc. | $106.4 |
| **Car Rental Companies** | |
| Hertz Global Holdings, Inc. | $20,271.8 |
| Avis Budget Group, Inc. | $17,256.1 |
| Localiza Rent a Car S.A. | $10,664.3 |
| AMERCO | $10,160.6 |
| Europcar Mobility Group S.A. | $5,554.0 |
| CAR Inc. | $2,801.7 |

**Leverage [1]** (Debt to Enterprise Value as of 2/21/20)

| Rent-to-Own Companies | |
|---|---|
| Aaron's, Inc. | 10.5% |
| Rent-A-Center, Inc. | 15.7% |
| FlexShopper, Inc. | 23.5% |
| **Car Rental Companies** | |
| Localiza Rent a Car S.A. | 16.4% |
| AMERCO | 44.8% |
| CAR Inc. | 73.5% |
| Avis Budget Group, Inc. | 84.0% |
| Hertz Global Holdings, Inc. | 89.0% |
| Europcar Mobility Group S.A. | 92.7% |

**Liquidity** (LTM Current Ratio)

| Rent-to-Own Companies | |
|---|---|
| FlexShopper, Inc. | 7.3 |
| Rent-A-Center, Inc. | 2.2 |
| Jiedian | 0.6 |
| Aaron's, Inc. | 0.3 |
| **Car Rental Companies** | |
| AMERCO | 5.2 |
| Hertz Global Holdings, Inc. | 1.6 |
| Europcar Mobility Group S.A. | 1.1 |
| Localiza Rent a Car S.A. | 1.1 |
| CAR Inc. | 1.0 |
| Avis Budget Group, Inc. | 1.0 |
| Jiedian | 0.6 |

**Historical Growth** (CY 2018 to CY 2019 Revenue)

| Rent-to-Own Companies | |
|---|---|
| Jiedian | 96.7% |
| FlexShopper, Inc. | 5.2% |
| Aaron's, Inc. | 3.1% |
| Rent-A-Center, Inc. | 0.0% |
| **Car Rental Companies** | |
| Jiedian | 96.7% |
| CAR Inc. | 33.9% |
| Localiza Rent a Car S.A. | 31.5% |
| AMERCO | 4.2% |
| Hertz Global Holdings, Inc. | 3.1% |
| Europcar Mobility Group S.A. | 0.7% |
| Avis Budget Group, Inc. | 0.5% |

**Projected Growth** (CY 2020E Revenue)

| Rent-to-Own Companies | |
|---|---|
| FlexShopper, Inc. | 27.4% |
| Jiedian | 14.3% |
| Aaron's, Inc. | 9.3% |
| Rent-A-Center, Inc. | 2.8% |
| **Car Rental Companies** | |
| Localiza Rent a Car S.A. | 27.2% |
| Jiedian | 14.3% |
| CAR Inc. | 12.1% |
| Europcar Mobility Group S.A. | 6.4% |
| Hertz Global Holdings, Inc. | 3.0% |
| Avis Budget Group, Inc. | 2.8% |
| AMERCO | 1.9% |

**Historical Growth** (CY 2018 to CY 2019 Adjusted EBIT)

| Rent-to-Own Companies | |
|---|---|
| FlexShopper, Inc. | 102.2% |
| Aaron's, Inc. | 8.1% |
| Rent-A-Center, Inc. | NMF |
| Jiedian | NMF |
| **Car Rental Companies** | |
| Localiza Rent a Car S.A. | 20.1% |
| Europcar Mobility Group S.A. | -14.4% |
| CAR Inc. | NA |
| AMERCO | NMF |
| Hertz Global Holdings, Inc. | NMF |
| Jiedian | NMF |

**Projected Growth** (CY 2019 to CY 2020E Adjusted EBIT)

| Rent-to-Own Companies | |
|---|---|
| Aaron's, Inc. | 114.7% |
| Rent-A-Center, Inc. | 12.4% |
| FlexShopper, Inc. | -5.1% |
| Jiedian | NMF |
| **Car Rental Companies** | |
| Hertz Global Holdings, Inc. | 35.6% |
| Localiza Rent a Car S.A. | 29.3% |
| Europcar Mobility Group S.A. | 9.6% |
| AMERCO | NA |
| CAR Inc. | NA |
| Jiedian | NMF |

**Profitability** (CY 2019E Adjusted EBIT to 2019E Revenue)

| Rent-to-Own Companies | |
|---|---|
| Rent-A-Center, Inc. | 8.8% |
| Aaron's, Inc. | 7.9% |
| FlexShopper, Inc. | 4.8% |
| Jiedian | -4.9% |
| **Car Rental Companies** | |
| Localiza Rent a Car S.A. | 14.5% |
| AMERCO | 14.3% |
| Europcar Mobility Group S.A. | 10.1% |
| Avis Budget Group, Inc. | 6.2% |
| Hertz Global Holdings, Inc. | 4.8% |
| Jiedian | -4.9% |
| CAR Inc. | NA |

**Profitability** (CY 2020E Adjusted EBIT to CY 2020E Revenue)

| Rent-to-Own Companies | |
|---|---|
| Aaron's, Inc. | 8.2% |
| Rent-A-Center, Inc. | 8.1% |
| FlexShopper, Inc. | 8.1% |
| Jiedian | -4.1% |
| **Car Rental Companies** | |
| Localiza Rent a Car S.A. | 14.8% |
| Europcar Mobility Group S.A. | 9.8% |
| Avis Budget Group, Inc. | 6.5% |
| Hertz Global Holdings, Inc. | 6.3% |
| Jiedian | -4.1% |
| AMERCO | NA |
| CAR Inc. | NA |

**Internal Investment** (LTM Capital Expenditures to LTM Revenue)

| Rent-to-Own Companies | |
|---|---|
| Jiedian | 24.3% |
| Aaron's, Inc. | 2.4% |
| FlexShopper, Inc. | 2.0% |
| Rent-A-Center, Inc. | 0.7% |
| **Car Rental Companies** | |
| Hertz Global Holdings, Inc. | 145.5% |
| AMERCO | 63.4% |
| Jiedian | 24.3% |
| Europcar Mobility Group S.A. | 2.9% |
| Avis Budget Group, Inc. | 2.7% |
| CAR Inc. | 2.3% |
| Localiza Rent a Car S.A. | 0.4% |

Source: Company management, public filings, Capital IQ, Bloomberg, Wall Street equity research.
Note: No comparable companies are identical to the Company.
Note: 2019 represents actual performance for Jiedian, Aaron's, Inc., Avis Budget Group, Inc., and AMERCO and expected performance for all other selected companies.
1. Based on public trading prices of common stock.
Preliminary and Confidential | Subject to Further Review and Revision

HOULIHAN LOKEY   15

172.  In addition, Houlihan improperly accepted Jumei management's projection that Jiedian's revenue would stagnate between just 0.2% growth to 2.1% *contraction* from 2021 through 2024—resulting in a total compound annual growth rate ("CAGR") for 2019 through 2024 of just 1.7%. These assumptions completely contradicted the accepted growth of the shared power bank industry being between 50% and 80% for the next several years, along with Jiedian's position as the leader in that industry with substantial room for further growth.  (*See supra* Sections IV.D.3.a.ii- IV.D.3.b).

173.  Houlihan's decision to compare Jiedian to rental car and appliance companies (from other continents, no less) is even more egregious because Jiedian had well-known competitors in the power bank industry in China. There were four main companies in the industry—Jiedian (as the market leader), Xiaodian, Laidian, and Energy Monster. Comparing Jiedian to these less-successful peers shows the absurdity of Houlihan's analysis.

174.    Energy Monster raised 500 million yuan and was reported to be worth $500 million in December 2019. (*See supra* ¶¶ 149-51, 157). On June 17, 2020, *Hurun Report*, described Energy Monster as one of the top high-growth companies in the country, and stated that it was one of the companies most likely to reach "unicorn-level valuation" of $1 billion within three years. At this time, Energy Monster was present "across the country, and has settled in various scenarios such as catering, entertainment, shopping, office buildings, and transportation hubs to provide services for more than 200 million users."[19]

175.    Jiedian similarly had 200 million users in 2019, "covered the entire consumption scene of eating, drinking, playing, shopping and entertainment" in major cities, and was continuing to grow very fast.[20] Jumei currently states on its website that "[a]s of the end of 2019, Jiedian has covered 95% of cities across the country, with a cumulative number of users exceeding 200 million, and peak daily orders exceeding 2 million. It is the domestic shared power bank brand with the largest revenue and market share."[21] And Jiedian's CEO described how Jiedian performed *better* than its peers in 2019. (*See supra* ¶¶ 157, 165).

176.    In addition, as of March 22, 2018, Xiaodian had raised over $100 million in financing and was valued at $300 million.[22] That amount does not even account for the exponential growth of the shared power bank industry in China since 2018. Like Jiedian and Energy Monster, Xiaodian also had 200 million users in 2019.[23]

177.    Jiedian, as the market leader, is worth *more* than its peers in the power bank industry. Trustdata, another firm that conducts market research in China, reported that in 2019,

---

[19] "Monster Charging is on the List of '2020 Hurun China Gazelle Enterprise," *Jiangxi Internet Radio and Television Station* (June 24, 2020), available at https://cn.chinadaily.com.cn/a/202006/24/WS5ef318a8a310a859d09d41f9.html.

[20] "Interview With Jiedian CEO Wan Li," *Blue Whale TMT* (January 7, 2020), available at https://36kr.com/p/1724956147713.

[21] *See* http://www.jumei.com/about/about_us?from=footer.

[22] *See* "Xiaodian completed hundreds of millions of yuan in B+ round of financing, with a valuation of more than 300 million US dollars," *36Kr* (March 22, 2018), available at https://36kr.com/p/1722370670593; and "Xiaodian Technology completed B+ round of financing, with a valuation of over US$300 million," *Sohu* (March 23, 2018), available at https://www.sohu.com/a/226190378_115267.

[23] http://m.us.sina.com/gb/finance/cb/2020-07-17/detail-ifzyhczh7973842.shtml.

1    Jiedian had a 28.6% market share, as compared to 27%, 25.1% and 15.6% for Xiaodian, Energy

2    Monster, and Laidian, respectively.[24]

3         178.    Houlihan valued Jiedian at just $148.55 million (based on the midpoint of the

4    valuation range of $119.5 million to $177.6 million that Houlihan applied to Jiedian). That is

5    substantially lower than what Jiedian's inferior competitors were worth at the time, including

6    Energy Monster's $500 million valuation at the end of 2019 and Xiaodian's $300 million

7    valuation in 2018. Jumei's shareholders, however, did not have the opportunity to compare

8    Jiedian to its peers in the power bank industry, because Houlihan improperly chose instead to

9    compare Jiedian to car and appliance rental companies.

10        179.    Moreover, the multiple ranges that Houlihan applied to Jiedian (0.90x to 1.20x

11   for Jiedian's estimated 2019 revenue and a range of 0.80x to 1.10x for Jiedian's estimated 2020

12   revenue) were *substantially lower* than the mean enterprise value-to-revenue ratios that

13   Houlihan derived for these supposedly comparable companies of 1.97 for 2019 estimated

14   revenue and 1.77 for 2020 estimated revenue:

---

[24] "Has it reached the harvest time for Xiaodian to go public and Meituan to join the shared power bank?," *China Business News* (July 17, 2020), available at http://m.us.sina.com/gb/finance/cb/2020-07-17/detail-ifzyhczh7973842.shtml

## Jiedian Financial Analysis
### Selected Companies Analysis

(dollars in millions, except per share values)

| Rent-to-Own Companies | Country | Exchange | Share Price [2] | Equity Market Value [2,3] | Enterprise Value [2,3] | Enterprise Value [1] to Revenue | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | LTM | CY 2019E [4] | CY 2020E [4] |
| Aaron's, Inc. | United States | NYSE | $43.33 | $2,958.0 | $3,241.2 | 0.82x | 0.82x | 0.75x |
| FlexShopper, Inc. | United States | NasdaqCM | 2.75 | 83.7 | 106.4 | 0.99x | 1.19x | 0.94x |
| Rent-A-Center, Inc. | United States | NasdaqGS | 24.91 | 1,423.8 | 1,601.2 | 0.60x | 0.60x | 0.59x |
| Low | | | | | | 0.60x | 0.60x | 0.59x |
| High | | | | | | 0.99x | 1.19x | 0.94x |
| Median | | | | | | 0.82x | 0.82x | 0.75x |
| Mean | | | | | | 0.80x | 0.87x | 0.76x |
| **Car Rental Companies** | | | | | | | | |
| AMERCO | United States | NasdaqGS | $342.76 | $6,720.8 | $10,160.6 | 2.62x | 2.62x | 2.57x |
| Avis Budget Group, Inc. | United States | NasdaqGS | 47.94 | 3,656.1 | 17,256.1 | 1.88x | 1.88x | 1.83x |
| CAR Inc. | China | SEHK | 0.64 | 1,378.2 | 2,801.7 | 2.69x | 2.28x | 2.03x |
| Europcar Mobility Group S.A. | France | ENXTPA | 4.29 | 673.9 | 5,554.0 | 1.74x | 1.74x | 1.64x |
| Hertz Global Holdings, Inc. | United States | NYSE | 20.25 | 2,810.8 | 20,271.8 | 2.08x | 2.07x | 2.01x |
| Localiza Rent a Car S.A. | Brazil | BOVESPA | 12.37 | 9,394.9 | 10,664.3 | 4.80x | 4.52x | 3.55x |
| Low | | | | | | 1.74x | 1.74x | 1.64x |
| High | | | | | | 4.80x | 4.52x | 3.55x |
| Median | | | | | | 2.35x | 2.17x | 2.02x |
| Mean | | | | | | 2.64x | 2.52x | 2.27x |
| **All Selected Companies** | | | | | | | | |
| Low | | | | | | 0.60x | 0.60x | 0.59x |
| High | | | | | | 4.80x | 4.52x | 3.55x |
| Median | | | | | | 1.88x | 1.88x | 1.83x |
| Mean | | | | | | 2.02x | 1.97x | 1.77x |

Source: Bloomberg, public filings, Capital IQ, Wall Street equity research
Note: No company used in this analysis for comparative purposes is identical to the Company.
2019 represents actual performance for Aaron's, Inc., Avis Budget Group, Inc., and AMERCO and expected performance for all other selected companies.
1. Enterprise value equals equity market value + debt outstanding + preferred stock + minority interests − cash and cash equivalents.
2. Based on closing prices as of 2/21/2020.
3. Based on diluted shares.
4. Multiples based on forward looking financial information may have been calendarized to the Company's fiscal year end of December 31st.
Preliminary and Confidential | Subject to Further Review and Revision

HOULIHAN LOKEY   14

180.   The exceedingly low multiples that Houlihan applied to Jiedian were therefore also a result of the artificially low financial projections that Jumei's management provided for Jiedian based on the false and unfounded assumption about the unavailability of financing for Jiedian. That key misrepresentation thus further infected Houlihan's and Defendants' valuation.

        d.     *The Recommendation Statement Incongruously Claims That Chen Was Not Aware of the Jiedian Financial Projections*

181.   The Recommendation Statement is even further inadequate as to Jiedian because it represents that the Jiedian financial projections were created by Jumei's management, but also states that "[1 -] [n]o members of the Buyer Group were provided with, and [2 -] none of such persons were entitled rely to [*sic*] or relied on, any of these financial projections."

182.   The first part of this statement is plainly false because Chen, the sole buyer of the Company, was its CEO, acting CFO, Chairman, and dominant shareholder. He is synonymous

with Jumei's management and did not recuse himself from Company management's role in the Buyout. Chen therefore not only knew about, but had to have been involved in, the production of the management projections for Jiedian. Chen, as Chairman of the Board, also did not recuse himself from the Board's role in deciding whether to recommend the Buyout to shareholders.

183.   The second part of this statement (that no members of the Buyer Group were entitled to rely on the Jiedian financial projections) is telling because if Chen did not rely on these financial projections, that highlights their irrelevance to assessing Jumei's true value.

### 4.   Defendants Provided False Information for Jumei's Other Businesses

184.   The other part of Houlihan's valuation applied a "liquidation analysis" to all of Jumei's business segments other than Jiedian.  The Recommendation Statement explained:

> The management of the Company advised Houlihan Lokey, and Houlihan Lokey has assumed, that (i) due to the capital intensiveness of certain businesses of the Company, the inability of the Company to secure third party financing and the recent difficulties faced by the E-Commerce segment of the Company's businesses, among other factors, the Company expected to wind down its Other Businesses by 2021 and 2022.

185.   Based on these assumptions provided by Jumei's management, the Recommendation Statement explained that "the highest and best use of the Company's assets is likely to cease operations of, and liquidate the Other Businesses. Therefore, a liquidation analysis has been performed by the management of the Company on a combined basis for the Other Businesses. The liquidation analysis indicated an implied liquidation reference range of $37.2 million to $105.3 million for the Other Businesses."

186.   All of these assessments came from Jumei's management. Houlihan made clear that "Company management" was the source for its assumptions about Jumei's Other Businesses. As with the Jiedian financial projections, Houlihan did not independently verify this information concerning Jumei's other businesses.

187.   The SEC did not understand based on the initial transaction documents why Jumei's management provided financial projections only for Jiedian. Jumei therefore had to clarify in an amendment to the initial version of the Recommendation Statement that Jumei did

not prepare financial projections for the Company's "the Company's other business units (i.e. the E-Commerce business and the Shuabao business) because the Company expects to wind down these business units by 2021 and 2022, respectively."

188.    Moreover, not only did Jumei's management provide the assumption that Houlihan should apply a liquidation analysis because Jumei would be winding down its Other Businesses—it also provided Houlihan with the *substance* of that analysis. Houlihan's fairness opinion states that "management of the Company advised Houlihan Lokey, and Houlihan Lokey assumed, that the liquidation analysis of the Other Businesses of the Company reviewed by Houlihan Lokey were reasonably prepared by the management of the Company in good faith on bases reflecting the best currently available estimates and judgments of such management as to the matters covered thereby, and ***Houlihan Lokey expressed no opinion with respect to such analysis, or the estimates, assumptions or judgements on which they were based***."

189.    Based on these assumptions, Jumei did not disclose past financial results for its e-commerce business and disclosed only revenue and expenses from 2019 for its Shuabao business. This means that Jumei has not disclosed financial results for the e-commerce business since 2018.

190.    Contrary to Defendants' representations, however, Jumei's management did not plan to wind down the Company's flagship e-commerce business (Jumei.com) and Shuabao at the time of the Buyout. In fact, Chen stated in his Offer to Purchase that  that he "currently has no plan to liquidate any business of Jumei in the near future but expressly reserves the right to make any changes that are necessary, appropriate or feasible to capitalize on and optimize the shareholders' value of Jumei."

191.    This indicates that the liquidation analysis that Jumei used to value the Company was meaningless because Chen—who led and controlled Jumei's management—was not actually planning to wind down these substantial businesses. There is no plausible reason why Jumei's management would plan to wind these businesses down because of their supposedly poor prospects, but Chen would not plan that same course of action. While Chen's Offer to

Purchase revealed the unfounded nature of the assumption that Jumei's Other Businesses would be wound down, however, it did not reveal the true value of these businesses to Jumei's shareholders. The transaction documented omitted the key information concerning how Jumei actually valued these businesses as ongoing operations, which was necessary for shareholders to be able to assess Defendants' averments of the fairness of the Buyout price.

192.    Information since the Buyout confirms that Jumei is not winding down its Other Businesses. Indeed, these businesses have continued to operate in the normal course since the Buyout. Both Jumei.com's and Shuabao's websites and apps are running without any sign of winding down as of the time of this Complaint: http://gz.jumei.com/; https://www.shuabaola.cn/.

193.    Jumei is even continuing to actively hire for positions at all levels of the Company. It currently lists active job advertisements on Liepin and Boss Zhipin, two widely used job platforms in China, for positions including Financing Department Head, Legal Specialist, Senior Systems Architect, Senior Product Manager, and Product Commercialization Manager.[25] The last two of the advertisements specify that they are for "short video products," which is Shuabao's business.

194.    The advertisements on Liepin also continue to describe Jumei as an e-commerce company: "Founded in 2010, Jumei is a diversified fashion technology group with business areas including e-commerce, shared charging, film and television drama production, finance, and smart hardware. . . . At present, Jumei Group has more than 2,800 employees. In addition to its Beijing headquarters, it has branches in Tianjin, Zhengzhou, Suzhou, Chengdu, Guangzhou and other places, and has more than 150 million registered users."

195.    Multiple former employees confirm that Jumei's e-commerce and Shuabao businesses were not winding down as of the time of the Buyout. A senior data operations

---

[25] These posts are available at (last accessed October 19, 2020):
https://www.liepin.com/job/1926703509.shtml; https://www.liepin.com/job/1925921775.shtml; https://www.liepin.com/job/1926604939.shtml;
https://www.zhipin.com/job_detail/0ed8df030882d5133nZ83N-5F1M~.html;
https://www.zhipin.com/job_detail/13d3f7d4f526639633Bz29S_GVA~.html.

1    employee who worked at Jumei from October 2017 to March 2020 ("CW 2") stated that both

2    the e-commerce platform and Shuabao were operating normally when this witness left the

3    Company in March 2020. This witness did not hear of any plans to shut down either business.

4    The witness also specifically noted that the e-commerce business was able to maintain its

5    operations.

6         196.    In addition, a product manager in Jumei's e-commerce business from March

7    2018 through March 2020 ("CW 3") reported that the e-commerce business had a net profit in

8    2019. Jumei has never publicly reported the financial results for its e-commerce business in

9    2019 (or any results for that business since the Company's 2018 Annual Report). This witness

10   also reported that he or she had never heard of any plans to shut down the e-commerce business

11   when working at the Company.

12        197.    Jumei's e-commerce business (Jumei.com) even continues to advertise that it

13   offers nearly one hundred flagship brands and "more big names are coming soon, please look

14   forward to it!":

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SECOND AMENDED CLASS ACTION COMPLAINT
- 3:20-cv-02751-EMC

**So far, nearly a hundred brand flagship stores have settled in Jumei. Brands have direct supply of authentic products, and more responsibilities are at your service**

More big names are coming soon, please look forward to it!

198. In addition, Shuabao is a short video app that Jumei spent $462 million on in 2019. This resulted in Shuabao becoming one of the most popular short video apps in China. An article in the *China Financial Times*, from August 1, 2019, described Shuabao's "rapid rise" to reach 10 million daily active users in half a year. It also referred to Shuabao as a "rising star" that could be grouped alongside the two industry leaders, Douyin (the local version of TikTok) and a company called Kuaishou.[26] On December 27, 2019, Tencent was reported to have

---

[26] "The growth rate of daily activity has surpassed Douyin and Weishishubao," *China Financial Times* (August 1, 2019), available at http://life.jrj.com.cn/2019/08/01182227916798.shtml.

invested $3 billion in Kuaishou, valuing the company at $28.6 billion.[27] This highlights the impropriety of Defendants assuming that Shuabao was worthless, rather than determining its value based on its financial metrics, comparing it to peer companies, or conducting an independent market check to determine what third parties would be willing to pay for the business.

199.    Shuabao has continued to be a popular short video app in China since the Buyout. Jumei continues to update the app, most recently on September 22, 2020. Just on Android devices, it has been downloaded over 769 million times, and has been downloaded over 384,000 times on average, per day, over the last thirty days (averaging out to approximately 11.5 million total downloads over the last 30 days).[28]

200.    All of these sources confirm that Jumei.com and Shuabao have been running as usual since the Buyout to the present day. This is not based on any information that has changed since the buyout. Rather, it shows that the businesses have continued to operate in the normal course since that time—as CWs 2 and 3 reported, and as Chen admitted, was the case at the time of the Buyout. Moreover, winding down such large businesses would be a substantial endeavor that cannot be done or undone overnight. The fact that these businesses continue to operate in the ordinary course shows that management was not actually planning to wind them down at the time of the Buyout.

201.    The assumption that Jumei's e-commerce business and Shuabao should be assigned negative "liquidation value" because they were winding down was demonstrable false. This key foundation for Houlihan's analysis substantially deflated the Company's value.

202.    Furthermore, Defendants grossly undervalued Jumei's other businesses *even within the context a liquidation analysis* (which should not have been done in the first place for

---

[27] "Valuation of 28.6 billion US dollars! Why is this Chinese short video giant so valuable?," *Sohu* (December 27, 2019), available at https://www.sohu.com/a/363103971_120375212?scm=1002.44003c.fe017c.PC_ARTICLE_REC&spm=smpc.content.fd-d.9.1547769600186X7PojRD.
[28] https://www.chandashi.com/android/downloadandincome/appId/184221631/market/huawei/country/cn.html (last accessed October 19, 2020).

SECOND AMENDED CLASS ACTION COMPLAINT
- 3:20-cv-02751-EMC

the reasons explained above). Plaintiff's expert in Chinese M&A and capital market transactions explains that even when doing a liquidation analysis, one should still apply a discounted cash flow or relative valuation to assess a business's baseline value before determining how that value should apply in the liquidation context. Houlihan, however, did not conduct a discounted cash flow or relative valuation analysis for Jumei's e-commerce or Shuabao businesses. Moreover, Houlihan did not even conduct the basic step of doing a market check to assess how much third parties would be willing to pay for these businesses. Doing those basic valuation steps would have been particularly important here because Jumei.com and Shuabao were able to continue to operate as usual—and did not need to be shut down or sold off—immediately following the Buyout.

203.   Instead, based on its blind reliance on data from Jumei's management, Houlihan valued all of Jumei's businesses and substantial assets other than Jiedian—including its flagship e-commerce business, its popular Shuabao app, and significant long-term investments in other businesses that Houlihan described in its presentation—at approximately $71 million at the midpoint of this liquidation analysis. That is $39 million *less* than Jumei's $110 million in cash and cash equivalents that it had on hand.

204.   Houlihan also concluded—based purely on the assumptions that Jumei management provided—that the midpoint liquidation value of Jumei's assets was worth approximately 326 million yuan less than the value of those assets on the Company's balance sheet, and that the Company would incur 95 million yuan in wind-down charges. These extra charges therefore made Jumei's other assets and businesses worth 421 million yuan (or approximately $60 million, based on the exchange rate that Houlihan used) less than they were worth on Jumei's balance sheet. For example, Jumei had 105.2 million yuan on its balance sheet attributable to Goodwill (based in part on the large user base that the Company spent $462 million in 2019 to acquire for Shuabao) that Houlihan simply wrote-down to being worthless in its liquidation analysis.

205.   Defendants assumed that the Company's e-commerce and Shuabao businesses

were not only worthless, but were actually substantial costs for the Company, because they were being wound down. Given that Jumei's other businesses did not need to be liquidated immediately—as evidenced by the fact that they are still running in the normal course and Chen did not plan to liquidate them—Houlihan's failure to conduct basic valuation steps to determine their true value rendered its analysis false and misleading. Moreover, Defendants did not include *any* projections for—or even full past financial results for—these businesses. The omission of that financial information, which would allow shareholders to fairly value these businesses,  rendered their valuations of these businesses misleading.

## VI.   DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS

206.    Defendants made three categories of statements that were false and misleading: (1) Defendants' statements relating to the fairness of the Buyout, including the analysis and assumptions that supported that determination; (2) Defendants' statements concerning the absence of plans or negotiations relating to Jiedian; and (3) Defendants' statements as to the existence of appraisal rights for shareholders who dissented on the issue of whether the merger price reflected the fair value of their Jumei common stock.[29]

### 1.    Statements Related to the Fairness of the Buyout and Valuation of Jumei's Businesses

207.    Defendants made many statements in the Recommendation Statement (including its exhibits and the documents that it incorporated by reference), Offer to Purchase, and Rule 13e-3 Transaction Statements that the Special Committee, Jumei's Board of Directors, and Chen (in his capacity as the Chairman of Jumei's Board, as well as the offeror in the Buyout) all deemed the Buyout price of $2 per share (or $20 per ADS) to be "fair" to Jumei's shareholders.

#### a.    *Fairness Statements*

208.    In particular, "[t]he Special Committee reviewed the terms and conditions of the Offer and the Merger with the assistance of its legal and financial advisors and unanimously (a)

---

[29] In addition to being described in this Section of the Complaint, these statements are included in the chart attached as Exhibit A, in accordance with Paragraph 10 of the Court's Civil Standing Order.

determined that the Merger Agreement and the transactions contemplated thereby, including the Offer and the Merger, are fair to, and in the best interests of" Jumei's shareholders; (b) recommended that the Unaffiliated Security Holders accept the Offer and tender their Class A Ordinary Shares and/or ADSs to Purchaser pursuant to the Offer; and (c) recommended that the Board" determine that the Merger is fair and recommend it to shareholders.

209.    Moreover, the Special Committee "expressly adopted" Houlihan Lokey's fairness opinion and analysis "in reaching its determination as to the fairness of the transactions contemplated by the Merger Agreement, including the Offer and the Merger."

210.    In addition to supporting its determination that the Buyout was substantively fair, the Special Committee determined that Houlihan's role as its financial adviser supported the procedural fairness of the Buyout.

211.    The Board, in turn, based its fairness determination and recommendation on "the Special Committee's unanimous determination, which the Board adopted, that it was fair to, and in the best interests of, the Company and the Unaffiliated Security Holders that the Company enter into the Merger Agreement, the Plan of Merger and consummate the transactions contemplated thereby, including the Offer and the Merger, on the terms and subject to the conditions set forth in the Merger Agreement, and the Special Committee's unanimous recommendation that the Board approve and adopt the Merger Agreement on the terms and subject to the conditions set forth in the Merger Agreement."[30]

212.    In addition, Chen and his affiliated entities stated in their Offer to Purchase (which the Recommendation Statement incorporated by reference) that "[t]he Offeror Group believes that the Offer Price to be received by Jumei's Unaffiliated Security Holders is fair to

---

[30] Similarly, Jumei's "Board, acting upon the unanimous recommendation of the Special Committee, has (a) determined that the Merger Agreement and the transactions contemplated thereby, including the Offer and the Merger, are fair to, and in the best interests of, the Company and the Unaffiliated Security Holders; (b) approved and adopted the Merger Agreement and declared it advisable for the Company to enter into the Merger Agreement . . . ; and (d) recommended that the Unaffiliated Security Holders accept the Offer and tender their Class A Ordinary Shares and/or ADSs to" Chen and his affiliated entities.

such Unaffiliated Security Holders" based on "[t]he recommendations to Jumei's Unaffiliated Security Holders by, and the findings of, the Special Committee and the Jumei Board with respect to the fairness of the Offer and the Merger, as described in the Schedule 14D-9 [Recommendation Statement] to be filed by Jumei with the SEC."

213.    The Offer to Purchase also stated that Chen and his affiliated entities believed that the Buyout was "procedurally fair" based on "[t]he factors considered by, and the findings of, the Special Committee and the Jumei Board with respect to the procedural fairness of the Offer and the Merger"; the Special Committee's unanimous determination "that the transactions contemplated by the Offer and the Merger Agreement are advisable and fair to and in the best interests of the Unaffiliated Security Holders"; the Jumei Board's recommendation, based upon the unanimous recommendation of the Special Committee, that Jumei's shareholders tender their Class A Ordinary Shares and/or ADSs pursuant to Chen's Offer; "[t]he fact that the Special Committee received an opinion from its financial advisor [Houlihan Lokey], dated February 25, 2020, as to the fairness, from a financial point of view and as of the date of the opinion, of the Offer Price of $2.00 per Class A Ordinary Share and $20.00 per ADS"; and the fact that "[t]he Special Committee had access to all of the information prepared or otherwise developed by Jumei's management including Jumei's financial projections."

*b.    Inputs For the Fairness Analysis*

214.    The Recommendation Statement also contained Houlihan Lokey's fairness opinion and the financial projections and assumptions that Jumei's management provided that formed the basis for this opinion. As described above, Houlihan did not independently investigate or verify any of these assumptions or information. (*See supra* ¶¶ 127-35, 138, 186, 188).

**i.    Materially False and Misleading Information Related to Jiedian**

215.    This included Jumei's financial projections for Jiedian from 2020 through 2024 that assumed that Jiedian's revenue would grow just 0.2% in 2021 and would be negative from 2022 through 2024, resulting in a compound annual growth rate for 2019 through 2024 of just

1.7%.

216.     These poor financial projections, in turn, were based on the assumption from Jumei's management that "the Company is unable to adequately finance the operations of its businesses resulting in limited expected growth at Jiedian."

217.     Similarly, Houlihan stated in its presentation to the Special Committee that Jumei's management told Houlihan that these "[p]rojections do not assume the Company can raise sufficient financing to support Jiedian's required capital expenditures, increased revenue sharing costs and sales & marketing expenses, that are necessary to compete with other major players in the industry."

218.     In addition, Houlihan's valuation of Jiedian was further depressed by the exceedingly low multiple ranges that it applied to the business based on Houlihan's selection of supposedly comparable companies from different industries that were not informative of Jiedian's leading role atop the growing power bank industry in China, as well as the negative growth contained in management's financial projections.

**ii.     Materially False and Misleading Information Related to Jumei's "Other Businesses"**

219.     The other key component of Houlihan's valuation came from its applying a "liquidation analysis" to Jumei's other businesses.  This too was based entirely on assumptions provided by Jumei's management, including their statement that "due to the capital intensiveness of certain businesses of the Company, the inability of the Company to secure third party financing and the recent difficulties faced by the E-Commerce segment of the Company's businesses, among other factors, the Company expects to wind down its E-Commerce and Shuabao business by 2021 and 2022."

220.     Moreover, Houlihan relied on Jumei's management not only for the assumption that these businesses other than Jiedian would be wound down, but also for the specific financial metrics contained in its liquidation analysis for these businesses.

c.      *Reasons Why Defendants' Statements Related to the Fairness of the Buyout and Valuation of Jumei's Businesses Were Materially False and Misleading*

221.    All of these statements by Defendants concerning the fairness of the Buyout price, and the inputs that led to that determination, were false and misleading because the inputs into Houlihan's fairness opinion and analysis were false and misleading. This, in turn, made the opinion that the offer price of $2 per share (or $20 per ADS) was fair, and in the best interests of shareholders, false and misleading. The Special Committee's, the Board's, and Chen's Offeror Group's fairness assessments and (in the case of the Special Committee and the Board) recommendations as to the Buyout price were therefore false and misleading.

222.    Defendants made these statements in the Recommendation Statement (including its exhibits and documents incorporated by reference), Offer to Purchase, and Rule 13e-3 Transaction Statements through their roles on the Special Committee, Jumei's Board, Jumei's management, and as the offeror, including Chen's dual role as Jumei's CEO, CFO, and Chairman, as well as offeror.

223.    In particular, the poor financial projections for Jiedian from 2020 through 2024 were based on the false assumption that Jumei was unable to "raise sufficient financing to support Jiedian's" operations and growth. This is patently false based on the abundant financing that was available to Jiedian's main competitors as this time and Jiedian's role as the industry leader. Jiedian's CEO admitted both of these points, which are confirmed by many industry sources. It is also false because Jiedian did not actually need additional financing to support its growth, as Jiedian's CEO admitted internally after the Buyout.

224.    The assumption that Jumei's other businesses would be forced to wind down, including its flagship e-commerce business and its popular video-sharing Shuabao business, was also false because Jumei's management was not actually planning to wind these businesses down.

225.    All of these facts show that the assumptions that Jumei's management—which Chen led as the Company's CEO and CFO, and oversaw as the Chairman of the Board and dominant shareholder—provided to Houlihan as a basis for its fairness assessment at the center

1    of the Buyout were false. The valuation that Defendants used as a basis for their fairness

2    assessments, and their recommendations to Jumei's shareholders, were therefore also false.

3        226.    The true valuation of Jumei is instead based on Jumei's true (1) financial

4    projections or assessment of how Jiedian was expected to perform absent the false and

5    misleading financing assumption and (2) valuation of Jumei's other businesses as operational

6    businesses that were not in the process of being wound down. Defendants did not disclose this

7    crucial information that rendered their affirmative statements false and misleading, despite

8    having access to all of Jumei's and its management's information about the Company.

9        227.    In addition, Plaintiff's expert highlights the extent to which Houlihan's valuation

10   analysis was false and misleading because it (1) compared Jiedian to companies from different

11   industries and geographies that were not actually comparable, when Jiedian had direct peers in

12   the fast-growing shared power bank industry in China where Jiedian was the market leader, and

13   (2) conducted a "liquidation analysis" of Jumei's other businesses that did not account for their

14   true value. The omission of any comparison of Jiedian to its actual peer companies rendered the

15   valuation of Jiedian false and misleading. Similarly, the omission of projections or recent

16   financial results for Jumei's e-commerce and Shuabao businesses, rendered the liquidation

17   analysis of these other businesses false and misleading.

18           **2.    Statements Concerning the Absence of Plans or Negotiations Related
19                  to Jiedian**

20       228.    Defendants falsely stated in the Recommendation Statement that "the Company

21   is not currently undertaking or engaged in any negotiations in response to the Offer that relate

22   to, or would result in, (a) a tender offer for or other acquisition of the Company's securities by

23   the Company, any subsidiary of the Company or any other person, (b) any extraordinary

24   transaction, such as a merger, reorganization or liquidation, involving the Company or any

25   subsidiary of the Company, (c) any purchase, sale or transfer of a material amount of assets of

26   the Company or any subsidiary of the Company, or (d) any material change in any present

27   dividend rate or policy, indebtedness or capitalization of the Company."

28       229.    Similarly, Chen stated in his Offer to Purchase (which was incorporated by

reference into the Recommendation Statement and Rule 13e-3 Transaction Statements) that "[e]xcept as otherwise described in this Offer to Purchase, Parent and Purchaser have no current plans or proposals or negotiations that relate to or would result in (i) an extraordinary corporate transaction, such as a merger (other than the Merger), reorganization or liquidation involving Jumei or any of its subsidiaries; (ii) any purchase, sale or transfer of a material amount of assets of Jumei or any of its subsidiaries; (iii) any material change in Jumei's present dividend rate or policy or the indebtedness or capitalization of Jumei; or (iv) any other material change in Jumei's corporate structure or business."

230.    These statements that the Company was "not currently undertaking or engaged in any negotiations," and that Chen had "no current plans or proposals or negotiations," that would result in the change in ownership or structure of any of the Company's assets or subsidiaries was false in light of the ongoing negotiations that Jumei was conducting while the Buyout was pending to sell Jiedian to Laidian.

### 3.    Disclosures Concerning the Existence of Appraisal Rights

231.    Rule 13e-3(f), 17 C.F.R. § 240.13e–3(f), requires the disclosure of "the information concerning appraisal rights required by § 229.1016(f)". That section (17 C.F.R. § 229.1016(f)) requires "A detailed statement describing security holders' appraisal rights and the procedures for exercising those appraisal rights referred to in response to Item 1004(d) of Regulation M-A."

232.    Item 1004(d) of Regulation M-A states that the filer must "[s]tate whether or not dissenting security holders are entitled to any appraisal rights." It also states that if shareholders are entitled to any appraisal rights, the filer must "summarize the appraisal rights." If they are not entitled to appraisal rights, the filer must "briefly outline any other rights that may be available to security holders under the law."

233.    Both the Schedule 13e-3 Transaction Statement that Jumei filed and the Tender Offer Statement that Chen, Super ROI, and JIHL filed incorporate by reference the information relating to appraisal rights appearing in the Offer to Purchase, which was attached as an exhibit

to both documents.  However, both the Offer to Purchase and the Recommendation Statement that Jumei filed (which also attaches the Offer to Purchase as an exhibit) failed to meet the requirements set forth in Item 1004(d) of Regulation M-A, as detailed above. Each of them simply deny the existence of any appraisal rights, with only one statement in each document providing any reason, even if conclusory and erroneous, for that denial. These denials occur in several places throughout both documents as described below.

<em>a.     The Individual Appraisal Rights Disclosures</em>

234.    Under the bold header "**Are appraisal rights available in either the Offer or any subsequent merger?**," the Offer to Purchase states that "[a]ppraisal rights are not available in connection with the [Tender] [o]ffer." To the extent "in connection with" refers narrowly to the Tender Offer itself, this statement is correct. However, the paragraph goes on to state the following false statement:

> For the subsequent Merger, Purchaser expects to merge with and into the Company through a "short-form" merger in accordance with Part XVI and in particular section 233(7) of the Companies Law with the Company continuing as the Surviving Company. Under section 233(7) of the Companies Law, because the Merger is a "short-form" merger, the vote of the holders Class A Ordinary Shares and the holders of ADSs is not required to effect the Merger if a copy of the Plan of Merger is given to every registered shareholder of the Company. Section 238 of the Companies Law attached as Schedule C hereto provides a procedure for exercising dissenters' right in the case of a "long-form" merger. However, **because the Merger is a "short-form" merger, the terms of Section 238 of the Companies Law do not apply to the holders of the Class A Shares and ADSs in connection with the Merger.** A copy of the Plan of Merger will be given each registered holder of the Class A Ordinary Shares pursuant to section 233(7) of the Companies Law. See "Special Factors — Section 6. Appraisal Rights; Rule 13e-3."

235.    The Offer to Purchase then makes essentially the same point in the following paragraph appearing in the portion of the document boldly titled "**Introduction**":

> If the Offer is completed, Purchaser will cause a second-step "short-form" Merger of Purchaser and the remaining shareholders other than Offeror Group and Purchaser would, without the need for further action by such shareholders, receive the same price per share as was paid in the Offer, without interest and less any ADS cancellation fees

and other related fees and withholding taxes. In the Merger, each then issued and outstanding Ordinary Share (other than Ordinary Shares held by Offeror Group) will be cancelled and converted into and represent the right to receive, as merger consideration, the Offer Price. **In the Merger, the Unaffiliated Security Holders will not have appraisal rights.**

236.    Under the bold heading of **"Position of the Offeror Group Regarding Fairness of the Offer and the Merger"**, the Offer to Purchase lists eighteen separate factors that, in the Offeror Group's "judgment, supports its views as to the fairness of the Offer and the Merger", listing only four factors that "the Offeror Group considered negative in its considerations concerning the fairness of the terms of the transaction".   One of those purportedly negative factors (with respect to a transaction that dissenting shareholders had no procedural means to stop) was:

> Because the Merger is being effected pursuant to a "short-form" merger under section 233(7) of Companies Law, the Merger does not require a shareholder vote or approval by special resolution by the Company's shareholders if a copy of the Plan of Merger is given to every shareholder of the Company. The Unaffiliated Security Holders will not therefore have the opportunity to vote on the Merger. **Further, the Unaffiliated Security Holders will not be entitled to the dissenters' rights available in a "long-form" merger as contemplated under section 238 of the Companies Law.**

237.    The Offer to Purchase yet again repeats this point under the bold heading **"Effects of the Offer"**:

> If the Offer is completed, in accordance with the terms of the Merger Agreement, Purchaser will cause the second-step merger of Purchaser and Jumei in which all remaining Unaffiliated Security Holders would, without the need for further action by such shareholder, receive the same price per share as was paid in the Offer, without interest, and less $0.05 per ADS cancellation fees, $0.02 per ADS depositary service fees and other related fees and withholding taxes and other fees and expenses. In the Merger, each then issued and outstanding Class A Ordinary Share owned by the Unaffiliated Security Holders, including Class A Ordinary Shares represented by ADSs, will be converted into and represent the right to receive the Offer Price. Because the Merger is being effected pursuant to a "short-form" merger under section 233(7) of the Companies Law, the Merger does not require the vote or approval by the Company's shareholders if a copy of the Plan of Merger is given to every registered shareholder of the Company. The Unaffiliated Security Holders will therefore not have the opportunity to vote on the Merger. **Further, the Unaffiliated Security Holders will not be entitled**

1
2

**to the dissenters' rights available in a "long-form" merger as contemplated by section 238 of the Companies Law.** See "Special Factors—Section 8. Appraisal Rights; Rule 13e-3."

3
4
5

238.    Under the bold heading "**Appraisal Rights; Rule 13e-3**," the Offer to Purchase further asserts the non-existence of appraisal rights. That section states:

6
7
8
9
10
11
12

**Appraisal Rights**.    As the Merger will be a "short-form" merger in accordance with Part XVI (and in particular section 233(7)) of the Companies Law with the Company continuing as surviving company, the vote of the shareholders of Jumei is not required to effect the Merger. A copy of Section 238 of the Companies Law is attached to this Offer to Purchase as an Exhibit which provides a procedure for exercising dissenters' rights in the case of a "long-form" merger. However, **because the Merger will be a "short-form" merger, the terms of Section 238 of the Companies Law do not apply to the Unaffiliated Security Holders.** A copy of Section 238 of the Companies Law is attached to this Offer to Purchase as an Exhibit for the information of the Unaffiliated Security Holders.

13
14
15
16
17
18

239.    Finally, under the bold heading "**Certain Legal Matters; Regulatory Requirements**", the Offer to Purchase again, for the sixth time, reinforced its unqualified assertion that appraisal rights were not available, this time stating that more than just that appraisal rights are not offered to shareholders subject to short-form mergers. It also states, in conclusory and unqualified fashion, that such rights are also unavailable because "no shareholder vote on the Merger will be held":

19
20
21
22
23
24
25
26
27
28

**Requirements for a Merger**.    Following the consummation of the Offer, Purchaser will, pursuant to the Merger Agreement, consummate a merger with Jumei in which all outstanding Shares not owned by Parent and Purchaser will be cancelled and converted into the right to receive cash in an amount equal to the Offer Price, without interest, but subject to applicable $0.05 per ADS cancellation fees, $0.02 per ADS depositary service fees and related fees and withholding taxes. The Merger will be a "short-form" merger in accordance with Part XVI (and in particular section 233(7) of the Companies Law, which does not require the vote of the shareholders of the parties to the Merger. Section 238 of the Companies Law is attached to this Offer to Purchase as an exhibit and provides a procedure for exercising dissenters' rights in the case of a "long-form" merger. However, **as the Merger will be a "short-form" merger pursuant to section 233(7) of the Companies Law and no shareholder vote on the Merger will be held, holders of Class A Ordinary Shares (including holders of Class A Ordinary Shares represented by ADSs) will not be able to exercise dissenters' rights under section 238 of the Companies Law, which applies to mergers under the Companies Law in**

which a shareholder vote is held.

240.    In the Recommendation Statement, under the bold heading titled **"Reasons for the Offer and the Merger; Recommendation of the Special Committee"**, Jumei repeated, almost word for word, as a "countervailing factor", the representation, as detailed above, made in the Offer to Purchase, under the heading of "**Position of the Offeror Group Regarding Fairness of the Offer and the Merger**" relating  to the purported nonavailability of appraisal rights:

> [B]ecause the Merger is being effected pursuant to a "short-form" merger under section 233(7) of **Companies** Law, the Merger does not require a shareholder vote or approval by special resolution by the Company's shareholders. The Unaffiliated Security Holders will not therefore have the opportunity to vote on the Merger. **Further, the Unaffiliated Security Holders will not be entitled to the dissenters' rights available in a "long-form" merger as contemplated under section 238 of the Companies Law.**

241.    Under the bold heading **"Appraisal Rights"**, the Recommendation Statement asserts, as did the Offer to Purchase in one instance, in conclusory and unqualified fashion, that such rights are also unavailable because "no shareholder vote on the Merger will be held":

> **Appraisal rights are not available in connection with the Offer.** Holders of Class A Ordinary Shares (including holders of Class A Ordinary Shares represented by ADSs) will not be entitled to a vote with respect to the Merger, as Purchaser will be holding at least 90% of the total voting **power** in the Company and the Merger will be a "short-form" merger in accordance with Part XVI (and in particular Section 233(7)) of the Companies Law, which does not require the vote of the shareholders of the parties to the Merger if a copy of the Plan of Merger is given to every registered shareholder of the Company. **As the Merger will be a "short-form" merger pursuant to Section 233(7) of the Companies Law and no shareholder vote on the Merger will be held, holders of Class A Ordinary Shares (including holders of Class A Ordinary Shares represented by ADSs) will not be able to exercise dissenters' rights under Section 238 of the Companies Law, which applies to mergers under the Companies Law in which a shareholder vote is held**. A copy of Section 238 of the Companies Law is set forth in Annex C hereto for the information of the Unaffiliated Security Holders.

242.    These disclosures are false, materially misleading, and utterly fail to meet the obligations imposed by Item 1004(d) of Regulation M-A.

1

2

                      **b.**     *Reasons Why The Foregoing Appraisal Rights Statements Are False And   Misleading*

3

4      243.      Section 238(1) of the Cayman Island Companies Law (2020 Revision) (the

5  "Companies Law") clearly and unambiguously states that stockholders ***do have appraisal***

6  ***rights***. That provision states: "A member of a constituent company incorporated under this Law

7  shall be entitled to payment of the fair value of that person's shares ***upon dissenting from a***

8  ***merger or consolidation***."[31] No provision of the Companies Law holds otherwise. No provision

9  of the Companies Law distinguishes (as the Offer to Purchase and the Recommendation

10  Statement have) between the sort of appraisal rights available in the context of a "short-form"

11  merger and those available in the context of a "long-form merger."

12      244.      That the procedural steps set forth in the subsequent subsections of the statute

13  contain time periods that refer to "the vote on the merger" does not obviate those rights, and

14  provided no basis for Defendants to misrepresent that as a result, short-form mergers do not

15  provide an opportunity for appraisal. If the Cayman legislature had intended to restrict appraisal

16  rights to only long-form mergers it is reasonable to believe that it would have expressly done so.

17  As the maxim goes, legislatures "do not hide elephants in mouseholes".

18

19      245.      It was simply false and materially misleading for Defendants to represent that

20  "the terms of Section 238 of the Companies Law do not apply to the holders of the Class A

21  Shares and ADSs in connection with the Merger" simply because, as both the Offer to Purchase

22  and the Recommendation say, each in one instance, "no shareholder vote on the Merger will be

23  held". ***At absolute most***, § 238 of the Companies Law does not itself provide a method for

24  shareholders subject to a short-form merger of exercising appraisal rights, but that does not

25  render the "terms" of § 238 inapplicable.

26

27

28  _____

[31] The term "member" is analogous to the concept of a shareholder in this context.

246.     That a statute may not expressly establish the method of exercising a right certainly does not mean the right no longer exists. It is common for statutes to provide legal rights without expressly providing detailed instructions regarding the method of exercising those rights. In fact, even the notion of implied causes of action embedded within statutes is well-established.

247.     Indeed, the Cayman Grand Court has subsequently established that, contrary to Defendants' unqualified assertions to Class Members otherwise, shareholders subjected to a short-form merger do, in fact, have appraisal rights under § 238 of the Companies Law.  The Grand Court in *In the Matter of the Companies Act (2020 Revision) and In the Matter of Changyou.com Limited*, Cause No. FSD 120 of 2020 (ASCJ) ("*Changyou*"), in a decision filed on January 28, 2021[32], held that "[t[he words Parliament has chosen to use in subsection 238(1) are, indeed, unqualified. …[T]he subsection is not in terms limited to members who dissent from a short-form merger". *Id.* at ¶41

248.     As the Grand Court further held, the absolute position taken by Defendants in the Offer to Purchase and the Recommendation Statement (and, because they both incorporate by reference the same relevant provisions of the Offer to Purchase, the Schedule 13e-3 Transaction Statement and the Tender Offer Statement) "elevates the procedural or mechanical provisions contained in subsections 238(2) to (16), for the access to and conduct of an appraisal, to the status of the substantive right to fair value appraisal conferred by subsection 238(1); which rights are given as subsection 238(1) states expressly, to every member who dissents.  I accept that this is clearly not what subsections 238(2) to (16) were intended by Parliament to do". *Id.* at ¶127.

249.     The Grand Court concluded by ruling that "Subsection 238(1) is compendious in

---

[32] A copy of this decision is attached as an exhibit hereto.

conferring the right to be paid fair value on any shareholder dissenting from a merger or consolidation....[T]he subsequent provisions of section 238 describe the procedure by which a member may apply to the court for the appraisal of fair value without exclusion of short-form mergers". *Id.* at 159.

250.      It is no answer for Defendants to note that the decision in *Changyou* came after they filed their merger documents. Before that decision, this was a contestable issue under Cayman law as to which Defendants' position was by no means deemed correct by all participants in merger and acquisition transactions governed by that law. Indeed, there was prior precedent for the fact that shareholders *do* have appraisal rights in the context of "short-form" mergers involving Cayman Islands companies. For example, in the privatization of Tsingda eEDU Corporation by short-form merger, the Schedule 13Ee-3 stated: "Holders of Ordinary Shares of [the company] will not be entitled to vote their Ordinary Shares of TEC with respect to the Merger, but will be entitled to dissenters' rights in accordance with Section 238 of the Cayman Companies Law."[33] A description of those rights, and how they may be exercised notwithstanding that there would be no shareholder vote, was provided in a formal notice issued as part of that transaction.[34]

251.      The black and white assertions in the Offer to Purchase—the relevant provisions of which were, again, incorporated by reference into the Schedule 13E-3 Transaction Statement and the Tender Offer Statement—and the Recommendation Statement regarding the purported absence of appraisal rights is materially misleading in that they fail to adequately disclose the

---

[33] Tsingda eEDU Corporation, Schedule 13E-3, Amendment No. 2, dated January 24, 2013, available at
https://www.sec.gov/Archives/edgar/data/1381790/000093041313000305/c72371_13sce3.htm
[34] Form of Notice of Merger and Dissenters' Rights, Exhibit (a)(2) to Tsingda eEDU Corporation, Schedule 13E-3, dated January 24, 2013, available at
https://www.sec.gov/Archives/edgar/data/1381790/000093041313000305/c72371_ex99-a2.htm

likely possibility that shareholders *do* have appraisal rights. Adequate disclosure would have meaningfully apprised shareholders of their potential appraisal rights, even while describing the position(s) of the parties to the transaction regarding those potential rights, but identifying who asserts those positions, and fully describing the basis for those positions in each instance in which they are asserted. Instead, Defendants simply stated their position as an unqualified conclusion, as if it were the undisputed law in the Cayman Islands. Such a representation was without support, deeply misleading and dissuaded shareholders from seeking legal counsel regarding the meaning of § 238.

252.     It was also wholly insufficient for Defendants to attach to their merger documents the text of Section 238. All that Class Members who read that text would have seen is the ambiguity in the context of a short-form merger  between the conferral of dissenter rights in Section 238(1) and the procedural steps outlined in the other subsections, with both the text of the Offer to Purchase and the Recommendation Statement, in numerous places, providing the purported proper answer as to how to resolve it—by their assertions that it means there exists no right to appraisal when there is a short form merger.

253.     Indeed, including the text of Section 238, but not other relevant Cayman statutes, compounded the misrepresentation as to the availability of appraisal rights in the context of a short-form merger. As the Grand Court in *Changyou* explained, Defendants' incorrect interpretation of Section 238 "give[s] rise to a number of anomalous inconsistencies with other provisions with Part XVI of the [Companies] Act". *Id.* at ¶74. As one example noted by the court, "section 239 of the Act sets out various provisions which limit the rights of dissenters, under the heading '*Limitation on the right of dissenters*'…. Significantly, subsection 239(1) does not see to exclude from the scope of section 238 minority shareholders who dissent from a

short-form merger". *Id.* at  ¶82.

254.     Further, even if it *had* been the law in the Cayman Islands that shareholders were not entitled to appraisal rights, the Offer to Purchase and the Recommendation Statement (and the other above-referenced documents that incorporate by reference the representations in the Offer to Purchase with respect to appraisal rights) are still materially misleading because they fail to adequately disclose "any other rights that may be available to security holders under the law," as required by Item 1004(d) of Regulation M-A requires.

255.     Indeed, the company challenging the right of appraisal in a short-form merger in *Changyou* did so, in part, precisely because it contended that there were alternative remedies that an aggrieved shareholder in that circumstance may seek.   Counsel for Changyou.com argued that "a disgruntled shareholder may have the right to '*challenge the merger or consolidation on the grounds that it is void or unlawful and may have a right to bring a petition under section 92(e) [for winding up by the court on just and equitable grounds], or to bring an action for fraud on the minority*'".  *Id.* at ¶143 (emphasis in original).

256.     The Grand Court noted that these claims "may be plausible alternatives", though attendant with many difficulties for a dissenting shareholder, ¶157, and that, in either case "[t]he possible availability of the alternative remedies" provided no basis to interpret Section 238 as providing appraisal rights only to long-form merger shareholders. Regardless, though, Defendants here not only misrepresented the purported unavailability to Jumei shareholders of appraisal rights under Section 238, they also failed to comply with their obligation under Item 1004(d) of Regulation M-A to describe these potential other legal rights available to securities holders.

257.     Jumei's shareholders cannot be expected to be knowledgeable of these issues of

Cayman law, particularly because they relate to a foreign statute that was enacted less than ten years before the filing of the Merger documents, and was therefore not the subject of many court decisions, and the relevant issue – the extent to which the relatively recent statute applies to short-form mergers – had not been addressed in any fashion until the holding in *Changyou*.

## VII.   DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS CAUSED PLAINTFF'S LOSSES

258.    The false and misleading statements and omissions regarding Jumei's value, and plans or negotiations related to Jiedian, described above caused shareholders to believe that the Buyout price was more beneficial than it truly was, and thus caused them to mistakenly accept Chen's tender offer. The inaccurate assumptions that Jumei's management provided, enabled Houlihan to perform financial analyses that implied that the offer price of $2 per share (or $20 per ADS) was fair, despite the fact that Jumei's stock traded as high as $2.75 per share— approximately 38% above Chen's offer price—as recently as May 6, 2019, and traded above the offer price as recently as January 6, 2019 (when Chen was already discussing his offer with Jumei's counsel).

259.    If Jumei's management provided accurate assumptions about the Company's business, Defendants and Houlihan would not have been able to opine that the Buyout price was fair. Moreover, if these true facts had been disclosed in connection with the offer, shareholders would have been able to determine on their own that the offer price was not fair and would not have accepted Chen's offer. In addition, if Defendants had disclosed the truth about Jumei's value, Chen would have been forced to offer a higher price for the Buyout. The market price of Jumei's shares and ADS therefore would have been higher to reflect this higher offer price and the information that it would have been based on.

260.    Plaintiff and members of the Class suffered economic loss (*i.e.*, damages) when they sold their ADS for less than fair value. The amount of loss suffered is equal to the fair value of the shares minus the price that Plaintiff and members of the Class received when they sold their Jumei ADS in the Buyout.

261.     Upon discovery and through the use of credible valuation techniques, the fair value of Jumei's ADS can be easily ascertained. At the very least, it is clear that the fair value exceeded the Buyout price of $2 per share (and $20 per ADS), because Defendants substantially undervalued both Jiedian and Jumei's other businesses. Jumei was valued at $219.75 million in the Buyout, based on a valuation of $148.55 million for Jiedian and $71.2 million for Jumei's other businesses.

262.     The value of Jiedian can be ascertained by applying management's actual projections for the business (rather than the deflated projections that management gave to Houlihan) or by adjusting management's projections based on the true state of Jiedian's access to—or need for—financing. The value of Jiedian can also be ascertained by comparing it to its comparable competitors in the power bank industry in China, which is dominated by just four companies. Based on that type of comparison, Jiedian is worth *at least* $500 million at the time of the Buyout—far more than the $148.55 million in value that Houlihan attributed to Jiedian.

263.     In addition, the value of Jumei's e-commerce business and Shuabao can be easily discerned using common valuation techniques, such as a discounted cash flow analysis, which Houlihan failed entirely to do in connection with the Buyout. Instead, based on its blind reliance on data from Jumei's management, Houlihan valued all of Jumei's businesses and substantial assets other than Jiedian at approximately $71 million. That is $39 million *less* than Jumei's $110 million in cash and cash equivalents that it had on hand.

264.     Finally, adequate disclosures regarding appraisal rights were material to investors' evaluation of the Tender Offer and Merger because they determined the options available to investors when considering those transactions. A shareholder informed that they lack appraisal rights—or not otherwise apprised of their potential appraisal rights—may believe that their only option is to accept the Tender Offer or wait and be forced to accept the Merger. They may prefer the immediacy of accepting the Tender Offer – even at an undesirable price – over the apparent only alternative of receiving that same unfair price through the Merger. Furthermore, the market price and other context of the Tender Offer and Merger will be

substantially altered if investors remain misinformed regarding the availability of appraisal rights. If appraisal rights had been known to have existed, the share price could have risen above the price offered by the Offeror Group, as sophisticated parties would have acquired shares to seek appraisal – which, in turn, would have sent signals to all investors about the fairness of the price of the Tender Offer and Merger price.[35]  By failing to adequately disclose appraisal rights, Defendants  irreparably altered  and damaged the Tender Offer and Merger process, thereby damaging Class Members.

## VIII.   SCIENTER ALLEGATIONS RELEVANT TO SECTION 10(b) CLAIM

265.    The following allegations related to Defendants' fraudulent conduct are relevant only to their violations of Section 10(b) of the Exchange Act.

266.    At all relevant times, Defendants acted with scienter. Defendants Chen, Ren, Shao, Su, and Zhao had actual knowledge that the statements and omissions that they made were false and misleading, or acted with reckless disregard for the truth or falsity of those statements and omissions.

267.    In addition, Jumei has the scienter of its agents and management-level employees. This includes Defendant Chen, the Company's CEO, acting CFO, and Chairman; Defendants Shao and Zhao (Board members and members of the Special Committee, which Shao served as Chairman of), and any other management-level employees or Board members that acted on behalf of the Company.

### A.    Motive and Opportunity

268.    Defendants Chen's, Shao's, and Zhao's fraudulent intent can be established by their motive and opportunity to defraud.

269.    Chen stood to profit substantially by reducing the price at which he would need to pay Jumei's shareholders in order to acquire all outstanding shares of the Company. By publishing false, misleading, and incomplete information, and by failing to make required

---

[35] Charles Korsmo, Minor Myers, Reforming Modern Appraisal Litigation, 41 Del. J. Corp. L. 279, 317 (2017) (describing the many benefits of appraisal both for those shareholders actually dissenting and to other shareholders indirectly benefiting from the efforts of specialists).

disclosures, Chen was able to buy Jumei at a price far below its fair value.

270.    If Defendants had disclosed the true and complete information concerning Jumei, shareholders would have been unwilling to tender their shares at Chen's offer price, and Chen would have been forced to offer a higher price for the Buyout, causing him to lose substantial profits from the transaction.

271.    In addition, Defendants Shao and Zhao each received a monthly compensation of $20,000 in exchange for their service on the Special Committee. Moreover, as longtime Board members of Jumei (Shao has been a Director since May 2014 and Zhao since March 2016), they are beholden to Chen, the Company's Chairman and dominant shareholder.

272.    Defendants Chen, Shao, and Zhao also had the opportunity to defraud Jumei's shareholders. Chen was the sole buyer of the Company in the Buyout, signed his Offer to Purchase, and was Jumei's leading executive (serving as CEO and CFO), Chairman, and dominant shareholder. He therefore had substantial control over the portions of the Recommendation Statement attributed to the Company and its Board, including the information that Jumei's management provided as the basis for Houlihan's valuation analysis and the Board's recommendation to shareholders concerning the Buyout. He also had substantial control over his Offer to Purchase.

273.    As members of the Special Committee, Defendants Shao and Zhao also had substantial control over the Recommendation Statement. In addition, Zhao signed the Recommendation Statement as Chairman of the Special Committee.

**B.     The Individual Defendants' Knowledge, Recklessness, and Involvement in the Fraudulent Buyout**

274.    Defendants' improper valuation of the Company was based on the incorrect assumptions that Jumei's management provided to Houlihan. Defendant Chen, as Jumei's CEO and acting CFO, is synonymous with  Jumei's management. The only other executive officer that Jumei listed in connection with the Buyout was Huipu Liu, a "Senior Vice President," whose role the Company did not describe any further. Chen therefore, by definition, knew of the falsity and misleading nature of the assumptions that Jumei's management provided as a basis

for undervaluing the Company. This includes 1 - the false projections for Jiedian, 2 - the false assumption that there was not adequate financing available for Jiedian, 3 - the false statement that Jumei was not involved in  any plans or negotiations related to the structure or sale of Jiedian, 4 - the false assumption that Jumei's e-commerce and Shuabao businesses were being wound down, and 5 – the improper liquidation value applied to Jumei's other businesses that failed to account for their true value.

275.    Indeed, Houlihan based its analysis on "a certificate addressed to us from senior management of the Company which contains, among other things, representations regarding the accuracy of the information, data and other materials (financial or otherwise) provided to, or discussed with, us by or on behalf of the Company."

276.    Defendants' scienter is further established by the confidential witnesses who described how Jumei was in negotiations with Laidian for the sale of Jiedian while the Buyout was pending, and that Jumei's e-commerce and Shuabao businesses were not being wound down at the time of the Buyout.

277.    In addition, Defendants' scienter is established because Chen admitted in his Offer to Purchase that he did not actually plan to wind down Jumei's e-commerce and Shuabao businesses.

278.    Defendants' scienter is also established by the descriptions of Jiedian's CEO (Wan Li) concerning Jiedian's status as the market leader in the power bank industry with further room for growth, and the availability of financing. Defendants either knew of this information from the CEO of Jumei's most valuable asset or were reckless in failing to consult him. Chen also knew this information about Jiedian because he was Jiedian's Chairman.

279.    In addition, Defendants Shao and Zhao knew or had access to the information showing the falsity of the assumptions that Jumei's management provided to Houlihan, based on their positions on the Special Committee and Jumei's Board.  Shao's and Zhao's positions on the Special Committee (which Shao chaired) makes them particularly knowledgeable of, or reckless as to, the falsity of their statements because the Special Committee was given

unfettered access to Jumei's management and business information in their task of assessing the fairness of Chen's offer, including to take any actions that the Committee deemed "necessary or appropriate" to investigate the fairness of the Buyout. Defendants Shao and Zhao therefore knew of the falsity of the information that Jumei provided to Houlihan as a basis for its valuation of the Company based on their access to this information, or recklessly disregarded its falsity. Shao and Zhao did not even take the basic step of conducting a market check to assess the fairness of Chen's offer.

280.    For example, the Special Committee focused on Houlihan's fairness analysis based on their discussions during the transaction process, from their introductory "organizational" meeting on January 21, 2020 with Houlihan and Hogan Lovells, to the Special Committee's recommendation in support of the Buyout on February 25, 2020. This included meetings between the Special Committee, Houlihan, and Hogan Lovells on January 28, 2020, February 15, 2020, and February 25, 2020, where the Special Committee discussed Houlihan's financial analysis. Houlihan also based its analysis on conversations with "certain members of the management of the Company and certain of its and the [Special] Committee's representatives and advisors regarding the businesses, operations, financial condition and prospects of the Company, the Transaction and related matters."

281.    Defendants also knew or recklessly disregarded that their statements as to the purported non-existence of appraisal rights under Cayman Island law with respect to short-form mergers reflected at best their own opinions,  did not constitute a definitive holding by any Cayman Island court or express statement under any Cayman Island statute or rule, failed to acknowledge that this was a disputed issue, and otherwise failed to provide a statement of rights beyond appraisal afforded to dissenting shareholders under Cayman Island Law as required by  Item 1004(d) of Regulation M-A.  The decision  by the Grand Court of the Cayman Islands in *Changyou*, ruling that despite an ambiguity in its subsections, Section 238 of the Companies Law of the Cayman Islands does, in fact, provide short-form merger shareholders with appraisal rights, and detailing an evidentiary foundation  for that holding, shows that Defendants had no

basis to assert without qualification that Cayman Law provided the opposite. Defendants knew or recklessly disregarded the fact that said ambiguity entitled them to, at best, advise minority shareholders of Jumei that they had a particular view as to what the statute provided but that it was not conclusive and that appraisal rights were, in fact, possibly available in the merger transaction.  Defendants also knew or recklessly disregarded that they otherwise  failed to fully comply with their obligations under Item 1004(d) of Regulation M-A by simply stating that appraisal rights were not available but then omitting a listing of "any other rights that may be available to security holders under the law".

282.    Lastly, the Buyout, and the assumptions that Jumei's management provided as the basis for valuing the Company in the Buyout, were matters of such core importance to Jumei that Defendants' knowledge of this information can be presumed. While it is not plausible for Chen to have been absent from, and unaware of, this process, the scienter of any other Jumei employees that were involved in this process can be imputed to the Company by virtue of their role acting on behalf of the Company in the course of providing key information in connection with the Buyout.

## IX.    APPLICABILITY OF THE PRESUMPTION OF RELIANCE

283.    The requirement to plead reliance in this case is relaxed because the votes of unaffiliated shareholders were required to close the Buyout, and the transaction documents containing false and misleading statements and omissions were essential links in the completion of the Buyout.

284.    In addition, to the extent that reliance is an element under any of Plaintiff's causes of action, Plaintiff and the Class is entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153-54 (1972), because Defendants concealed or improperly failed to disclose material facts with regard to Jumei.

285.    Plaintiff and the Class are also entitled to rely upon the presumption of reliance established by the fraud-on-the-market doctrine, in that, among other things:

a.    Defendants made public misrepresentations or failed to disclose material

facts in connection with the Buyout and during the Class Period;

b.      the misrepresentations and omissions were material;

c.      the misrepresentations and omissions would tend to induce a reasonable investor to misjudge the value of Jumei ADS;

d.      Plaintiff and other members of the Class transacted in Jumei ADS between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts; and

e.      Jumei ADS traded in an informationally efficient market, meaning that the market for Jumei ADS promptly digested current information regarding Jumei from publicly available sources and reflected such information in the price of Jumei ADS.

286.    An informationally efficient market is one in which material information would be received and interpreted by market participants and that, as a result, most publicly available information is reflected in market price. Many factors indicate that the market for Jumei ADS was informationally efficient, including:

a.      Jumei filed periodic public reports with the SEC and filed documents related to the Buyout with the SEC;

b.      Jumei communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures;

c.      Jumei ADS were actively traded in a liquid market with reasonably high transaction volumes;

d.      Jumei was followed by several securities analysts who wrote reports that were distributed to certain customers of these analysts' firms, and that were publicly available and entered the public marketplace;

e.      Jumei's stock price moved in reaction to the disclosures, including disclosures about the Buyout;

f.      Throughout the Class Period, Jumei had a reasonably high market

1    capitalization;

2               g.        Throughout the Class Period, Jumei ADS traded at a low bid-ask spread;

3               h.        Throughout the Class Period, public investors owned a high proportion of

4    outstanding shares of Jumei.

5         287.    For example, on January 13, 2020, the day that Jumei announced, before the

6    market opened, Chen's non-binding offer to purchase Jumei ADS for $20 per ADS, the price of

7    Jumei ADS rose from a closing price of $17.43 per ADS on the prior trading day (January 10,

8    2020) to a closing price of $19 per ADS on January 13, 2020, an increase of approximately 9%.

9    The trading volume on January 13, 2020 was over six times the trading volume from the prior

10   trading day, which was the first day that Jumei's ADS reflected the new ratio of 10 shares per

11   ADS instead of the prior ratio of one share per ADS.

12        288.    Jumei's ADS price then decreased over the following month as shareholders did

13   not know whether the Company and Chen would reach a definitive agreement (especially after

14   Chen's prior offer from 2016 that he ended up withdrawing in November 2017). Then, when

15   Jumei announced before the market opened on February 25, 2020, that the Company entered

16   into a definitive agreement for the Buyout premised on Chen's offer of $20 per ADS, the price

17   of Jumei's ADS rose from a closing price of $15.47 on February 24, 2020, to a closing price of

18   $19.52 per ADS on February 25, 2020, an increase of approximately 26%, on over *eleven times*

19   the 20-day moving average trading volume.

20        289.    The price of Jumei ADS continued to react to news while the Buyout was

21   pending. On April 1, 2020, the price increased from $18.48 per ADS the prior day to a closing

22   price of $19.42 per ADS on April 1, an increase of approximately 5%, on over twice the 20-day

23   moving average trading volume. Jumei announced before the market opened on April 1, 2020

24   that Chen had secured financing for the Buyout and that the tender offer deadline was being

25   extended until April 8, 2020, making the Buyout more likely to be completed.

26        290.    The price of Jumei ADS continued to get closer to Chen's offer price of $20 per

27   ADS as the final expiration date of offer, April 8, 2020, approached. When Jumei's ADS

28

1   stopped trading on April 14, 2020, the closing price was $19.93 per ADS, just 0.35% below the

2   Buyout price.

3       291.    Under these circumstances, all those who purchased or otherwise acquired Jumei

4   ADS during the Class Period suffered similar injury through sales of Jumei ADS at artificially

5   deflated prices, and the presumption of reliance applies.

6                                    **X.   NO SAFE HARBOR**

7       292.    The statutory safe harbor provided for forward-looking statements under certain

8   circumstances does not apply to any of the statements alleged to be false, misleading, and

9   incomplete in this complaint. As a threshold matter, the statutory safe harbor does not apply to

10  going-private transactions.

11      293.    Moreover, the statements alleged to be false and misleading herein all relate to

12  then-existing facts and conditions. In addition, to the extent certain of the statements alleged to

13  be false may be characterized as forward looking, they were not identified as "forward-looking

14  statements" when made, and there were no meaningful cautionary statements identifying

15  important factors that could cause actual results to differ materially from those in the

16  purportedly forward-looking statements. In the alternative, to the extent that the statutory safe

17  harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are

18  liable for those false forward-looking statements because at the time each of those forward-

19  looking statements were made, the speaker had actual knowledge that the forward-looking

20  statement was materially false or misleading, and/or the forward-looking statement was

21  authorized or approved by an executive officer of Jumei who knew that the statement was false

22  when made.

23      294.    Even Defendants' false statements that relate to projections and plans, are

24  alleged to be false and misleading based on presently existing facts at the time the statements

25  were made. For example, the fact that a plan, negotiation, or set of projections exists is

26  verifiable at any point in time. In addition, these statements were based on false assumptions

27  that Defendants made about then-existing facts.

28

## XI.   CLASS ACTION ALLEGATIONS

295.   Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of all former holders of Jumei ADS who were harmed by Defendants' actions described herein in connection with the Buyout. The Class includes all persons who sold Jumei ADS, and were damaged thereby, (a) during the period from February 26, 2020, through the completion of the Buyout, which became effective on April 14, 2020, and/or (b) by way of or as a result of tendering their Jumei ADS as part of the Buyout, regardless of when that tender occurred (together, the "Class Period"). For the avoidance of doubt, "tendering" as used in the prior sentence shall be interpreted as broadly as possible to describe any transaction in which Jumei ADS were cashed-out for the Buyout consideration.[36]

296.   Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

297.   The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Jumei securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are thousands of members in the proposed Class.  As of March 3, 2020, Jumei had approximately 63,255,412 Class A Ordinary shares issued and outstanding. The ratio of ADS to Class A Ordinary Shares is 10:1 pursuant to the ratio change that Jumei announced on an exhibit to the Form 6-K filed with the SEC on December 31, 2019. Record owners and other members of the Class may be identified from records maintained by Jumei or its transfer agent and may be notified of the

---

[36] For the avoidance of doubt, part (a) of the Class Period described above includes all ADS holders who sold their securities from February 26, 2020 through the effective time of the Buyout on February 14, 2020, when Jumei's ADS stopped being traded on the NYSE, regardless of whether the closing date for a sale in an investor's trading records is reflected as some time after the completion of the Buyout.

pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

298.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

299.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

300.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented or omitted material facts about the business, operations and management of Jumei;

- whether Chen's offer price in the Buyout was artificially deflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

301.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for them to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XII.   COUNT I

### (Violations of Section 14(e) of the Exchange Act and the Rules Promulgated Thereunder Against All Defendants)

302.    Plaintiff repeats and realleges each allegation contained above as if fully set forth

1    herein.

2            303.    Section 14(e) of the Exchange Act provides that it is unlawful "for any person to

3    make any untrue statement of a material fact or omit to state any material fact necessary in order

4    to make the statements made, in the light of the circumstances under which they are made, not

5    misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in

6    connection with any tender offer or request or invitation for tenders, or any solicitation of

7    security holders in opposition to or in favor of any such offer, request, or invitation." 15 U.S.C.

8    § 78n(e).

9            304.    As discussed above, Jumei issued the false and misleading Recommendation

10   Statement. Defendants knew that Plaintiff and all other shareholders would rely upon their

11   statements in the Recommendation Statement (including its exhibits and the documents that it

12   incorporated by reference) in determining whether to tender their shares pursuant to the tender

13   offer commenced in conjunction with the Buyout.

14           305.    The Recommendation Statement was prepared, reviewed and/or disseminated by

15   Defendants. It misrepresented and/or omitted material facts, including material information

16   about the fairness of the consideration offered to Jumei's shareholders in the Buyout. In so

17   doing, Defendants made untrue statements of material facts and omitted material facts necessary

18   to make the statements that were made not misleading in violation of Section 14(e) of the

19   Exchange Act.

20           306.    Defendants negligently made the false and misleading statements, and omitted

21   the material information identified above, from the Recommendation Statement or negligently

22   failed to notice that such material information had been omitted from the Recommendation

23   Statement, which caused certain statements therein to be materially incomplete and therefore

24   misleading. Indeed, while Defendants undoubtedly had access to and/or reviewed the omitted

25   material information in connection with approving the Buyout, they allowed it to be omitted

26   from the Recommendation Statement, rendering certain portions of the Recommendation

27   Statement materially incomplete and therefore misleading. As directors and officers of Jumei,

28

the Individual Defendants had a duty to carefully review the Recommendation Statement before it was disseminated to the Company's shareholders to ensure that it did not contain untrue statements of material fact and did not omit material facts. The Individual Defendants were negligent in carrying out their duty. Plaintiff expressly disclaims any allegations of scienter or fraudulent intent in this non-fraud claim.

307.    Jumei is imputed with the negligence of the Individual Defendants, who were each directors and/or senior officers of Jumei.

308.    In addition to their duties under Section 14(e) of the Exchange Act and the regulations that apply thereto, Defendants had a duty under Cayman Islands law to disclose the omitted information at issue because Jumei is a Cayman Islands corporations.

309.    The false and misleading statements in the Recommendation Statement are material in that a reasonable shareholder would consider them important in deciding whether to tender their shares, and would view the information identified above that was omitted from the Recommendation Statement as altering the "total mix" of information made available to shareholders.

310.    As a direct and proximate result of Defendants' negligent preparation, review, and dissemination of the false and/or misleading Recommendation Statement, Plaintiff and the Class were denied the opportunity to make an informed decision in deciding whether to tender their shares, and they were induced to accept the inadequate consideration for their shares in the Buyout. The false and misleading Recommendation Statement used to solicit the tendering of shares was an essential link in consummating the Buyout, which deprived shareholders of full and fair value for their Jumei shares. Thus, as a direct and proximate result of the dissemination of the false and misleading Recommendation Statement, Plaintiff and the Class have suffered damage and actual economic losses (*i.e.*, the difference between the price Jumei shareholders received and the true value of their shares at the time of the Buyout) in an amount to be determined at trial.

311.    Defendants are therefore liable for violating Section 14(e) of the Exchange Act.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## XIII.   COUNT II

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) Promulgated Thereunder Against Jumei, Chen, Shao, and Zhao)**

312.     Plaintiff repeats and realleges each allegation contained above as if fully set forth herein.

313.     During the Class Period, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder because Defendants disseminated or approved the false and misleading statements specified above, which they knew or recklessly disregarded were false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

314.     In addition to their duties under Section 10(b) of the Exchange Act, and Rule 10b5-(b) promulgated thereunder, Defendants had a duty under Cayman Islands law to disclose the omitted information at issue because Jumei is a Cayman Islands corporations.

315.     Plaintiff and the Class have suffered damages in that, as a result of Defendants' wrongful conduct alleged herein, they sold Jumei ADS at artificially deflated and unfairly low prices. Plaintiff and the Class would not have sold Jumei ADS at the prices they did, if they had not been defrauded, and if they had been aware that the market prices had been artificially and falsely deflated by Defendants' false and misleading statements.

316.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their sales of Jumei ADS during the Class Period.

## XIV.   COUNT III

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

317.     Plaintiff repeats and realleges each allegation contained above as if fully set forth herein.

318.     The Individual Defendants acted as controlling persons of Jumei within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as

officers or directors of Jumei and participation in or awareness of the Company's operations or intimate knowledge of the false and misleading statements that were filed with the SEC, they had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.

319.    In addition, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 10(b) and/or Section 14(e) of the Exchange Act by their acts and omissions, as alleged herein.

320.    Each of the Individual Defendants was provided with or had unlimited access to copies of transaction documents alleged by Plaintiff to be misleading prior to or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

321.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

322.    Each of the Individual Defendants was directly involved in recommending the Buyout to the Company and its shareholders.   The Individual Defendants were also each involved in negotiating, reviewing, and approving the Buyout, as described above.

323.    By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

## XV.   **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.    Awarding compensatory damages in favor of Plaintiff and the Class against all

Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial;

C.     Rescinding the Buyout and setting it aside or awarding rescissory or other damages to Plaintiff and the Class;

A.     Awarding Plaintiff and the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees, and other costs; and

B.     Awarding such other and further relief as this Court may deem just and proper.

## XVI.  DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated:  March 8, 2021                    Respectfully submitted,


                                         **POMERANTZ LLP**

                                         */s/ Michael Grunfeld*
                                         Michael Grunfeld (*pro hac vice*)
                                         600 Third Avenue, 20th Floor
                                         New York, NY 10016
                                         Telephone: (212) 661-1100
                                         Facsimile: (212) 661-8665
                                         mgrunfeld@pomlaw.com

                                         *Counsel for Lead Plaintiff Altimeo Asset*
                                         *Management and Lead Counsel for the Class*

1

**<u>PROOF OF SERVICE</u>**

2
          I hereby certify that on March 8, 2021, a copy of the foregoing was filed electronically.

3
Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic

4
filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice

5
of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

6

7
                                        */s/ Michael Grunfeld*
                                        Michael Grunfeld

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SECOND AMENDED CLASS ACTION COMPLAINT
- 3:20-cv-02751-EMC