1

2

3

4                          UNITED STATES DISTRICT COURT

5                        NORTHERN DISTRICT OF CALIFORNIA

6

7    EMAL HAIDERI,                              Case No.  20-cv-02751-EMC

8                    Plaintiff,

9           v.                                  **ORDER GRANTING DEFENDANTS'**
                                                **MOTIONS TO DISMISS**
10   JUMEI INTERNATIONAL HOLDING
     LIMITED, et al.,                           Docket Nos. 58, 72

11                  Defendants.

12

13

14                          **I.       INTRODUCTION**

15          This case is securities-fraud class action brought by Lead Plaintiff Altimeo Asset

16   Management against Jumei International Holding Ltd. ("Jumei" or "the Company"), members of

17   Jumei's Board of Directors,[1] and Jumei's CEO for violating Sections 10(b), 14(e), and 20(a) of the

18   Securities Exchange Act of 1934 (the "Exchange Act") and regulations promulgated thereunder.

19   *See* Docket No. 71 ("SAC") ¶ 1.  Plaintiffs' claims arise from a buyout of Jumei's former

20   shareholders by the Company's CEO, Leo Ou Chen, during which Defendants allegedly made

21   false and misleading "statements that Chen's Buyout offer was fair to, and in the best interests of,

22   Jumei's minority shareholders."  *Id.* ¶ 2.  Specifically, Altimeo asserts that Defendants' statements

23   regarding the fairness of the transaction "were based on two key false and misleading

24   assumptions," which "led to Defendants grossly undervaluing the Company when they

25   recommended that shareholders should accept Chen's tender offer and that the Company should

26   ───────────────────

27   [1] Jumei's Board of Directors included Leo Ou Chen (its Chairman), Zhenquan Ren, Sean Shao,
     Mang Su, and Adam Zhao.  Docket No. 48 ("FAC") ¶¶ 27-31.  Ren, Shao, Su, and Zhao were all
28   independent directors.  *Id.*  As will be discussed below, Defendants Shao and Zhao served on the
     Special Committee that was formed to evaluate the fairness of Chen's tender offer.  *Id.* ¶ 35.

agree to the Buyout."  *Id.*

Pending before the Court are two motions by Jumei: (1) a motion to dismiss Altimeo's First Amended Class Action Complaint, Docket No. 58 ("First Mot."), and (2) a motion to dismiss the new, discrete claims and allegations in Altimeo's Second Amended Class Action Complaint, Docket No. 72 ("Second Mot.").  For the reasons given below, the Court **GRANTS** Jumei's motions to dismiss, with leave to amend, on the grounds that Altimeo has failed to adequately plead scienter under Section 10(b) and loss causation under Sections 10(b) and 14(e).[2]

## II.   BACKGROUND

A.   Factual Background

Altimeo's complaints allege the following.[3]  Defendant "Chen has been Jumei's CEO and Chairman since he founded the Company in 2009," as well as its acting CFO since April 2018.  FAC ¶¶ 3, 38.  "Jumei was incorporated in 2010 in the Cayman Islands and was publicly listed on the [New York Stock Exchange] in May 2014."  *Id.* ¶ 36.  "Jumei is an offshore holding company that, since its founding, engaged in selling beauty products online in China in the retail market."  *Id.*  "Jumei has also invested in adjacent fashion and lifestyle businesses such as Jiedian, a mobile

---

[2] At the time the pending motions were filed, "the Individual Defendants ha[d] not been served" with either of the two amended complaints and were not then "represented by counsel."  *See* First Mot. at 1 n.1, Docket No. 72 ("Second Mot.") at 1 n.2.  Both motions to dismiss were therefore "brought solely on Jumei's behalf."  First Mot. at 1 n.1, Second Mot. at 1 n.2.  After the Court held its hearing on the motions to dismiss, Altimeo filed a declaration stating that it had served the individual Defendants with process.  *See* Docket No. 107.  Given that "the argument in Jumei's Motions to Dismiss also apply to the claims against the . . . Individual Defendants," the parties on August 23, 2021, stipulated that the individual Defendants "have no obligation to answer, move, or otherwise respond to the SAC before the Court resolves Jumei's pending Motions to Dismiss."  Docket No. 108 at 1.  As the Court's ruling on the dispositive issue of loss causation—and therefore its granting of Defendants' motions to dismiss—applies to the individual Defendants as well as Jumei, the individual Defendants need not further respond to the FAC or SAC.

[3] As the Court explains below in greater detail, the operative complaint in this case is the Second Amended Class Action Complaint ("SAC").  Because the principal motion at issue here refers and cites to the Amended Class Action Complaint, Docket No. 48 ("FAC"), however, the Court likewise cites to and quotes from that document when discussing Jumei's first motion to dismiss.  Like the parties, the Court cites to and quotes from the SAC when specifically addressing Jumei's motion to dismiss the new claims asserted in the SAC.  Except for the allegations newly added to the SAC, the two complaints are identical.  *See* Docket No. 70 (stating, in a stipulation regarding the SAC's filing, that the SAC "does not change the allegations and claims asserted in the Amended Complaint, but merely adds additional discrete claims and allegations").

United States District Court
Northern District of California

device power bank operating company,"[4] and "Shuabao, a short-video-sharing mobile phone app" that the company launched in April 2019. *Id.* ¶ 37, 66.

Jumei acquired "a 60% equity stake" in Jiedian in May 2017, paying $46.1 million to become its majority owner. *Id.* ¶ 57. Mr. Chen thereafter became Jiedian's Chairman. *Id.* At the time of the purchase, Jumei described Jiedian as "one of the leading players in the portable power bank sharing business." *Id.* ¶ 58. "By the end of 2018, Jiedian was a substantial part of Jumei's business," with revenue from Jumei's non-e-commerce businesses (including Jiedian's power bank sharing services) increasing fivefold from 2017 to 2018. *Id.* ¶¶ 70-71. "The financial information that Jumei disclosed for Jiedian in connection with" Mr. Chen's tender offer also suggests that Jiedian "performed extremely well in 2018 and 2019," doubling its customers "from 100 million in 2018 to 200 million in 2019." *Id.* ¶ 72, 74. Jiedian also reported a profit margin of 30.5% in 2019. *Id.* ¶ 74. By February 2020, Jumei owned an 83.7% stake in Jiedian. *Id.* ¶ 60.

Jumei's share price at its initial public offering ("IPO") in May 2014 was $22. *Id.* ¶ 41. In February 2016, Mr. Chen "attempted to lead a group that offered to buy the Company's outstanding shares for a price of $7 per share," which represented a 68% decrease from the stock's IPO price. *Id.* ¶¶ 40-41. "Investors and analysts viewed that offer as significantly undervaluing Jumei's business." *Id.* ¶ 42. Chen's offer remained on the table until November 2017, when he and his group withdrew it. *Id.* ¶ 44. In the interim, "Jumei's share price continued to fall" and "[b]y the time that Chen withdrew his offer . . . Jumei's shares traded for just $3.30 per share." *Id.* ¶¶ 45-46. Nevertheless, Jumei "reported stellar results in its 2018 Annual Report," with net revenue of $623.8 million and gross profits of $158.6 million.[5] *Id.* ¶ 68.

At the time of Jumei's IPO, Mr. "Chen owned 35.6% of the Company's stock, with 75.7% of the aggregate voting power." *Id.* ¶ 39. In April 2018, Jumei's Board "authorized a share repurchase plan" and, throughout the rest of 2018, "Jumei repurchased over 26 million shares . . .

---

[4] *See* First Mot. at 6 (stating that power bank sharing involves "operat[ing] public mobile phone charging stations, where users can pay to charge their phones on site, or take a portable charger with them and return it to any other Jiedian location") (citing FAC ¶ 58).

[5] Jumei apparently did not release an Annual Report or other financial information covering 2019. *See* FAC ¶ 67.

United States District Court
Northern District of California

at an average price of $2.30 per share." *Id.* ¶¶ 47-48.  As a result of Jumei's stock buybacks, Chen owned "44.6% of the Company's total ordinary shares (representing 88.9% of the total outstanding voting power)," whereas in March 2016, around the time he first sought to buy out the company, he owned "just 34.7% of the Company's total ordinary shares and just 75.3% of its aggregate voting power." *Id.* ¶¶ 52-53.  "Jumei's repurchasing spree thus enabled Chen to substantially increase his stake in the Company at no personal cost to himself." *Id.* ¶ 53.

On January 12, 2020, Jumei announced that Mr. "Chen and entities that he controls" had made another tender offer for all outstanding shares in the company. *Id.* ¶ 86.  Mr. Chen offered a buyback price of $2 per share, *id.* ¶¶ 4, 86, which "reflected a premium of . . . 14.7% of the closing price of Jumei's stock . . . the day before Chen made his offer," *id.* ¶ 109; *see also* Docket No 58-2 ("Faigen Decl."), Ex. 3 at 13 (showing that Jumei's stock closed at $1.74 per share on January 10, 2020).  As Jumei later acknowledged, the purpose of Mr. Chen's tender offer was to increase his total voting power in the Company to 90%, at which point "the parties would conduct a 'short-form' merger" that, under Cayman Islands law, would permit Mr. Chen to purchase any remaining Jumei shares at the tender-offer price without requiring further shareholder approval. *See id.* ¶ 94. In response to Mr. Chen's offer, Jumei "announced the creation of [a] Special Committee" comprised of independent directors Shao and Zhao. *Id.* ¶¶ 86, 29, 31, 35.  "The Board unanimously adopted written resolutions providing that each member of the Special Committee would receive a monthly compensation of $20,000 in exchange for his service on the Special Committee." *Id.* ¶ 35.  "The Special Committee was given wide latitude to take any actions that the Committee deemed 'necessary or appropriate' to investigate the fairness of the Buyout." *Id.* On January 14, 2020, Jumei announced that the Special Committee had retained the firm of Houlihan Lokey ("Houlihan") as its financial advisor and Hogan Lovells as its legal counsel. *Id.* ¶ 89, 118.

On February 25, 2020, Houlihan "presented its financial analysis to the Special Committee and verbally rendered its opinion" that Mr. Chen's tender offer was fair to shareholders "from a financial point of view." *Id.* ¶ 119.  "The Special Committee made its fairness determination and recommendations in support of the Buyout that same day." *Id.*  Also on February 25, "Jumei

entered into [a] Merger Agreement" with the Chen entities and announced the agreement via a press release filed with the Securities Exchange Commission ("SEC"). *Id.* ¶ 90. The following day, "Jumei filed a Schedule 14D-9 (Rule 14d-101) Solicitation/Recommendation Statement" ("Recommendation Statement") which was signed by Mr. Shao "as Chairman of the Special Committee." *Id.* ¶ 91. The Recommendation Statement included the "fairness opinion" prepared by Houlihan and Mr. Chen's formal tender offer. *Id.* Prior to issuing the Recommendation Statement, the Special Committee met numerous times with Houlihan and/or Hogan Lovells to discuss various aspects of the buyout process. *Id.* ¶¶ 118-19.

The Special Committee "determined in the Recommendation Statement that Chen's offer was fair and in the best interests of Jumei's shareholders." *Id.* ¶ 105. Jumei's Board then adopted the Recommendation Statement and in turn recommended that shareholders accept Mr. Chen's tender offer. *Id.* ¶ 106. Mr. Chen "did not recuse himself" from the vote on the Special Committee's Recommendation Statement "even though he was highly conflicted because the Board was evaluating his offer to purchase" the Company. *Id.* ¶ 107.

On April 9, 2020, after repeatedly extending the deadline for shareholders to accept or reject the tender offer, Mr. Chen and Jumei filed documents with the SEC announcing that approximately 64% of outstanding shares had been tendered and that Mr. Chen now controlled 80% of Jumei's ordinary shares and 96% of the Company's total voting power. FAC ¶¶ 96, 98. "This satisfied the condition that Chen obtain 90% voting rights to be able to complete" the short-form merger and take Jumei private. *Id.* ¶ 98. On April 14, 2020, "Jumei and Chen announced the completion of the Buyout." *Id.* ¶ 99. All non-tendered shares were "cancelled and ceased to exist in exchange for the right to receive $2.00," and Jumei's stock was delisted from the New York Stock Exchange. *Id.* ¶ 100.

B.    <u>Procedural Background</u>

Plaintiff Emal Haideri filed a class action complaint against Defendants on April 21, 2020. *See* Docket No. 1. After multiple rounds of briefing on the issue, the Court appointed Altimeo Asset Management lead plaintiff and approved its selection of lead counsel in September 2020. *See* Docket Nos. 42 and 43. In October 2020, Altimeo filed its Amended Class Action Complaint,

asserting claims against Defendants under Sections 10(b), 14(e), and 20(a) of the Exchange Act. *See* FAC.  Jumei moved to dismiss the claims in their entirety on December 3, 2020.  *See* First Mot.  Briefing on the motion to dismiss was completed in February 2021.  *See* Docket No. 64 ("First Reply").

In March 2021, the parties filed a stipulation in which Jumei consented to Altimeo's request to file a Second Amended Complaint adding "certain discrete allegations and claims . . . regarding the availability of certain shareholder rights under Cayman Islands law."  Docket No. 70 at 3.  "[B]ecause the proposed Second Amended Complaint [would] not change the allegations and claims asserted in the Amended Complaint, but merely add[] additional discrete claims and allegations," the parties agreed that the briefing on Defendants' initial motion to dismiss would "apply to the allegations and claims in the Second Amended Complaint that remain unchanged from the Amended Complaint."  *Id.*  Jumei was also permitted to "file an additional motion to dismiss the Second Amended Complaint, directed only to the new, discrete allegations and claims that [were] raised for the first time in the Second Amended Complaint."  *Id.*  The Court granted the parties' stipulation.  *See id.* at 4.

Altimeo filed its Second Amended Class Action Complaint on March 8, 2021.  *See* SAC. The new complaint continued to assert claims under Sections 10(b), 14(e), and 20(a) of the Exchange Act but alleged new facts and an alternative theory of liability under each provision. *See infra*.  Jumei filed its motion to dismiss the Second Amended Class Action Complaint on March 31, 2021, and briefing on the motion was completed in mid-May 2021.  *See* Docket Nos. 72 ("Second Mot.") and 89 ("Second Reply").  Both motions were heard on July 29, 2021.  *See* Docket No. 97.

C.     Defendants' Allegedly Misleading Statements

Altimeo's complaints allege that the "$2.00 per share Buyout price for Jumei's public stockholders was insufficient, as it failed to adequately account for the Company's strong financial performance and prospects."  *Id.* ¶ 109.  "This price reflected a premium of just 14.7% of the closing price of Jumei's stock" on "the day before Chen made his offer," "a much smaller premium than is typically provided in tender offers or other shareholder buyouts."  *Id.*  Further,

6

"Jumei's stock traded above the Buyout price as recently as January 6, 2020," or "just five days before he officially made his offer to buy the Company." *Id.* ¶ 110.  "The Company's stock price was also consistently higher than the Buyout price for most of 2019." *Id.*

The gravamen of the complaints is that the Recommendation Statement "misstates and omits certain pieces of critical information" such that the Statement is "materially false, misleading, and incomplete." *Id.* ¶ 112.  "Specifically, the Recommendation Statement falsely represented, and omitted material information necessary to make not misleading, *the data and inputs underlying Houlihan Lokey's financial valuation* . . . related to (i) Jumei's financial projections for Jiedian" and "(ii) the value of Jumei's businesses and assets other than Jiedian," *i.e.*, the e-commerce business and Shuabao.  *Id.* ¶ 113 (emphasis added).  The complaints emphasize that, in "evaluating Jumei's value, Houlihan relied entirely upon the assumptions provided by Jumei's management," and "relied upon and assumed, without independent verification, the accuracy and completeness of all data, material[,] and other information." *Id.* ¶ 127.  The complaints also stress that the Special Committee failed "to conduct a market check to assess potential alternative offers for the Company from third parties—a standard step in the buyout process." *Id.* ¶ 120.

Altimeo's principal opposition brief lays out the various ways, articulated in different parts of the complaints, that the Recommendation Statement contained false or misleading statements.  First, regarding Jumei's misrepresentation of Jiedian's value, Altimeo alleges that Houlihan's valuation of Jiedian at $148.55 million "was based entirely on the assumption provided by Jumei's management that Jumei would not be able to raise sufficient financing for Jiedian."  Docket No. 60 ("First Opp'n") at 6 (citing FAC ¶¶ 178, 134-36).  "This key assumption was false," however, since "[a]t the time of the Buyout, Jiedian was the market leader in the fast-growing power bank industry in China, with 28.6% market share in 2019."  *Id.* (citing FAC ¶¶ 161, 177).  "Multiple industry analysts," including those at the consulting group iResearch, "ma[d]e clear that adequate financing was available for Jiedian," given that it was one of "the four dominant players" in the power bank industry and that the industry as a whole began rapidly expanding in late 2018.  *Id.* (citing FAC ¶¶ 148-57, 160-61); *see also* FAC ¶ 152 (quoting an iResearch report predicting that

the power bank industry would "have a high growth rate, with a trend of 50-80% in the next few years"). Similarly, in January 2020, Jiedian's CEO told a trade publication "that Jiedian was the only power bank company that increased its revenue since August 2019, with December 2019 being its best month." *Id.* (citing FAC ¶ 157).

Additionally, "Energy Monster (one of the other industry leaders) raised $70 million in December 2019—just before Chen began discussing his offer in early January 2020—from major institutional investors, giving it a valuation of over $500 million." *Id.* at 7 (citing FAC ¶¶ 87, 150-51). "Then, in June 2020, just three months after the Buyout, Xiaodian, one of the other four leading [power bank] companies, filed documents to prepare for its IPO." *Id.* (citing FAC ¶ 158). Based on Xiaodian's IPO, Jiedian's CEO stated his belief that the industry could "see more capital moves . . . soon" and emphasized Jiedian's "advantages over its competitors." *Id.* (citing FAC ¶¶ 158-59, 161). An August 2020 article in another trade publication likewise asserted that "the outlook for the power bank sharing industry [was] bright" and described Jiedian as occupying "a leading position." *Id.* (quoting FAC ¶ 162). Jiedian itself had also informed the SEC in August 2019 that the chances of the company *not* launching an IPO by 2022 were "remote." *Id.* (citing FAC ¶¶ 155-56). And yet another trade publication described Jiedian's performance in May 2020 as "strong and eye-catching," "surpassing the company's pre-pandemic levels from December 2019." *Id.* at 8 (citing FAC ¶ 165).

"Because of the deflated growth assumptions that Jumei's management provided," Altimeo argues, "Houlihan compared Jiedian to appliance and car rental companies in the U.S. that had extremely low projected growth rates." *Id.* (citing ¶¶ 169-72, 179). "Houlihan's 148.55 million valuation of Jiedian" was therefore unreasonably low, especially since that valuation "was substantially lower than what Jiedian's inferior competitors were worth at the time, including Energy Monster's $500 million valuation at the end of 2019." *Id.* (citing FAC ¶ 178). In Altimeo's view, these allegations indicate that Mr. Chen was seeking to buy Jumei "at a deflated price when he saw the opportunity to profit off of Jiedian's rapid growth just as the [power bank] industry was taking off." *Id.* at 9.

Second, regarding Jumei's valuation of its e-commerce and Shuabao businesses in the

United States District Court
Northern District of California

1   Recommendation Statement and related documents, Altimeo alleges that Houlihan conducted a

2   liquidation analysis "on the assumption that [Jumei] expected to wind down [these] businesses by

3   2021 and 2022, respectively" and that "[t]his assumption was also false." *Id.* (citing FAC ¶¶ 129,

4   184, 187-89). Altimeo asserts that Mr. "Chen admitted in his [tender] offer that he '[then] ha[d]

5   no plan to liquidate any business of Jumei in the near future,'" and that Jumei is not presently

6   "winding down these businesses." *Id.* (citing FAC ¶¶ 76-82, 190, 192-94, 197). "In addition,

7   multiple former employees that worked at Jumei while the Buyout was pending—including a

8   senior data operations employee and a product manager in the e-commerce business—confirm that

9   these businesses were operating in the ordinary course" and that they "did not hear of any plans

10  for these businesses to wind down." *Id.* (citing FAC ¶¶ 195-96).

11          Further, Altimeo alleges that "Jumei grossly undervalued its [non-Jiedian] businesses even

12  within the context of the liquidation analysis" because the Company's "management told

13  Houlihan that these businesses . . . would cost $39 million to wind down." *Id.* (citing FAC ¶¶ 203-

14  04). But this valuation was baseless since "the Special Committee chose not to do a market

15  check," *i.e.*, to "assess what [the businesses] were worth to third parties." *Id.* at 10 (citing FAC

16  ¶¶ 120-21, 202). The failure to perform a market check "was particularly significant because . . .

17  Jumei's e-commerce business was profitable in 2019" and "Jumei spent $462 million on Shuabao

18  in 2019—an astonishing amount for a business that the Company determined was worthless at the

19  beginning of 2020." *Id.* (citing FAC ¶ 198). "As with Jiedian," Altimeo concludes, "this evidence

20  concerning Jumei's other businesses shows that the key assumptions underlying their deflated

21  valuation in the Buyout were false." *Id.*

22          As indicated above, Altimeo's SAC also added new allegations and claims based on

23  references to appraisal rights in the Recommendation Statement, Jumei's Rule 13e-3 Transaction

24  Statements, and Mr. Chen's Tender Offer. These documents essentially stated that minority

25  shareholders would not be entitled to appraisal rights in connection with the Buyout. *See* SAC ¶¶

26  233, 234-41. For example, the Tender Offer asserts the following:

27              Appraisal Rights. As the Merger will be a "short-form" merger in
                accordance with Part XVI (and in particular section 233(7)) of the
28              [Cayman Islands] Companies Law[,] . . . the vote of the shareholders

                                                9

1

> of Jumei is not required to effect the Merger.  A copy of Section 238
> of the Companies Law is attached to this Offer to Purchase as an
> Exhibit which provides a procedure for exercising dissenters' rights
> in the case of a "long-form" merger.  However, *because the Merger
> will be a "short-form" merger, the terms of Section 238 of the
> Companies Law do not apply to the Unaffiliated Security Holders*.

2

3

4    SAC ¶ 238 (emphasis added) (bolding omitted).  Similarly, the Recommendation Statement

5    included, as a "countervailing factor" to the asserted fairness of Chen's proposal, the following

6    passage:

7

> *As the Merger will be a "short-form" merger* pursuant to Section
> 233(7) of the Companies Law and no shareholder vote on the
> Merger will be held, hol*ders of Class A Ordinary Shares . . . will not
> be able to exercise dissenters' rights under Section 238 of the
> Companies Law*, which applies to mergers under the Companies
> Law in which a shareholder vote is held.  A copy of Section 238 of
> the Companies Law is set forth in Annex C hereto for the
> information of the Unaffiliated Security Holders.

8

9

10

11

12    *Id.* ¶ 241 (emphasis added) (bolding omitted).  In the SAC, Altimeo argues that these statements

13    violated Sections 10(b) and 14(e) of the Exchange Act.

14         Altimeo's theory of liability proceeds as follows.  Section 238(1) of the Cayman Islands

15    Companies Law concerns appraisal rights and provides that a corporation's shareholders "shall be

16    entitled to payment of the fair value of that person's shares *upon dissenting from* a merger or

17    consolidation."  Docket No. 78 ("Second Opp'n") at 1 (citing SAC ¶ 243) (emphasis added).  In a

18    short-form merger, however, where a parent company owns at least 90% of the voting power in

19    another company, a shareholder vote is not required to effect their merger.  *See* Second Mot. at 4

20    (citing Companies Law Section 233(7)).  Consequently, minority shareholders have no

21    "mechanism to vote against or dissent from" a short-form merger, and Section 238(1) does not

22    expressly provide an alternative mechanism for triggering appraisal rights.  *See id.* at 4-5.  It was

23    on this basis that Jumei, in its merger-related filings of early 2020, stated that "appraisal rights

24    [were] not available in connection with [Mr. Chen's Tender] Offer."  *See id.* at 5 (quoting SAC

25    ¶¶ 94, 241).

26         In January 2021, however, the Cayman Islands Grand Court held in *In the Matter of

27    Changyou.com Ltd.* ("*Changyou*") that Section 238(1) appraisal rights *are* available to

28

United States District Court
Northern District of California

shareholders in the event of short-form mergers.[6]  *See* Second Opp'n at 1-2.  The *Changyou* court emphasized that Section 238 confers appraisal rights on all shareholders who disapprove of a merger and does not explicitly exclude short-form mergers from this grant of rights.  *See id.*  The court thus concluded that "[i]t would be absurd to exclude a [dissenting] member of a company subject to a short-form merger from the protection of Section 238 simply because . . . that member is not allowed to vote."  *Id.* at 2 (quoting SAC, Ex. B ¶ 159).  The issue in the case was evidently one of first impression for the Cayman courts, as the parties are unaware of any prior interpretation of Section 238(1) as it relates to short-form mergers.  *See id.*  Thus, while *Changyou* was issued approximately one year after Mr. Chen made his tender offer, Altimeo views the decision as showing that the statute's meaning "was unsettled and subject to dispute."  *See id.* at 1.  Jumei, however, "falsely represented that Cayman law unequivocally precluded appraisal rights," *id.* at 3, whereas it should have "meaningfully apprised shareholders of their potential appraisal rights" and "describ[ed] the position(s) of the parties to the transaction regarding those potential rights," SAC ¶ 251.  Altimeo therefore asserts that Defendants' statements regarding the absence of appraisal rights independently violate Section 10(b) and Section 14(e).

## III.  <u>LEGAL STANDARDS</u>

A.    <u>Rule 12(b)(6)</u>

Federal Rule of Civil Procedure 12(b)(6) provides that a defendant may move to dismiss a plaintiff's complaint based on its failure to state a claim on which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  To overcome a Rule 12(b)(6) motion to dismiss after the Supreme Court's decisions in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), a plaintiff's "factual allegations [in the complaint] must . . . suggest that the claim has at least a plausible chance of success."  *See Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1135 (9th Cir. 2014) (internal quotation omitted).  The court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party."  *Manzarek*

---

[6] As Jumei notes, the Cayman Islands Grand Court is a national trial court, which makes its decision "non-binding" on other trial courts.  *See* Second Mot. at 6, 9.  Jumei represents that the decision is currently being appealed.  *Id.*

1  *v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).  But "allegations in a

2  complaint . . . may not simply recite the elements of a cause of action [and] must contain sufficient

3  allegations of underlying facts to give fair notice and to enable the opposing party to defend itself

4  effectively."  *Levitt*, 765 F.3d at 1135 (quoting *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir.

5  2011)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the

6  court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

7  *Iqbal*, 556 U.S. at 678.  "The plausibility standard is not akin to a 'probability requirement,' but it

8  asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.* (quoting

9  *Twombly*, 550 U.S. at 556).

10  B.   Rule 9(b) and the PSLRA

11       Federal Rule of Civil Procedure 12(b)(6) provides that a defendant may move to dismiss a

12  plaintiff's complaint based on its failure to state a claim on which relief can be granted.  Fed. R.

13  Civ. P. 12(b)(6).  "Securities fraud complaints are subject to heightened pleading requirements" in

14  comparison with the baseline standard of Federal Rule of Civil Procedure 8(a).  *See Nguyen v.*

15  *Endologix, Inc.*, 962 F.3d 405, 414 (9th Cir. 2020).  As the Ninth Circuit has recently explained:

16       One source of these higher standards is Federal Rule of Civil
       Procedure 9(b), which requires a plaintiff to "state with particularity
17       the circumstances constituting fraud."  *See also* [*Schueneman v.
       Arena Pharm., Inc.*, 840 F.3d 698, 705 (9th Cir. 2016)]; [*Zucco*
18       *Partners, LLC v. Digimarc Corp.*, 552 F.3d, 981 990 (9th Cir.
       2009)].  Another source is the [Private Securities Litigation Reform
19       Act ("PSLRA")], which was enacted in 1995 as part of Congress's
       desire to "curb perceived abuses of the § 10(b) private action—
20       'nuisance filings, targeting of deep-pocket defendants, vexatious
       discovery requests and manipulation by class action lawyers.'"
21       [*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 320
       (2007) (quoting *Merrill Lynch, Pierce, Fenner & Smith Inc. v.*
22       *Dabit*, 547 U.S. 71, 81 (2006))].

23       Under the PSLRA, "the complaint shall specify each statement
       alleged to have been misleading, the reason or reasons why the
24       statement is misleading, and, if an allegation regarding the statement
       or omission is made on information and belief, the complaint shall
25       state with particularity all facts on which that belief is formed."  15
       U.S.C. § 78u-4(b)(1).  Importantly for purposes here, *the complaint*
26       *must also "state with particularity facts giving rise to a strong*
       *inference that the defendant acted with the required state of mind."*
27       *Id.* § 78u-4(b)(2)(A).

28       *The PSLRA's "strong inference" requirement has teeth*.  It is an

> "exacting" pleading obligation, *Zucco Partners*, 552 F.3d at 990, that "present[s] no small hurdle for the securities fraud plaintiff." *Schueneman*, 840 F.3d at 705 (quotations omitted).  As the Supreme Court has explained, "[t]he strong inference standard unequivocally raised the bar for pleading scienter." *Tellabs*, 551 U.S. at 321 (quotations omitted) (alteration adopted).  Given the substantial costs that securities fraud litigation can impose, the "strong inference" standard reflects Congress's attempt to halt early on securities litigation that lacks merit or is even abusive, while allowing plaintiffs with potentially winning claims to proceed to discovery.  *See id.* at 323–24.
>
> Acknowledging these interests, the Supreme Court has held that under the PSLRA's "strong inference" standard, *a complaint will survive a motion to dismiss "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."* *Id.* at 324.

*Endologix*, 962 F.3d at 414 (emphasis added).  Pursuant to the PSLRA's scienter requirement, therefore, courts "must compare the malicious and innocent inferences cognizable from the facts pled in the complaint, and only allow the complaint to survive a motion to dismiss if the malicious inference is at least as compelling as any opposing innocent inference." *Id.* at 419 (quoting *Zucco Partners*, 552 F.3d at 991).

C.   <u>Section 10(b) and Rule 10b-5</u>

Regarding the substantive provisions at issue in this case, the Ninth Circuit has stated:

> Section 10(b) . . . makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b).  Pursuant to this section, the [SEC] promulgated Rule 10b-5, which makes it unlawful . . . "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b).[7]
>
> . . .
>
> "To recover damages for violations of [S]ection 10(b) and Rule 10b-5, a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Halliburton Co. v. Erica P. John Fund, Inc.*, [573 U.S. 258, 267 (2014)] (internal quotation marks omitted). . . .

---

[7] This paragraph is quoted from *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1108 (9th Cir. 2010).

United States District Court
Northern District of California

*In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1140-41 (9th Cir. 2017).

In order to adequately plead "the critical element of scienter," the Ninth Circuit requires a complaint to "allege that the defendants made false or misleading statements either intentionally or with deliberate recklessness." *Endologix*, 962 F.3d at 414 (quoting *Zucco Partners*, 552 F.3d at 991). Deliberate recklessness entails "an *extreme* departure from the standards of ordinary care," one that "presents a danger of misleading buyers or sellers that is either known to the defendant or is so *obvious* that the actor must have been aware of it." *Id.* (quoting *Schueneman*, 840 F.3d at 705) (emphasis in original). While courts are to "examine individual allegations" of scienter "in order to benchmark whether they are actionable," they also "consider the allegations collectively and examine the complaint as a whole." *See Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1058 (9th Cir. 2014) ("*PRS*"). "In the Ninth Circuit," therefore, "courts must first determine 'whether any of the plaintiff's allegations, standing alone, is sufficient to create a strong inference of scienter,'" and, if "none is sufficient alone," courts "must 'then consider the allegations holistically to determine whether they create a strong inference of scienter taken together.'" *Colyer v. Acelrx Pharm., Inc.*, 2015 WL 7566809, at *11 (N.D. Cal. Nov. 25, 2015) (quoting *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1056 (9th Cir. 2014)).

D.   <u>Section 14(e)</u>

Section 14(e) of the Exchange Act "was enacted as one of the 1968 . . . amendments to the Exchange Act, for the purpose of 'insur[ing] that public shareholders who are confronted by a cash tender offer for their stock will not be required to respond without adequate information.'" *Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156, 1167 (9th Cir. 2009) (quoting *Plaine v. McCabe*, 797 F.3d 713, 717 (9th Cir. 1986)). Section 14(e) thus "prohibits a person from making an untrue statement of material fact or a misleading omission in connection with a tender offer." *Id.* (citing 15 U.S.C. § 78n(e)).

The Ninth Circuit "applie[s] the PSLRA's falsity pleading requirement to claims under Section 14(e)"; as a result, the analysis of "[S]ection 14(e) claims is identical to that of . . . [S]ection 10(b) claims with regard" to pleading false or misleading statements or omissions. *Id.* (citing *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1005-06 (9th Cir. 2002)). The Ninth

1    Circuit has held, however, that Section 14(e) only "requires a showing of negligence, not

2    scienter."[8]  *Varjabedian v. Emulex Corp.*, 888 F.3d 399, 401 (9th Cir. 2018) ("*Emulex I*").

3    Plaintiffs bringing claims under Section 14(e) must nevertheless adequately plead loss causation,

4    just as under Section 10(b).  *See In re Ocera Therapeutics, Inc. Sec. Litig.*, 806 Fed. Appx. 603,

5    604-05 (9th Cir. 2020); *see also* 15 U.S.C. § 78u-4(b)(4) ("In any private action arising under [the

6    PSLRA], the plaintiff shall have the burden of proving that the act or omission of the

7    defendant . . . *caused the loss* for which the plaintiff seeks to recover damages.") (emphasis

8    added).

9    E.    Section 20(a)

10         "To prevail on a Section 20(a) claim, 'a plaintiff must first prove a primary violation of

11   underlying federal securities laws,'" such as Section 10(b) or Section 14(e), "'and then show that

12   the defendant exercised actual power over the primary violator.'"  *Emulex I*, 888 F.3d at 403 n.2

13   (quoting *In re NVIDIA*, 768 F.3d at 1052); *see also* 15 U.S.C. § 78t(a) (stating that "[e]very person

14   who, directly or indirectly, controls any person liable under any provision of this chapter . . . shall

15   also be liable jointly and severally with . . . such controlled person to any person to whom such

16   controlled person is liable").  Section 20(a) thus "provides for derivative liability" of "controlling"

17   individuals based on predicate violations of Section 10(b) and Rule 10b-5.  *See In re Leapfrog*

18   *Enter., Inc. Sec. Litig.*, 200 F. Supp. 3d 987, 1000 (N.D. Cal. 2016) (internal quotation omitted).

19   F.    Leave to Amend

20         Where a court dismisses a complaint, it "'should grant leave to amend . . . unless it

21   determines that the pleading could not possibly be cured by the allegation of other facts.'"  *Lopez*

22   *v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000).  In making this determination, the court should

23

24   _____

     [8] In reaching this conclusion the Ninth Circuit emphasized that "important distinctions exist
25   between Rule 10b-5 and Section 14(e) . . . that strongly militate against importing the scienter
     requirement from the context of Rule 10b-5 to Section 14(e)."  *Emulex I*, 888 F.3d at 404-05.  "Put
26   simply, Rule 10b-5 requires a showing of scienter because it is a regulation promulgated under
     Section 10(b) of the Exchange Act, which allows the SEC to regulate *only* 'manipulative or
27   deceptive device[s].'"  *Id.* at 406.  Under Section 14(e), in contrast, "the SEC is authorized to
     regulate a broader array of conduct than under Section 10(b)," including "acts not themselves
     fraudulent under the common law or § 10(b)" so long as the regulation is "reasonably designed to
28   prevent . . . acts and practices [that] are fraudulent."  *Id.* at 407 (quoting *United States v. O'Hagan*,
     521 U.S. 642, 673 (1997)).

United States District Court
Northern District of California

consider factors such as ''the presence or absence of undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party[,] and futility of the proposed amendment.''  *See Moore v. Kayport Package Express*, 885 F.2d 531, 538 (9th Cir. 1989) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

## IV.    DISCUSSION

As indicated above, Altimeo alleges that Defendants effectively "made two categories of statements that were false and misleading" in the Recommendation Statement and other merger-related documents (including Mr. Chen's formal tender offer and SEC transaction statements). FAC ¶ 206.  First, Altimeo takes issue with Jumei's fairness opinion in and of itself, which concluded that Mr. Chen's offer was "fair to, and in the best interests of," Jumei's minority shareholders.[9]  *See id.* ¶ 208.  Second, and more to the point, Altimeo objects to the "inputs for the fairness analysis," *i.e.*, the "assumptions that Jumei's management provided that formed the basis for" the fairness opinion.  *Id.* ¶ 214 (capitalization omitted).  These include Jumei's low-growth projections for Jiedian from 2020 through 2024, which were in turn founded on the representation that, at the time of the buyout, Jumei was unable to secure adequate financing for Jiedian.  *Id.* ¶¶ 215-16.  The "inputs" also relate to Jumei's ostensible plans to wind down its e-commerce and Shuabao businesses in 2021 and 2022.  *See id.* ¶¶ 219-20.  Altimeo alleges, in contrast, (1) that Jumei's stated inability to obtain financing for Jiedian was "patently false" given "the abundant financing that was available to Jiedian's main competitors" at the time of Mr. Chen's tender offer as well "Jiedian's role as the industry leader" and (2) that "Jumei's management was not actually planning to wind [its non-Jiedian] businesses down."  *Id.* ¶¶ 223-24.  "All of these facts show," Altimeo concludes, "that the assumptions that Jumei's management . . . provided to Houlihan as a basis for its fairness assessment at the center of the Buyout were false."  *Id.* ¶ 225.

Jumei challenges the sufficiency of these allegations and moves to dismiss on the grounds that Altimeo's complaints fail to plead (1) a false or misleading statement, (2) scienter under

---

[9] The view that Mr. Chen's tender offer was fair to Jumei and its minority shareholders was first expressed in Houlihan's financial analysis, then adopted by the Special Committee, and then further adopted by Jumei's full Board of Directors.  FAC ¶ 209-11.

United States District Court
Northern District of California

Section 10(b) and Rule 10b-5 or negligence under Section 14(e), (3) reliance, or (4) loss causation. *See* First Mot. at 11, Second Mot. at 2-4.

As the Court explains below, it finds that Altimeo has failed to plead loss causation. As loss causation is an element of Altimeo's Section 10(b) and Section 14(e) claims alike, Jumei's motions may be granted in their entirety on this ground alone. The Court also finds that Altimeo has failed to allege facts giving rise to a strong inference that Jumei acted with scienter for purposes of Section 10(b). Given the Court's conclusions with respect to these issues, it need not rule on whether Altimeo has adequately pled, *inter alia*, a false or misleading statement or negligence under Section 14(e). As Altimeo is given leave to amend its complaint, however, the Court offers some observations on these issues.

A.     Request for Judicial Notice

As a threshold matter, the Court must rule on Jumei's Request for Incorporation by Reference and Judicial Notice, which it filed along with its first motion to dismiss. *See* Docket No. 59 ("First RJN"). Jumei argues that ten exhibits are incorporated by reference into Altimeo's Amended Class Action Complaint, *id.* at 3-7, and that the Court may (in the alternative) take judicial notice of three of these ten exhibits, along with an eleventh exhibit, *id.* at 7-10. Altimeo opposes the request, at least in part, on the grounds that "Jumei improperly raises disputed facts and asks the Court to draw inferences in Jumei's favor," which the Court may not do at the pleadings stage. *See* Docket No. 61 at 1.

The Ninth Circuit has recently "address[ed] and clarif[ied] when and how [a] district court should consider materials extraneous to the pleadings at the motion to dismiss stage via judicial notice and the incorporation-by-reference doctrine." *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 994 (9th Cir. 2018). In *Khoja*, a securities-fraud class action, the Ninth Circuit averred that, in general, "district courts may not consider material outside the pleadings when assessing the sufficiency of a complaint under Rule 12(b)(6)." *Id.* But two exceptions to this rule, "the incorporation-by-reference doctrine[] and judicial notice under Federal Rule of Evidence 201," "permit district courts to consider materials outside a complaint," albeit for different

United States District Court
Northern District of California

1   reasons.[10]  *Id.*

2        With respect to judicial notice, the *Khoja* court explained that "Rule 201 permits a court to

3   notice an adjudicative fact if it is 'not subject to reasonable dispute,'" *i.e.*, "if it is 'generally

4   known,' or 'can be accurately and readily determined from sources whose accuracy cannot

5   reasonably be questioned.'"  *Id.* (quoting Fed. R. Evid. 201(b)).  "Accordingly, [a] court may take

6   judicial notice of matters of public record" but *not* "of disputed facts contained in the public

7   record."  *Id.* (internal quotation omitted) (brackets in original).  In *Khoja*, the Ninth Circuit held

8   that the district court improperly took judicial notice of two exhibits, an "investor call transcript

9   submitted to the SEC" and a report from the European Medicines Agency.  *Id.* at 999-1001.  In

10  both instances, the *document itself* qualified for judicial notice because it constituted a "source[]

11  whose accuracy cannot reasonably be questioned," but certain of the document's *contents* were not

12  judicially noticeable because they were "subject to varying interpretations."  *Id.* at 999-1000.  In

13  the latter instance, "there is no fact established by the [document] 'not subject to reasonable

14  dispute,' and the fact identified does not qualify for judicial notice under Rule 201(b)."  *Id.* at

15  1000.  The Ninth Circuit thus emphasized that courts, in deciding requests for judicial notice, must

16  consider both the accuracy of the source document and the specific fact(s) that the moving party

17  seeks to rely on within the document, and take notice only of those facts that are not subject to

18  dispute.

19       The incorporation-by-reference doctrine, on the other hand, "is a judicially created doctrine

20  that treats certain documents as though they are part of the complaint itself."  *Id.* at 1002.  The

21  doctrine's purpose is to "prevent[] plaintiffs from selecting only portions of documents that

22  support their claims, while omitting portions of those very documents that weaken—or doom—

23  their claims."  *Id.* at 1002.  Notably, "unlike judicial notice, a court may assume [that an

---

[10] The court prefaced its analysis by observing, however, "a concerning pattern in securities cases" in which defendants "exploit[] these procedures improperly to defeat what would otherwise constitute adequately stated claims at the pleading stage."  *Id.*; *see also id.* (stating that "the unscrupulous use of extrinsic documents to resolve competing theories against the complaint risks premature dismissals of plausible claims").  "Such undermining of the usual pleading burdens," the Ninth Circuit warned, "is not the purpose of judicial notice or the incorporation-by-reference doctrine."  *Id.* at 999.

1    incorporated document's] contents are true for purposes of a motion to dismiss under Rule

2    12(b)(6).  *Id.* at 1003.

3          The Ninth Circuit has held that "a defendant may seek to incorporate a document into the

4    complaint 'if the plaintiff refers extensively to the document or the document forms the basis of

5    the plaintiff's claim.'"  *Id.* (quoting *United States v. Ritchie*, 342 F.3d 903, 907 (9th Cir. 2003)).

6    In *Khoja*, the court acknowledged that it is not always clear what "extensively" means in this

7    context but stated that "the mere mention of the existence of a document is insufficient to

8    incorporate [its] contents" and that "extensively" should ordinarily be taken to mean "more than

9    once."[11]  *Id.* at 1002-03.  *Khoja*'s own analysis of exhibits that the district court incorporated by

10   reference (a mix of analyst reports, SEC filings and attachments, and regulatory agency reports),

11   thus asked whether the complaint referred to the exhibits "extensively enough to warrant

12   incorporation on that ground alone" and, if not, whether the plaintiff used the exhibit to help "form

13   the basis of [her] claims."  *See id.* at 1006.  The Ninth Circuit nevertheless cautioned that "if the

14   document merely creates a defense to the well-pled allegations in the complaint, then that

15   document d[oes] not necessarily form the basis of the complaint," and so should not be

16   incorporated by reference.  *Id.* at 1002.  "Submitting documents *not mentioned in the complaint* to

17   create a defense," the court concluded, "is nothing more than another way of disputing the factual

18   allegations in the complaint" and permitting defendants to do so would "short-circuit the

19   resolution of a well-pleaded claim."  *Id.* at 1003 (emphasis added).

20         Here, Jumei argues that Exhibits 1-2 and 4-11 are incorporated by reference into Altimeo's

21   Amended Class Action Complaint because they "are referenced or relied upon" in multiple

22   paragraphs.[12]  First RJN at 4.  Exhibits 1, 2, and 4 are SEC filings; Exhibit 5 is Houlihan's

23   financial analysis (or "fairness" opinion), which was attached to the Special Committee's

24

25   _____

26   [11] The court also concluded, however, that "a reference may be sufficiently 'extensive' if a single
     reference is relatively lengthy" and noted that, in certain instances, materials may be incorporated
27   even where the complaint does not explicitly identify them at all.  *Id.*; *see also Knieval v. ESPN*,
     393 F.3d 1068, 1076 (9th Cir. 2005) (affirming incorporation of a photo and caption from a
28   website where the plaintiff alleged that they were defamatory without expressly citing them).

     [12] The exhibits themselves are collected at Docket No. 58-2 ("Faigen Decl.").

United States District Court
Northern District of California

Recommendation Statement; Exhibit 6 is the Recommendation Statement itself; Exhibit 7 is Chen's Tender Offer, also filed with the SEC; and Exhibits 8-11 are English translations of Chinese-language news articles.  *Id.* at 4-5.  As Jumei's request points out, Exhibits 2, 5, 6, and 7 are mentioned upwards of ten times in the complaint, and in most instances more than twenty times.  *Id.*  These documents are therefore referenced "extensively enough to warrant incorporation on that ground alone" and the Court may assume the truth of their contents for purposes of Jumei's motion to dismiss.  *See Khoja*, 899 F.3d at 1006.

Exhibits 1 and 4 present closer questions, as the complaint refers to these documents three and four times, respectively.  First RJN at 4.  These references are found almost exclusively in "background" sections of the Amended Class Action Complaint, namely those that present financial information about Jumei in 2014 and 2016.  *See* FAC ¶¶ 3, 36, 40-41.  As a result, Exhibits 1 and 4 are arguably not referenced "extensively" enough to warrant incorporation into Altimeo's complaint "on that ground alone."  *See Khoja*, 899 F.3d at 1006.  Exhibit 4 nevertheless serves to form the basis of a claim, *i.e.*, to help show that Mr. "Chen's offer to purchase Jumei's outstanding shares [in 2020] was the culmination of his years' long effort to take the Company private."  *See* First RJN at 4, FAC ¶ 114.  Exhibit 4 may therefore be incorporated by reference on that ground.  As the Court does not rely on either of these documents in reaching its decision, however, it denies Jumei's request to incorporate them by reference into the complaint.

Exhibits 8-11, the translated articles, also present close questions because they are each referenced only twice in Altimeo's Amended Class Action Complaint.  *See* First RJN at 5.  Nevertheless, they are all discussed at some length, with individual paragraphs devoted to summarizing their contents.  *See* FAC ¶¶ 151, 157, 162, and 165.  Perhaps more importantly, the articles also serve as the basis for Altimeo's claim "that, contrary to Jumei's representation to Houlihan that the Company was unable to raise adequate financing for Jiedian, Jiedian was the leading business in the fast-growing and profitable power bank sharing industry in China" and that "[s]ubstantial financing" was therefore available to Jiedian.  *See* FAC ¶ 163.  As a result, the articles are incorporated by reference into the complaints.

Jumei lastly requests that the Court take judicial notice of Exhibit 3, "which is a chart of

historical stock prices for Jumei's" shares.  First RJN at 7.  Doing so here is proper, as "courts regularly take notice of historical stock prices because they can be readily and accurately ascertained."  *See In re WageWorks, Inc. Sec. Litig.*, 2020 WL 2896547, at \*4 (N.D. Cal. June 1, 2020).  The Court agrees with Altimeo, however, that it must take notice only of the stock prices themselves and "not accept this information," in and of itself, "as supportive of" the fairness of Mr. Chen's offer, which is what Jumei ultimately seeks to use the exhibit for.  *See* Docket No. 61 at 6-7; *see also Khoja*, 899 F.3d at 999 (stating that courts "cannot take judicial notice of disputed facts contained in [otherwise accurate] public records").

In sum, the Court finds that Exhibits 2, 5, 6, 7, 8, 9, 10, and 11 are incorporated by reference into the Amended Class Action Complaint.  It also takes judicial notice of Jumei's historical stock prices as reflected in Exhibit 3, although not for establishing any fact which is subject to any reasonably disputed inferences.

B.   False or Misleading Statements

"To plead falsity under the PSLRA, a complaint must 'specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.'"  *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 614 (9th Cir. 2017) (quoting 15 U.S.C. § 78u-4(b)(1)(B)).  In *City of Dearborn Heights*, the Ninth Circuit addressed "the proper standard for pleading falsity when," as here, "the alleged misstatements are opinion statements."  *Id.*; *see also* First Mot. at 3 ("[F]airness opinions are statements of opinion, not fact . . . ."), First Opp'n at 12 ("[T]he allegations here satisfy all three ways to plead the falsity of opinion statements . . . .").

> First, when a plaintiff relies on a theory of material misrepresentation, the plaintiff must allege both that the speaker did not hold the belief she professed and that the belief is objectively untrue.  Second, when a plaintiff relies on a theory that a statement of fact contained within an opinion statement is materially misleading, the plaintiff must allege that the supporting fact the speaker supplied is untrue.  Third, when a plaintiff relies on a theory of omission, the plaintiff must allege facts going to the basis for the issuer's opinion . . . whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context.

1  *City of Dearborn Heights*, 856 F.3d at 615-16 (internal quotations omitted); *see also Omnicare,*

2  *Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 182-95 (2015)

3  (establishing these three standards for pleading falsity of opinion statements under Section 11 of

4  the Securities Act of 1933).[13]

5       In arguing that Altimeo has failed to plead a false or misleading statement, Jumei contends,

6  *inter alia*, that the complaints do not adequately allege objective falsity because they do not

7  "identify specific contemporaneous statements or conditions showing that, at the time the fairness

8  opinion was issued: (i) Jumei was *not* planning to wind down its e-commerce and video-sharing

9  app business; or (ii) Jumei *was* able to raise sufficient capital to finance Jiedian's growth." *Id.* at

10  12 (bolding omitted).  First Mot. at 11-12.

11       With respect to Jumei's e-commerce and Shuabao businesses, the Court is highly doubtful

12  that Altimeo has pled objective falsity.  The complaints allege, for example, that one of the key

13  assumptions underlying Houlihan's financial analysis was that Jumei "expected to wind down"

14  these businesses "by 2021 and 2022," respectively, and that this assumption was untrue.  FAC

15  ¶ 184.  But, as Jumei points out, this expectation has yet to be proven false since neither of those

16  deadlines has passed.  First Mot. at 13.  The complaints also cite Mr. Chen's statement, in his

17  formal Tender Offer, that he "ha[d] no plan to liquidate any business of Jumei" as evidence that

18  the liquidation analysis was misleading.  See FAC ¶ 190.  But the Tender Offer also noted that Mr.

19  Chen's buyer group "believe[d] the liquidation value better reflect[ed] the fair value of [the]

20  businesses" than other metrics "[g]iven the capital intensiveness of . . . operating such businesses

21

22  [13] In the instant case, it is not entirely clear which of the *City of Dearborn Heights* standards
Altimeo's theory of falsity applies to.  Altimeo argues that its allegations "satisfy all three ways to

23  plead the falsity of opinion statements," First Opp'n at 12, but it does not otherwise clarify how
the allegations fit within each category.  *See* First Reply at 7-8 (arguing, for example, that

24  "Plaintiff does not explain how" the second and third standards "apply here, or how Plaintiff
adequately pled them").  Altimeo's typical characterization of its claims throughout its opposition

25  suggests that it is relying, at least primarily, on a "theory of material misrepresentation," *City of
Dearborn Heights*, 856 F.3d at 615-16, or the first of the Ninth Circuit's standards.  *See, e.g.*, First

26  Opp'n at 11 (stating that "Jumei made materially false and misleading statements concerning the
fairness of the Buyout," namely "Jumei's affirmations that the Buyout was fair" and its

27  "descriptions of the assumptions underlying that conclusion").  The Court therefore applies this
standard to Altimeo's allegations of falsity, recognizing that it may be possible for Altimeo to

28  adapt them to one of the other *City of Dearborn Heights* standards in an amended complaint.

United States District Court
Northern District of California

and the difficulty for Jumei to secure third party financing for such businesses." Faigen Decl., Ex. 7 at 9. Altimeo has not explained, with particularity, "why th[at] statement is misleading," as the PSLRA requires it to do. *See* 15 U.S.C. § 78u-4(b)(1)(B). Further, Altimeo argues that "Jumei grossly undervalued its [non-Jiedian] businesses even within the context [of] a liquidation analysis," most notably by failing "to do a market check" to determine what those businesses were worth to potential buyers. First Opp'n at 9-10 (citing FAC ¶ 120-21, 202). But while the complaints conclusorily assert that performing a market check is a "standard step in the buyout process," FAC ¶ 120, they do not sufficiently explain how Jumei's decision not to conduct a market check renders its liquidation analysis inherently untrustworthy. Moreover, at the motion hearing, Jumei argued that the failure of potential buyers to bid on the company after Mr. Chen's tender offer became public amounted to a *de facto* market check since it shows that potential buyers, aware of the opportunity, did not believe the company had significantly greater value than Jumei itself did. *See* Docket No. 106 ("Hearing Tr.") at 18-20. As noted below, the market indicators arguably demonstrate the lack of objective falsity (and thus as discussed below the lack of loss causation).

Lastly, Altimeo points to the allegations of two "former employees that worked at Jumei while the Buyout was pending," who state that they never "hear[d] of any plans for these businesses to wind down" while they worked for Jumei. First Opp'n at 9 (citing FAC ¶¶ 195-96). But, as Jumei argues, the complaints likely fail to meet "the Ninth Circuit standard for confidential witness allegations." First Mot. at 13. That court has held that plaintiffs must identify confidential sources "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged" and provide additional "corroborating details." *In re Daou Sys., Inc.*, 411 F.3d 1006, 1015 (9th Cir. 2005). District courts applying the *Daou* standard have thus often required plaintiffs to describe, at a minimum, a witness's "job description" and "his or her responsibilities" at the relevant company. *See McGovney v. Aerohive Networks, Inc.*, 367 F. Supp. 3d 1038, 1053 (N.D. Cal. 2019). Here, the complaints provide only general job descriptions for CW2 and CW3, who are described as a "senior data operations employee" and a "product manager in Jumei's e-commerce business,"

respectively.  FAC ¶¶ 195-96.  "Further, [Altimeo] fails to allege facts showing why these mid-level employees would have any knowledge about senior management's plans for the Company" around the time of the Buyout.  First Mot. at 13; *see also Kipling v. Flex Ltd.*, 2020 WL 2793463, at *16 (N.D. Cal. May 29, 2020) ("It is unclear how CW3 and CW4 would have firsthand knowledge of operational issues in Flex's factories given their alleged roles.").  As a result, Altimeo has likely failed to plead the objective falsity of any statements concerning the winding down of Jumei's e-commerce and Shuabao businesses.

Jumei's statements regarding its inability to raise sufficient capital to support Jiedian at the time of Mr. Chen's tender offer present a closer question.  The key facts that Altimeo alleges in support of its theory of falsity include (1) "the availability of financing to Jiedian's competitors immediately before and after the Buyout," (2) "the fast-growing nature of the shared power bank market" of which "Jiedian was the recognized leader," and (3) the significant amount of cash that Jumei and Jiedian had on hand at the time of the Buyout.  *See* First Opp'n at 13.  Jumei argues that these allegations fail to establish objective falsity because, *inter alia*, only one of Jumei's competitors in the power-bank industry had secured financing when Mr. Chen submitted his offer in January 2020, First Mot. at 15-16, and because Jumei's admittedly substantial market share in the industry did not guarantee its continued success, First Reply at 6.  Jumei also emphasizes that, as Houlihan's financial analysis notes, the company "held discussions with five investment banks and 26 potential investors" throughout 2019 "in search of financing for Jiedian, yet was unsuccessful" in obtaining it.  First Mot. at 15 (citing Faigen Decl., Ex. 5 at 7).  In Jumei's view, this fact alone indicates that there was insufficient financing available for Jiedian at the time of the buyout.  *See id.*

Altimeo's third main argument on this issue—that Jumei and Jiedian had substantial amounts of cash on hand at the time of Chen's tender offer—appears unpersuasive.  Altimeo relies principally on two allegations in support of its position: first, that Jiedian's CEO remarked, in a news article from May 2020, that Jiedian's cash "reserves have enough of a margin of safety to face future challenges," ¶¶ 14, 165-66; second, that "Jumei had $110 million in cash prior to the Buyout," First Opp'n at 13 (citing FAC ¶¶ 103-04, 140).  But, as Jumei responds, the remarks by

Jiedian's CEO were not intended to suggest "that Jiedian could continue to grow even without additional financing"; rather, his assurance that Jiedian's "reserves ha[d] sufficient margin of safety to deal with the challenges ahead" was prompted by the damaging effects of the covid-19 pandemic on the power-bank industry, and was seemingly intended to "show his confidence of leading Jiedian's employees through the crisis." *See* First Mot. at 17 n.10, Faigen Decl., Ex. 11 at 4.  Further, Jumei observes that while the company did indeed have "$110 million in cash" and "$150 million in total . . . assets" when Mr. Chen made his tender offer the Company "also had $180 million in current liabilities."  First Reply at 7 (citing Faigen Decl., Ex. 5 at 17-18).  The amount of cash that Jumei and/or Jiedian might have had on hand at the time of the Buyout, therefore, is not  particularly probative of the falsity of the Jumei's statements about Jiedian's access to financing.[14]  For the reasons stated below, however, the Court need not rule on whether Altimeo has adequately pled objective falsity with respect to Jumei's statements about Jiedian's financing.

C.      Section 10(b) Scienter

As noted above, the PSLRA requires that complaints "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2)(A).  For claims brought under Section 10(b) and Rule 10b-5 the required state of mind is scienter, according to which "a complaint must allege that the defendants made false or misleading statements either intentionally or with deliberate recklessness."  *Endologix*, 962 F.3d at 414 (internal quotation omitted).  Courts are to consider allegations of scienter both individually and holistically.  *See PRS*, 759 F.3d at1058; *In re NVIDIA*, 768 F.3d at 1056.  The complaint must plead particularized facts which give rise to a "strong inference" of scienter.  *Endologix*, 962 F.3d at 414.

Jumei argues that Altimeo's complaints fail to adequately allege that the company acted with scienter because Altimeo "does not allege any facts showing what any Defendant believed

United States District Court
Northern District of California

---

[14] The Court declines to comment here on whether Jumei's statements about the lack of appraisal rights for minority shareholders under Cayman Islands law were objectively false, as its ruling on the loss-causation issue obviates the need for detailed analysis of those statements' falsity at this time.

about the fairness of the tender offer," much less "particularized" ones.  First Mot. at 10.  In doing

so, Jumei observes that Altimeo must "plead the scienter of the Individual Defendants who were

acting on Jumei's behalf" in order to impute scienter to the company.  *Id.* at 18; *see also In re*

*ChinaCast Educ. Corp. Sec. Litig.*, 809 F.3d 471, 475 (9th Cir. 2015) (stating that "a corporation

can only act through its employees and agents and can likewise only have scienter through them").

More specifically, Jumei points out that "the vast majority of Plaintiff's scienter allegations

concern Chen, with only a few allegations concerning [Special] Committee members Shao or

Zhao, and zero allegations about" Jumei's other directors, Defendants Ren and Su.  *Id.*

The Court agrees with Jumei that Altimeo fails to allege facts that raising "a strong

inference" that Defendants Shao or Zhao, the Special Committee members, or Ren and Su, the

company's additional directors, acted with scienter.  *See* 15 U.S.C. § 78u-4(b)(2)(A).  With respect

to Messrs. Shao and Zhao, the complaints merely allege that their "fraudulent intent can be

established by their motive and opportunity to defraud."  *See* FAC ¶¶ 240; *see also* First Opp'n at

20 ("Shao and Zhao . . . were given unfettered access to Jumei's management and business

information in . . . assessing the fairness of Chen's offer.").  But the Ninth Circuit has expressly

held that allegations of scienter that are based on "nothing but 'motive and opportunity' . . . [are]

not enough to create a strong inference of scienter."  *Rubke v. Capitol Bancorp Ltd.*, 551 F.3d

1156, 1166 (9th Cir. 2009).

In any event, Altimeo does not plausibly suggest how Messrs. Shao and Zhao "were

motivated to defraud Jumei's shareholders."  *See* First Mot. at 19.  The complaints allege only that

they were paid "a monthly compensation of $20,000 in exchange for their service on the Special

Committee," FAC ¶¶ 35, 243, but does not charge that this payment was somehow dependent on

their endorsement of the Buyout's fairness.  To the contrary, the Recommendation Statement

affirms that the monthly payment to Messrs. Shao and Zhao was "not contingent upon the

completion of the Merger or any alternative transactions, or the Special Committee's or the

Board's recommendation of the proposed transactions or any alternative transactions."  Faigen

Decl., Ex. 6 at 7.  There is thus no obvious connection "between the money Shao and Zhao

26

United States District Court
Northern District of California

1    received for being on the Committee and the alleged misstatements."[15]  First Mot. at 19.

2    Additionally, the complaints assert that scienter on the part of Messrs. Shao and Zhao can be

3    inferred because they were "beholden to Chen, the Company's Chairman and dominant

4    shareholder."  FAC ¶ 243.  But this bald allegation is, again, unsupported by any factual detail that

5    would render it plausible—especially since Altimeo does not dispute that Messrs. Shao and Zhao

6    were, in the words of the Recommendation Statement, "independent and disinterested director[s]"

7    of Jumei.  See Faigen Decl., Ex. 6 at 4.  This is far short of a "strong inference."

8          The complaints' failure to allege facts suggesting that Messrs. Shao and Zhao acted with

9    scienter is especially problematic given the Ninth Circuit's recent emphasis on the often-important

10   role of motive in satisfying this "heightened pleading requirement[]."  See Endologix, 962 F.3d at

11   413-14.  In Endologix, the Ninth Circuit rejected allegations of scienter where the plaintiff's

12   "central theory [was] that company executives knew" that a medical device for which they were

13   seeking FDA approval "had encountered problems in Europe that would manifest again in U.S.

14   clinical trials, which would in turn lead the FDA to deny premarket approval."  Id. at 407.  Despite

15   the device's safety issues in Europe, however, "Endologix executives repeatedly assured investors

16   that the FDA would likely approve" the device.  Id. at 410.  Later, however, the company

17   announced "that the FDA would not approve [the device] within the timeline the company had

18   previously presented," leading its stock price to plummet.  Id. at 412.  On appeal, the Ninth Circuit

19   affirmed the district court's dismissal of the plaintiff's Section 10(b), Rule 10b-5, and Section

20   20(a) claims for failing to plead scienter.  Id. at 413.  The court held that the plaintiff's theory—

21   i.e., "that defendants knew the FDA would not approve [the device] . . . on the timeline defendants

22   were telling the market"—did "not make a whole lot of sense," given that the plaintiff did not

23   allege that "defendants had sought to profit from this scheme in the interim, such as by selling off

24   their stock or selling the company at a premium."  Id. at 415.  The court was thus being "asked to

25

26   _____

27   [15] At the motion hearing, Altimeo suggested that even if the $20,000 monthly compensation was
     not tied to the buyout's consummation, Messrs. Shao and Zhao were nevertheless "incentivized to
     go along with the process."  Hearing Tr. at 24.  But this conclusory assertion is, once again,
28   unsupported by any concrete allegations suggesting a motive to lie about the fairness of Mr.
     Chen's tender offer.

1    accept the theory that defendants were promising FDA approval for a medical device application

2    they knew was 'unapprovable'"—a theory that "does not resonate in common experience." *Id.*

3    The Ninth Circuit therefore held that the plaintiff's scienter theory was implausible as a matter of

4    law, and her Section 10(b)-focused claims had to be dismissed. *See Endologix*, 962 F.3d at 419-

5    20.

6         As in *Endologix*, Altimeo's allegations of scienter regarding Messrs. Shao and Zhao lack a

7    "basis in logic or common experience." *See id.* at 407-08.  The complaints fail to allege that the

8    directors' compensation for serving on the Special Committee was in any way tied to their opinion

9    that Mr. Chen's tender offer was fair to Jumei's minority shareholders.  And Altimeo's bare

10   allegation that these "independent and disinterested director[s]" were somehow "beholden" to Mr.

11   Chen is far too conclusory to satisfy the PSLRA's "exacting" requirements for pleading scienter.

12   *See* Faigen Decl., Ex. 6 at 4; FAC ¶ 243; *Endologix*, 962 F.3d at 414.

13        Additionally, while the complaints allege that "Shao and Zhao knew or had access to the

14   information showing the falsity of the assumptions that Jumei's management provided to

15   Houlihan" given their positions as Board and Special Committee members, FAC ¶ 251, the

16   complaints do not "identify a single document, report, or other piece of information in Defendants'

17   possession showing that (i) Jumei did not intend to wind down its e-commerce business by 2022,

18   or (ii) Jumei was able to secure financing to fund Jiedian's growth," First Mot. at 19-20.  The

19   Ninth Circuit has refused to credit scienter claims in analogous circumstances.  In *In re Rigel*

20   *Pharmaceuticals, Inc. Securities Litigation*, 697 F.3d 869 (9th Cir. 2012), for example, the

21   plaintiff alleged "that Defendants knew that their statements regarding" a clinical drug's "efficacy

22   were false because they had access to the clinical trial results and therefore knew that" they

23   contained potentially worrying data.  *Id.* at 883.  The Ninth Circuit rejected the plaintiff's

24   argument: "Even assuming," it stated, "that Plaintiff adequately pled that all of the defendants had

25   knowledge of the detailed clinical results at the time the allegedly false statements were made,

26   such an allegation does not support a strong inference of scienter" because it does not establish

27   that defendants knowingly misled investors about the drug's overall efficacy or commercial

28   prospects.  *See id.* at 883-84; *see also Prodanova v. H.C. Wainwright & Co., LLC*, 993 F.3d 1097,

United States District Court
Northern District of California

28

1    1109 (9th Cir. 2021) (holding that a plaintiff failed to plead scienter by alleging that a company's

2    CEO had only a "general awareness of the day-to-day workings of the company's business" rather

3    than "detailed and contemporaneous knowledge" of, and "control over," a specific report

4    containing misleading statements).  Consequently, Altimeo's allegations regarding the "access"

5    that Messrs. Shao and Zhao had to the contested information do not give rise to "a strong

6    inference" of scienter on their part.  *See* 15 U.S.C. § 78u-4(b)(2)(A).

7          For the same reason, Altimeo's suggestion that the "core operations" doctrine applies here

8    is unpersuasive.  *See* First Opp'n at 21, FAC ¶ 253.  This doctrine provides that scienter may be

9    based, at least in part, on "the theory that facts critical to a business's core operations . . . are

10   known to a company's key officers."  *See Azar v. Yelp, Inc.*, 2018 WL 6182756, at *20 (N.D. Cal.

11   Nov. 27, 2018).  The Ninth Circuit has thus stated that allegations of scienter founded on

12   "management's role in a company" may "satisfy the PSLRA where they are particular and suggest

13   that defendants had actual access to the disputed information" or where "the nature of the relevant

14   fact is of such prominence that it would be absurd to suggest that management was without

15   knowledge of the matter."  *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 786 (9th Cir. 2008)

16   (internal quotation omitted).  The Ninth Circuit has also held, though, that "[p]roof under this

17   theory is not easy," as plaintiffs "must produce either specific admissions by one or more

18   corporate executives of detailed involvement in the minutia of a company's operations," "or

19   witness accounts demonstrating that executives had actual involvement" in disseminating false

20   statements.  *PRS*, 759 F.3d at 1062.  Here, Altimeo has not produced such specific admissions,

21   witness accounts, or anything in that vein.[16]  Nor has Altimeo shown that "it would be absurd to

22

23   ――――――――――――――

24   [16] In support of its argument that Jumei could have secured financing for Jiedian, Altimeo cites
     remarks from CW1, a former "senior procurement engineer" at Jiedian who represents that former

25   Jiedian colleagues, who now work for a power-bank competitor, told CW1 that the competitor
     "has been in negotiations with Jiedian regarding a planned acquisition of Jiedian since early

26   2020."  *See* First Opp'n at 7 (citing FAC ¶ 142).  As with the statements of CW2 and CW3,
     however, the complaints do not provide detail about CW1 beyond his general job description and

27   so likely fail to satisfy the Ninth Circuit's particularity requirements for confidential witnesses.
     *See Daou*, 411 F.3d at 1015-16; *McGovney*, 367 F. Supp. 3d at 1053.  Further, since CW1 is being

28   cited as a conduit for the hearsay statements of otherwise unidentified "former colleagues,"
     Altimeo has failed to produce any firsthand witness accounts of management's wrongdoing.  *See*
     First Mot. at 15.

*(left margin)* United States District Court / Northern District of California

United States District Court
Northern District of California

1   suggest that" Messrs. Shao and Zhao "were without knowledge" of the specific information that

2   the complaint adduces to show that, for example, Jumei could have obtained additional financing

3   for Jiedian.  *See id.*

4        In sum, when the Court "compare[s] the malicious and innocent inferences cognizable

5   from . . . the complaint," as it must, "the mo[st] plausible inference from the facts alleged" is that

6   Messrs. Shao and Zhao concluded, on the basis of Houlihan's financial analysis and in good faith,

7   that the buyout was fair to, and in the best interests of, Jumei's shareholders.  *See id.* at 419.

8   Altimeo therefore fails to plead that Messrs. Shao and Zhao acted with scienter.  And as the

9   complaints lack any concrete allegations whatsoever against Defendants Ren and Su, Altimeo has

10  likewise not pled a cognizable Section 10(b) claim against them either.

11       As for Mr. Chen, Altimeo repeatedly argues that "Chen—as Jumei's CEO and CFO, and

12  Chairman of both Jumei and Jiedian—cannot separate himself from" Jumei's alleged fraud in

13  promulgating its fairness opinion.  *See* First Opp'n at 19.  But, as Jumei responds, there are two

14  main problems with Altimeo's line of argument.  First, while Altimeo suggests that Mr. "Chen did

15  not subjectively believe the buyout was fair to shareholders," the "fairness opinion at issue was

16  not Chen's—it was the [Special] Committee's and the Board's."  First Reply at 8 (citing Feigan

17  Decl., Ex. 6 at 7-8, 12).  Thus, it was "Shao, as Committee chairman, [who] issued the

18  Recommendation Statement, not Chen."  *Id.* (citing Feigan Decl., Ex. 6 at 1), FAC ¶¶ 91, 93.  To

19  the extent that Mr. Chen had any involvement in promulgating the Recommendation Statement, it

20  was solely in his capacity as one of five Jumei Board members who collectively adopted the

21  Special Committee's (and Houlihan's) fairness opinion.

22       Second, Jumei asserts that Mr. Chen's mental state cannot otherwise "be imputed to Jumei

23  because Chen was not acting on Jumei's behalf in connection with the transaction or the alleged

24  misstatements."  First Mot. at 18.  In making this argument, Jumei cites *In re ChinaCast*, where

25  the Ninth Circuit held that "[i]n the context of Rule 10b-5 . . . a corporation is responsible for a

26  corporate officer's fraud committed within the scope of his employment or for a misleading

27

28

United States District Court
Northern District of California

statement made by an employee or other agent who has *actual or apparent authority*."[17]  809 F.3d at 476 (emphasis added).  The *ChinaCast* court thus aligned itself with the Tenth Circuit, which had previously held that "[t]he scienter of the senior controlling officers of a corporation may be attributed to the corporation itself to establish liability as a primary violator of § 10(b) and Rule 10b-5 when those senior officers were acting within the scope of their apparent authority."  *Id.* (quoting *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1106-07 (10th Cir. 2003)).

Here, Jumei observes that Mr. Chen did not act with actual authority during the buyout process because, *inter alia*, he did not serve on the Special Committee and was not empowered to issue or alter the Recommendation Statement.  *See* First Mot. at 18.  "Nor did Chen act with apparent authority on behalf of Jumei in connection with the tender offer or the merger," Jumei argues, since "he was the buyer *on the other side* of the transaction from Jumei."  *Id.* (emphasis added).  Indeed, Mr. "Chen filed his own, separate statement as part of the buyer group, further clarifying that he had no 'apparent authority' with respect to the Recommendation Statement."  First Reply at 10; *see also* Feigan Decl., Ex. 7 at 6, 8 (stating, as part of Mr. Chen's Tender Offer, that the Buyer Group's "interests in the Offer and the Merger are different from those of shareholders being asked to sell their Shares" and that Jumei "did not participate in and did not have any influence over the deliberative process of, or the conclusions reached by, the Special Committee").  As Jumei thus points out, it is implausible that Jumei's minority shareholders would have believed that any statements made by Mr. Chen during the proposed merger were made in his capacity as a Jumei director and officer, rather than as the "adverse" party he was in the transaction.  *See Rochez Bros., Inc. v. Rhoades*, 527 F.2d 880, 884 (3d Cir. 1975) ("A corporation . . . is not liable for the fraud of its officer when the officer acted as an individual for his own account and the defrauded party knew that the officer was not acting for the corporation.").

---

[17] The *ChinaCast* court explained that "the Securities Exchange Act and accompanying regulations do not contain any explicit instructions on when an employee's acts and intent are to be imputed as those of the company"; as a result, "courts have looked to agency principles for guidance."  809 F.3d at 475.  In formulating this rule, the Ninth Circuit looked to its sister courts, which "follow the same [agency] principles, even after the advent of the PSLRA and its strict focus on scienter."  *Id.* at 476.

Altimeo counters that Mr. Chen's alleged scienter is imputable to Jumei because of his dominant role in the company as its Chairman, CEO, and CFO, and because he "communicated the false assumptions of Jumei's 'management' that formed the basis for the Board's recommendation." First Opp'n at 22-23. Altimeo relies heavily on *Securities and Exchange Commission v. City of Victorville*, 2018 WL 3201676 (C.D. Cal. Jan. 24, 2018), which held that "[t]he person whose state of mind is imputed to the corporate defendant need not also be the person who made the material misstatements at issue." *Id.* at *3 (quoting *Patel v. L-3 Commc'ns Holdings, Inc.*, 2016 WL 1629325, at *14-15 n.38 (S.D.N.Y. Apr. 21, 2016)); *see also Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 144 (2011) (holding that, for purposes of Section 10(b) and Rule 10b-5, "the maker of a statement is the entity with authority over the content of the statement and whether and how to communicate it"). But in reaching this conclusion, the *City of Victorville* court merely applied the uncontroversial principle that courts may sometimes impute scienter from an individual to an entity where the individual "participated in making the challenged statements" and "did so with scienter." *See City of Victorville*, 2018 WL 3201676, at *3-5 (quoting *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, and Prods. Liab. Litig.*, 2017 WL 6041723, at *8 (N.D. Cal. Aug. 10, 2012)). Here, in contrast, Altimeo has not adequately shown that Mr. Chen "participated in making the challenged statements" since, once again, he was not part of the Special Committee, had no evident role in preparing the Recommendation Statement, and is not alleged—with any specificity—to have otherwise exerted undue influence over the rest of Jumei's Board. Further, while *City of Victorville* cites to caselaw containing certain broad language about imputation,[18] those cases dealt with the commonplace securities-fraud scenario involving, for example, a misleading SEC financial statement, and not the unique situation here, where a company's officer is *on the other side* of a well-publicized

---

[18] *See, e.g.*, *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 476 (6th Cir. 2014) (stating that an individual's scienter is "probative" of a corporation's where a misstatement is made by, *inter alia*, an individual "who authorized, requested, commanded, furnished information for, prepared . . . , reviewed, or approved the statement"); *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, (5th Cir. 2004) (stating that an individual's scienter may be attributed to a corporation where the individual "make[s] or issue[s] the statement (or order[s] or approve[s] it or its making or issuance, or who furnish[es] information or language for inclusion therein, or the like").

United States District Court
Northern District of California

transaction as an adverse party.  *See* Hearing Tr. at 4-5.  As a result, *City of Victorville* does not support imputing Mr. Chen's state of mind to Jumei with respect to the company's fairness opinion and the assumptions on which it was clearly based.[19]

Finally, with respect to Altimeo's allegations regarding dissenter's rights, which were newly added to the SAC, the Court finds that they clearly fail to raise "a strong inference" that Jumei acted with scienter.  *See* 15 U.S.C. § 78u-4(b)(2)(A).  As described above, Altimeo's theory is that Jumei misled its minority shareholders "either intentionally or with deliberate recklessness" when it stated in its merger-related filings that these shareholders would not have dissenter's (*i.e.*, appraisal) rights under Cayman Island law if and when Mr. Chen executed the short-form merger. *See Endologix*, 962 F.3d at 414; Second Opp'n at 1, 4-5 (citing SAC ¶¶ 94, 241, 243).  This statement was revealed to be inaccurate in January 2021, however, when a Cayman trial court held—apparently as a matter of first impression—that appraisal rights *are* available to shareholders in short-form mergers.  *See id.* at 1-2, SAC ¶¶ 243-56.  While the court reached its decision approximately one year after Defendants made their statements about dissenter's rights, Altimeo alleges that the statements were "materially misleading in that they fail[ed] to adequately disclose the likely possibility that shareholders *do* have appraisal rights" under Cayman law in these circumstances.  *See* SAC ¶ 251.  They further argue that scienter should be inferred because, given the ambiguity in Cayman law, "Defendants knew or recklessly disregarded the fact that said ambiguity entitled them to, at best, advise minority shareholders of Jumei that . . . appraisal rights

---

[19] Without deciding the issue here, the Court also observes that Altimeo has arguably failed to plead that Mr. Chen was indeed "synonymous with Jumei's "management" and that he therefore provided Houlihan with the underlying assumptions for its financial analysis.  *See* First Opp'n at 14 (citing FAC ¶¶ 27, 38-40, 132).  Again, the complaints allege that "Houlihan relied entirely upon the assumptions provided by Jumei's management," including Jumei's financial projections for its Jiedian and non-Jiedian businesses.  *See* FAC ¶¶ 125, 127.  Altimeo also asserts that Mr. "Chen—as Jumei's CEO, CFO, and Chairman—is inseparable from the Company's management," and that any misleading statements among the assumptions are attributable to him. *See* First Opp'n at 3, FAC ¶ 246.  While this inference makes some intuitive sense given his many prominent roles in the company, the PSLRA requires plaintiffs to plead scienter with a high degree of particularity.  *See, e.g.*, *Endologix*, 962 F.3d at 413-15; *Prodanova*, 993 F.3d at 1109. As Altimeo admittedly cites no document or other evidence demonstrating that Mr. Chen himself provided Houlihan with financial projections or other contested assumptions for Houlihan's analysis, Hearing Tr. at 27-28, it is not clear that Altimeo's identification of Mr. Chen with Jumei's "management" in this context is warranted.

United States District Court
Northern District of California

were, in fact, possibly available in the merger transaction." *Id.* ¶ 281.

The Court agrees with Jumei that these allegations are wholly inadequate to pleading scienter under the "exacting" standards of the PSLRA. *See* Second Mot. at 3-4; *Endologix*, 962 F.3d at 414 (internal quotation omitted). As Jumei points out, Altimeo "identifies no case, statute, rule, or other Cayman legal authority that recognized appraisal rights . . . for a 'short-form' merger, at the Jumei made its statements"—a pleading deficiency that suggests that Jumei did not mislead its shareholders "intentionally or with deliberate recklessness." *See* Second Mot. at 8 (citing SAC ¶ 257); *Endologix*, 962 F.3d at 414. Jumei also observes (and Altimeo acknowledges) that Defendants provided the text of the relevant Cayman statute with their merger-related filings so that "[a]ny shareholder was free to read" the statute "and reach his or her own conclusion about the validity of Jumei's interpretation." *Id.* at 9 (citing SAC ¶¶ 252-53); *see also id.* at 11 ("Jumei never suggested that its statements were based on anything more than its own reading of [the statute]."). Additionally, the parties identify four instances in which Cayman companies explicitly addressed the availability, or lack thereof, of appraisal rights in short-form mergers: in three of these the company stated that appraisal rights were not available and in one of them the company reached the opposite conclusion.[20] *See* Second Mot. at 5 (citing Docket No. 72-2, Exs. 1-3), SAC ¶ 250. Taking these allegations together, the most "plausible inference is that the Individual Defendants believed their statements were correct and consistent with the plain language" of the relevant statute "and had no basis to think that, almost a full year later, a Cayman court would" interpret, apparently for the first time, the statute in a contrary fashion. *See* Second Mot. at 15. As a result, Altimeo's allegations regarding appraisal rights fail to adequately plead facts establishing strong inference of scienter.[21]

---

[20] Jumei has requested that the Court take judicial notice of the three exhibits it cites here. *See* Docket No. 73. As the documents are all SEC filings, their "accuracy cannot reasonably be questioned" and the Court takes judicial notice of them. *See* Fed. R. Evid. 201(b). Since the truth of their contents are obviously disputed, however, the Court declines to take notice of any factual inferences that may be contained therein. *See supra* Part IV.A.

[21] The SAC also alleges that Defendants made knowingly misleading statements in failing to advise shareholders of alternative remedies, such as petitioning a court to wind up the company, available to them under Cayman law. *See* SAC ¶¶ 254-57. The SAC acknowledges, however, that current Cayman law does not necessarily make these forms of relief available to minority

United States District Court
Northern District of California

United States District Court
Northern District of California

1   For the foregoing reasons, the Court finds that Altimeo has failed to adequately plead that

2   Jumei acted with scienter when it opined that Mr. Chen's tender offer was financially fair to

3   Jumei's minority shareholders.  As a result, the Court **GRANTS** Jumei's motion to dismiss

4   Altimeo's claims under Sections 10(b) and 20(a).

5   D.   Section 14(e) Negligence

6   As described above, the critical difference between Section 10(b) and Section 14(e) claims

7   in the Ninth Circuit is that the latter requires only a showing of negligence rather than scienter.

8   *Emulex I*, 888 F.3d at 401.  "[T]here is a legal debate regarding whether negligence can be a state

9   of mind, or is only culpable conduct that fails to meet a specified standard of care, in the context

10  of applying the PSLRA to [S]ection 14 claims."  *In re Ocera Therapeutics, Inc. Sec. Litig.*, 2018

11  WL 7019481, at *11 (N.D. Cal. Oct. 16, 2018); *see also* 15 U.S.C. § 78u-4(b)(2)(A) (requiring

12  that a securities-fraud complaint "state with particularity facts giving rise to a strong inference that

13  the defendant acted with the required state of mind").  At a minimum, however, "negligence in a

14  securities action" requires a showing that defendants failed to "exercise[] reasonable prudence in

15  their actions and inactions."  *See Varjabedian v. Emulex Corp.*, 2020 WL 1847708, at *10 (C.D.

16  Cal. Feb. 25, 2020) ("*Emulex II*") (citing *SEC v. Dain Rauscher, Inc.*, 254 F.3d 852, 856 (9th Cir.

17  2001)).

18  Here, Altimeo argues that "Defendants acted negligently by failing to 'exercise[]

19  reasonable prudence' in investigating the truth about Jiedian's availability of financing and its

20  growth prospects," as well as failing "to investigate whether Jumei's management actually

21  planned to wind down its e-commerce and Shubao businesses."  First Opp'n at 17 (quoting

22  *Emulex II*, 2020 WL 1847708, at *10).  Altimeo suggests that all Defendants were negligent

23  insofar as they each "'participat[ed] in the preparation and/or review' of the materially false and

24  misleading Buyout materials," and that negligence can be ascribed to Mr. Chen in particular

25  _____

26  shareholders.  *See id.* ¶¶ 255-56.  For the reasons given with respect to appraisal rights, therefore,
    these allegations do not raise a strong inference of Defendants' scienter.  Additionally, in its

27  second opposition Altimeo speculates that Jumei may have consulted with Cayman counsel on the
    availability of appraisal rights and knowingly disregarded the firm's legal advice.  *See* Second

28  Opp'n at 12-13.  As these allegations are not contained in the SAC, however, the Court declines to
    address them here.

1    because "he was the individual with the most access and control possible" concerning the buyout

2    materials.  *Id.* (quoting *Brown v. Brewer*, 2010 WL 2472182, at *25 (C.D. Cal. June 17, 2010)).

3            The Court considers the negligence question to be a close one and declines to definitively

4    rule on it here.  It notes, however, that Jumei raises two potentially persuasive arguments against a

5    finding of negligence.  First, Jumei contends that Altimeo's current complaints lack "specific facts

6    regarding how *each* Defendant was negligent in carrying out his or her duties."  First Mot. at 21

7    (emphasis in original) (bolding omitted).  Instead, Altimeo alleges only that "Defendants" as a

8    group "negligently made the false and misleading statements, and omitted [] material

9    information . . . from the Recommendation Statement."  *Id.* at 21-22 (quoting FAC ¶ 277).  Insofar

10   as the PSLRA's heightened requirements for pleading state of mind apply to Section 14(e) claims,

11   Altimeo's failure to identify the specific ways in which each Defendant was negligent likely

12   dooms these claims with respect to, for example, Messrs. Shao and Zhao.  *See In re Ocera*, 2018

13   WL 7019481, at *10 ("The PSLRA requires Plaintiffs to plead particular facts giving rise to a

14   strong inference that *each* Defendant acted with the required state of mind, not as a group.")

15   (emphasis in original); *but see Emulex II*, 2020 WL 1847708, at *10 (holding that "the PSLRA's

16   'strong inference' requirement does not apply" to Section 14(e) claims because negligence is not

17   properly a "state of mind").

18           Second, Jumei emphasizes the "thorough and robust" nature of the Special Committee's

19   review process and observes that Altimeo fails to cite any authority for the principle "that a board

20   acts negligently if it does not conduct a market check," which is a frequent refrain of the

21   complaints.  *See* First Reply at 12; *see also In re Ocera*, 2018 WL 7019481, at *10 (rejecting a

22   finding of negligence where plaintiffs failed to allege that "Defendants failed to review certain

23   materials . . . or designed or oversaw a flawed review process" in evaluating a tender offer).  Jumei

24   notes, for example, that the Special Committee met ten times, often with its financial and legal

25   advisors present, from late January to late February 2020 to discuss Mr. Chen's tender offer.  *See*

26   First Mot. at 7-8 (citing Faigen Decl., Ex. 6 at 9-11).  And it was only after considering Houlihan's

27   fairness opinion along with "more than 30 additional factors relating to the offer" that the Special

28   Committee "determined that the offer was fair to and in the best interests of Jumei, and

United States District Court
Northern District of California

1    recommended its approval to the Board." *Id.* at 8 (citing Faigen Decl., Ex. 6 at 12-16).  Thus, to

2    the extent that Altimeo fails to identify any deficiencies with the review process that Jumei

3    enacted in evaluating Mr. Chen's tender offer, it is difficult to see how Jumei could plausibly have

4    failed to "exercise[] reasonable prudence" or satisfy the relevant standard of care.  *See Emulex II*,

5    2020 WL 1847708, at *10.

6          While the Court need not rule, therefore, on the sufficiency of Altimeo's negligence

7    allegations at the present time, it notes the pleading difficulties that Altimeo will need to overcome

8    if it chooses to amend its complaint.[22]

9    E.    Loss Causation

10         Lastly, Jumei argues that Altimeo's claims under both Sections 10(b) and 14(e) must be

11   dismissed because the complaints fail to plead loss causation, *i.e.*, a "causal connection between

12   the deceptive acts that form the basis for the claim of securities fraud and the injury suffered."[23]

13   *See* First Mot. at 23-24 (quoting *Or. Pub. Emps. Ret. Fund v. Apollo Grp., Inc.*, 774 F.3d 598, 608

14   (9th Cir. 2014)).  The loss causation element of a securities fraud claim requires plaintiffs to

15   "prove both economic loss and proximate causation."  *In re Ocera*, 2018 WL 7019481, at *11; *see*

16   *also GAMCO Inv., Inc. v. Vivendi, S.A.*, 917 F. Supp. 2d 246, 251 (S.D.N.Y. 2013) (analogizing

17   the PSLRA's reliance and loss causation requirements "to but-for and proximate causation,

18   respectively").  Here, Jumei contends that Altimeo has not suffered any actual loss because it

19   received a roughly 15% premium on the price of Jumei stock immediately before Chen's tender

20   offer was extended.  First Mot. at 24; *see also* Faigen Decl., Ex. 3 at 13 (showing that Jumei's

21

22   ───────────────
     [22] The Court declines to address whether Altimeo's allegations concerning appraisal rights in the
23   SAC are sufficient to plead negligence under Rule 14(e).  It observes, however, that this issue
     presents a closer question than the scienter issue under Rule 10(b), which the Court discussed
24   above.

25   [23] In its first opposition, Altimeo argues that it need not plead loss causation (or reliance) to state a
     Section 14(e) claim.  First Opp'n at 17-18.  But "loss causation is an express element of any
26   Exchange Act claim under the PSLRA."  First Reply at 15; *see also* 15 U.S.C. § 78u-4(b)(4)
     (providing that securities-fraud plaintiffs must prove "that the act or omission of the defendant . . .
27   *caused the loss* for which the plaintiff seeks to recover damages") (emphasis added).  As such, the
     Ninth Circuit in *In re Ocera* expressly affirmed dismissal of a Section 14(e) claim on the grounds
28   that plaintiffs failed to plead loss causation.  *See* 806 Fed. Appx. at 604-05.  Altimeo is therefore
     required to plead loss causation under both Sections 10(b) and 14(e).

stock was trading at $1.74 per share at the time of Mr. Chen's tender offer of $2 per share). What Altimeo "is really claiming," therefore, "is that Jumei's stock *should* be valued at more than $2 per share, and if [that Altimeo] had been able to continue holding its stock, [Altimeo] would have eventually profited more than it did." *Id.* (emphasis in original) (bolding omitted). Jumei argues that this theory of loss causation is overly "speculative" as a matter of law and cannot survive a motion to dismiss. *Id.*

In making this argument, Jumei relies on the Ninth Circuit's unpublished opinion in *In re Ocera Therapeutics, Inc. Securities Litigation*, 806 F. App'x 603 (9th Cir. 2020). In that case, Ocera, a clinical-stage biopharmaceutical company, put itself up for sale throughout 2017. *In re Ocera*, 2018 WL 7019481, at *1-3. In May and June of that year, two companies expressed interest in acquiring Ocera and one made multiple offers of more than $50 million in upfront cash and more than $500 million in total potential cash consideration. *Id.* at *2. Ocera rejected the offers. *Id.* In August, while engaging in due diligence, the two potential buyers raised concerns about clinical results of Ocera's lead product candidate. *Id.* at *1-2. After one of the potential buyers dropped out of the bidding in October, the other submitted a best-and-final offer of $42 million in upfront cash and $75 million in contingent cash consideration; the offer translated to a valuation of $1.52 per share of Ocera stock. *Id.* at *3. In November, the Ocera Board concluded that the offer was fair to its shareholders, based in part on revised financial projections that were "prepared by the Company's management," and recommended that shareholders accept the offer. *Id.* Investors then filed a Section 14(e) claim, alleging that Ocera's merger-related statements were false and misleading. *Id.* at *4. In particular, they charged that the optimistic financial projections that led Ocera to reject one bidder's comparatively large offer in June "were the pure, unadulterated projections," and that the revised projections from November, which underlay Ocera's fairness opinion, were artificially reduced in order to facilitate the merger. *Id.* at *6. The district court dismissed plaintiffs' claims on various grounds, including loss causation.[24] *Id.* at

---

[24] In doing so, the court found that Ocera justifiably revised its financial projections downward from June to November in response to diminishing interest from potential buyers and negative feedback in the course of the buyers' due diligence. 2018 WL 7019481, at *7-8. The court also found that plaintiffs failed to "allege with sufficient particularity why the $1.52 per share upfront

*11.

On appeal, the Ninth Circuit affirmed the district court's dismissal on the sole ground of loss causation.  806 F. App'x at 604.  The court rejected plaintiffs' theory of economic loss, which they measured as "the difference between the price Ocera stockholders received and the true value of their shares at the time" of the merger, on the two factual bases that plaintiffs articulated.  *Id.* at 604-05.  First, the court noted that "[t]he primary factual allegation supporting the assertion of a higher 'true value'" for Ocera stock was the market analysts' estimate that the company was worth between $2.67 and $4.50 per share at the time of the tender offer, in contrast to the offer price of $1.52 per share in upfront cash and a potential, but contingent, price of $4.10 per share.  *Id.* at 605.  But "[t]he suggestion that the analysts' opinions of what the shares might be worth . . . represented the shares' true value," the Ninth Circuit held, "is too speculative to plead with particularity that shareholders experienced losses—or to plead with particularity that the required causal relationship existed between Ocera's purported misrepresentations or omissions and those losses."  *Id.*  This deficiency was especially problematic, the court noted, since "the actual market price of Ocera's shares on the date of . . . the merger agreements was only $1.00 per share."  *Id.*  "The only other allegations in the complaint on the issue of loss causation," the Ninth Circuit went on, were plaintiffs' suggestions that the June, rather than the November projections, "reflected the 'true value' of Ocera and that its shareholders would not have tendered their shares if they had known of the June Projections."  *Id.*  The court held that these allegations were likewise implausible since "numerous potential acquirers, including those that did due diligence on the company during the period around or after the June Projections, lost interest in acquiring Ocera," leaving only the ultimate buyer as a viable candidate.  *Id.*  The Ninth Circuit thus concluded that "suggestions that the undisclosed June Projections . . . represented the 'true value' of shares" at the time of the tender offer "and that reasonable shareholders if informed of the earlier projections would have recognized as much and held out for a hypothetical better offer than that received from the only

_____

offer price . . . was inadequate" to shareholders, given that it "represent[ed] a premium of approximately 52% to Ocera's closing price" at the time of the offer and that the "maximum potential offer price of $4.10," based on contingent considerations, fell within the stock's allegedly true value range (as estimated by market analysts) of $2.67 to $4.50 per share.  *See id.*

1    remaining bidder" were "speculative in the extreme" and could not survive a motion to dismiss.
2    *Id.*

3          Altimeo's loss causation allegations here are analogous to those that the Ninth Circuit

4    rejected in *Ocera*, and that its Section 10(b) and 14(e) claims must therefore be dismissed on this

5    basis.  Much as in *Ocera*, Altimeo's theory of loss is that Defendants' misleading statements

6    "prevented shareholders from making a fully informed decision about Chen's offer," that they

7    "'suffered economic loss (*i.e.*, damages) when they sold their [shares] for less than fair value' as a

8    result," and that the actual value of Jumei's shares "can be ascertained by applying management's

9    true information about Jiedian and Jumei's other businesses."  First Opp'n at 18 (quoting FAC

10   ¶¶ 233-36).  As an initial matter, though, Altimeo fails to explain with particularity how and why

11   Jumei's stock was undervalued at the time of Mr. Chen's tender offer.  Virtually all of the

12   information that Altimeo cites in support of Jumei's substantial value as a business was *public*,

13   including: Jiedian's leading position in the fast-growing power-bank industry; the $500 million

14   valuation accorded to one of its competitors around the time of the buyout; the profitability of

15   Jumei's e-commerce business in 2019; the significant sums that Jumei spent on Shuabao in the

16   same year; and Mr. Chen's stated intention not to wind down these businesses until 2021 and

17   2022.[25]  *See supra* Part II.C.  Under longstanding Supreme Court precedent, courts generally

18   presume that "the market price of shares traded on well-developed markets reflects all publicly

19   available," "material information."  *See Halliburton Co. v. Erica P. John Fund, Inc.,* 573 U.S.

20   258, 268 (2014).  Consequently, Altimeo must allege specific facts "explain[ing] why [Jumei's]

21   stock was trading well below $2 when, according to [Altimeo], its 'true value' was far higher."

22   First Mot. at 24.  Without such allegations, it is far from clear how Jumei's shareholders suffered

23   any loss from the buyout, especially since Mr. Chen's tender offer represented a roughly 15%

24

25   ────────────────
     [25] The only apparently nonpublic information that Altimeo relies on its complaints are the
26   statements from three confidential witnesses who allege that Jumei has discussed selling Jiedian to
     a competitor and that the e-commerce and Shuabao businesses remained operational as of mid-
27   2021.  *See* FAC ¶¶ 142, 195-96.  As the Court has explained, however, the allegations attributable
     to Altimeo's witnesses fails to satisfy the Ninth Circuit's pleading requirements.  The Court
28   therefore does not consider these allegations material to the price at which Jumei's stock was
     trading at the time of Mr. Chen's tender offer.

United States District Court
Northern District of California

premium over the contemporaneous value of Jumei's shares. *See Krieger v. Atheros Commc'ns, Inc.*, 2012 WL 1933559, at *7 (N.D. Cal. May 29, 2012) (holding that a plaintiff failed to plead loss causation where his allegations of loss were premised on publicly available information and attributable to "a relatively weak point" in a company's "business cycle," rather than its misleading statements).

As in *Ocera*, moreover, Altimeo's allegations about Jumei's "true value" are rendered speculative by the lack of competing offers that the company received before and after Mr. Chen made his tender offer. In view of the fact that "numerous potential acquirers . . . lost interest in acquiring" the company after performing due diligence, the Ninth Circuit in *Ocera* rejected plaintiffs' assertion that the company's actual value was substantially greater than its November financial projections reflected; plaintiffs' corollary allegation that Ocera's shareholders would have "held out for a hypothetical better offer" if they had known of the company's more optimistic June projections—made before several potential buyers dropped out of the bidding—was therefore "speculative in the extreme" and implausible as a matter of law. 806 F. App'x at 605. Here, Jumei points out that in 2019, according to Houlihan's publicly filed financial analysis, "the Company held discussions with five investment banks and contacted 26 potential investors . . . and was unsuccessful in finding third party financing to support [Jiedian] or position [Jiedian] for a stand alone listing." Faigen Decl., Ex. 5 at 7. Altimeo's foundational allegation that adequate financing was readily available for Jiedian at the time of the buyout (and that Jumei was therefore worth significantly more than Defendants represented) is thus vitiated by the market's evident lack of interest in Jiedian in the months preceding the buyout. Similarly, the Recommendation Statement notes that while the Special Committee chose not to "pursue an active market check" for the value of Jumei in response to the tender offer, the Committee determined to "remain open to any competing bids received or alternative transactions available" during the buyout process. *Id.*, Ex. 6 at 10. Neither party suggests, however, that any competing bids ever materialized despite public knowledge of the tender offer and the openness of Jumei to proposals. As in *Ocera*, then, the lack of potential acquirors other than Mr. Chen tends to undercut Altimeo's suggestion

United States District Court
Northern District of California

that Defendants' allegedly misleading statements led Jumei to be undervalued.[26]

Altimeo relies on cases including *In re Hot Topic, Inc. Securities Litigation*, 2014 WL 7499375 (C.D. Cal. May 2, 2014), and *Azar v. Blount International, Inc.*, 2017 WL 1055966 (D. Or. Mar. 20, 2017), for the proposition that "affirmations of a buyout's fairness are actionable when they are based on artificially deflated projections and incorrect assumptions." *See* First Opp'n at 11. As Jumei accurately summarizes those cases, however, they involve situations where "the defendants created an initial set of projections, and then quickly issued a second set of projections that downwardly revised the company's forecast." First Reply at 3. "In each case, the plaintiff alleged particularized facts showing that the individual defendants (i) knew about both sets of projections; (ii) knew the initial projections were more accurate; and (iii) were motivated to use the revised, less accurate projections for their own benefit." *Id.*; *see also Hot Topic*, 2014 WL 7499375, at *2-6; *Blount*, 2017 WL 1055966, at *2-5. The instant case is therefore distinguishable because Altimeo, *inter alia*, "does not allege there were two sets of projections, or that any Defendant acting on Jumei's behalf stood to gain from the buyout in a way different than other shareholders." *See* First Reply at 4. *Hot Topic* and *Blount* are less analogous to the facts alleged in the instant case than *Ocera*, which concluded that plaintiffs' theory of loss causation was not only unavailing but "speculative in the extreme." *See* 806 F. App'x at 605. As a result, Altimeo's allegations of loss causation relating to Jiedian and Jumei's non-Jiedian businesses do not satisfy the heightened pleading standards of the PSLRA.

Finally, the Court finds that Altimeo's claims based on the Jumei's statements concerning appraisal rights under Cayman law also fail on the ground of loss causation, as these claims are

---

[26] At the motion hearing, Altimeo argued that *Ocera* was "cabined to its facts" and so minimally relevant to the instant case. Hearing Tr. at 31. But, as the Court noted, the allegations in *Ocera* were stronger than those here insofar as plaintiffs in that case could at least point to analyst valuations of Ocera stock in arguing that the company was undervalued. *See* 806 F. App'x at 605. In response, Altimeo suggested that Energy Monster's valuation at $500 million approximately one month before Mr. Chen submitted his tender offer established that Jiedian's $150 million valuation was unreasonably low. *See id.* at 31-32. But, in addition to failing to allege how this disparity might be accurately reflected in *Jumei's* share price at the time of the offer, Altimeo does not explain how the comparison with Energy Monster provides a more telling valuation for Jiedian and Jumei than potential buyers' apparent lack of interest in those very companies before and during the buyout process.

considerably more attenuated than those in the FAC.  In Altimeo's view, Jumei's assertions that shareholders lack appraisal rights in short-form mergers proximately resulted in economic loss because shareholders' "knowledge of the arguable existence of appraisal rights for shares that are undervalued in a merger transaction creates buying opportunities for arbitrageurs, causing the market price of the stock to rise" and giving shareholders the option of pursuing appraisal or selling their shares to said arbitrageurs at enhanced prices.  Second Opp'n at 16.  Altimeo contends that "there is nothing speculative" about this chain of effects, which it believes represents "likely action by shareholders."  *Id.* at 17 (internal quotation omitted).  But, as Jumei puts it, Altimeo's "theory requires [several] inferential steps to arrive at any potential loss."  *See* Second Reply at 9-10.  According to that theory, an alternative statement by Jumei that appraisal rights may *possibly* have been available to Jumei's minority shareholders in early 2020 would have led arbitrageurs to acquire Jumei's stock, which would in turn have forced the share price above Mr. Chen's offer price and forced him to increase his bid for the company.  *See id.*  But given the Ninth Circuit's decisive rejected of the far more straightforward loss causation theory in *Ocera*, the highly contingent series of events that Altimeo posits here cannot suffice to plead loss causation.

The Court therefore **GRANTS** Jumei's motion to dismiss Altimeo's claims under Sections 10(b) and 14(e) on the ground that Altimeo's complaints fail to plead loss causation.  As Altimeo's Section 10(b) and 14(e) claims must be dismissed, the Court likewise dismisses Altimeo's derivative Section 20(a) claim, as well.

///

///

///

///

///

///

///

///

///

43

## V. <u>CONCLUSION</u>

For the reasons given above, the Court **GRANTS** Jumei's motions to dismiss Altimeo's Amended Class Action Complaint, *see* First Mot., and Altimeo's Second Amended Class Action Complaint, *see* Second Mot. As the Court cannot conclude that amendment would be futile at this stage, Altimeo is given leave to amend. *See Foman*, 371 U.S. at 182. Altimeo has thirty (30) days from the date of this order to file an amended complaint.

This order disposes of Docket Nos. 58 and 72.


**IT IS SO ORDERED**.


Dated: September 14, 2021

_____
EDWARD M. CHEN
United States District Judge